

WEINTRAUB LAW GROUP, PC
Richard A. Weintraub, Esq., SBN 82882
Kathryn J. Harvey, Esq., SBN 241029
10085 Carroll Canyon Road, Suite 230
San Diego, California 92131
Telephone (858) 566-7010
Facsimile (858) 566-7015

Attorneys for PLAINTIFFS

UNITED STATES DISTRICT COURT

FOR THE ~~CENTRAL~~ southern S.A. DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

'10 CV 1 51 4   W      WMc

| | |
|---|---|
| ROBERT ADAMS; KATHERINE ALTIERI; THOMAS DURBIN; JASON LI; CAROL PACHECO; LELAND WARNER; individuals; and HONEY BEE MEADOW, LP, a Utah Limited Partnership;<br><br>PLAINTIFFS,<br><br>vs.<br><br>LANDWIN PARTNERS FUND II, LLC, a Delaware Limited Liability Company; LANDWIN MANAGEMENT, LLC, a Delaware Limited Liability Company; SMITHDENNISON CAPITAL, LLC, a California Limited Liability Company; SEAN C. DENNISON, an individual; SYLVIA, INC., a California Corporation; MARTIN LANDIS, an individual; TOM CASAULT, an individual; CHRIS PARNASS, an individual; and DOES 1 through 50; inclusive,<br><br>Defendants. | Case No.: ~~27 2010 00033001 CU PO NC~~<br><br>**COMPLAINT FOR VIOLATION OF STATE AND FEDERAL SECURITIES LAWS:**<br><br>1. **VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 [§10B-5]**<br>2. **CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT [§20(a)]**<br>3. **VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAWS [§25401, §25501]**<br>4. **CONTROL PERSON LIABILITY UNDER CALIFORNIA CORPORATIONS CODE [§25504]**<br>5. **FRAUD**<br>6. **CONSPIRACY TO COMMIT FRAUD**<br>7. **NEGLIGENT MISREPRESENTATION**<br>8. **DAMAGES RESULTING FROM THE SALE OF SECURITIES IN VIOLATION OF CALIFORNIA CORPORATIONS CODE §25501.5**<br>9. **RESCISSION** |

PLAINTIFFS, ROBERT ADAMS, KATHERINE ALTIERI, THOMAS DURBIN,

JASON LI, CAROL PACHECO, LELAND WARNER; HONEY BEE MEADOW, LP,

(hereinafter collectively referred to as "PLAINTIFFS") allege against Defendants LANDWIN

PARTNERS FUND II, LLC ("FUND II"), LANDWIN MANAGEMENT, LLC

-1-

CR

("MANAGEMENT") (hereinafter, FUND II and MANAGEMENT shall be collectively referred to as "LANDWIN"), SMITHDENNISON CAPITAL, LLC ("SMITHDENNISON"), SEAN C. DENNISON ("DENNISON"), SYLVIA, INC. ("SYLVIA"), MARTIN LANDIS ("LANDIS"), TOM CASAULT ("CASAULT"), CHRIS PARNASS ("PARNASS") and DOES 1-50, inclusive, (collectively referred to as "DEFENDANTS") as follows:

## JURISDICTION AND VENUE

1.      Jurisdiction of the court is proper and exclusive under 28 U.S.C. §1331, The Securities Exchange Act of 1934, and under the Securities Act of 1933. Jurisdiction is proper as to the First and Second Causes of Action, pursuant to 28 U.S.C. §1367, in that these causes of action are transactionally related and factually interdependent with the claims for which jurisdiction is afforded under 28 U.S.C. §1331.

2.      Venue is proper in this District pursuant to 15 U.S.C. §78AA because pursuant to The Securities Exchange Act of 1934 and pursuant to 15 U.S.C. §77v of the Securities Act of 1933, venue is proper in any district where the transaction(s) occurred, and some of the transactions alleged herein occurred within this District.

## THE PARTIES

3.      PLAINTIFFS, at all times relevant herein, were residents of the State of California who purchased one half (1/2) or more Limited Liability Company Units, at a value of $50,000.00, offered by Landwin Partners Fund II, LLC in a Private Placement Memorandum dated July 1, 2007 (hereinafter "Units").

4.      Plaintiff Robert Adams is, and at all times relevant herein was, an individual residing in the City of Escondido, County of San Diego, California.

5.      Plaintiff Katherine Altieri is, and at all times relevant herein was, an individual residing in the City of Glendale, County of Los Angeles, California.

6.      Plaintiff Thomas Durbin is, and at all times relevant herein was, an individual residing in the City of Riverside, County of Riverside, California.

7.      Plaintiff Jason Li is, and at all times relevant herein was, an individual residing in the City of Northridge, County of Los Angeles, California.

-2-

COMPLAINT

8.   Plaintiff Carol Pacheco is, and at all times relevant herein was, an individual residing in the City of Seal Beach, County of Orange, California.

9.   Plaintiff Honey Bee Meadow, LP is a Utah limited partnership whose principal place of business is in the City of Albion, County of Mendocino, California.

10.   Plaintiff Leland Warner is, and at all times relevant herein was, an individual residing in the City of Ontario, County of San Bernardino, California.

11.   PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Landwin Partners Fund II, LLC, is a Delaware Limited Liability Company doing business throughout the State of California, with its principle place of business at 1340 E Route 66, Suite 205, Glendora, California, 91740.

12.   PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Landwin Management, LLC is a Delaware Limited Liability Company doing business throughout the State of California, with its principle place of business at 17200 Ventura Boulevard, Suite 206, Encino, California, 91361.   MANAGEMENT is the business manager, investment manager, asset manager and property manager of FUND II.

13.   PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant SmithDennison Capital, LLC is a California Limited Liability Company with its principle place of business at 630 Mission Street, Suite C, South Pasadena, California, 91030.   SMITHDENNISON is one of the Sponsors for FUND II and is a managing member of MANAGEMENT.

14.   PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Sean C. Dennison is an individual doing business throughout the State of California.   DENNISON is the CEO of SMITHDENNISON and a manager and the President of MANAGEMENT.   Additionally, DENNISON is an executive officer of FUND II and solicited individuals to invest in FUND II, for which DENNISON received a direct or indirect transaction based fee.   DENNISON is not certified as a securities broker dealer within the State of California.

///

-3-

15.     PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Sylvia, Inc. is a California Corporation with its principle place of business at 17200 Ventura Blvd., Suite 206, Encino, California, 91316.  SYLVIA is one of the Sponsors for FUND II and is a managing member of MANAGEMENT.

16.     PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Martin Landis is an individual doing business throughout the State of California.   LANDIS is the President of SYLVIA and the CEO and a manager of MANAGEMENT.   Additionally, LANDIS is an executive officer of FUND II and solicited individuals to invest in FUND II, for which he received a direct or indirect transaction based fee. LANDIS is not certified as a securities broker dealer within the State of California.

17.     PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Tom Casault is an individual doing business throughout the State of California.  CASAULT is an executive officer of FUND II and solicited individuals to invest in FUND II, for which he received a direct or indirect transaction based fee.  CASAULT is not certified as a securities broker dealer within the State of California.

18.     PLAINTIFFS are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Chris Parnass is an individual doing business throughout the State of California.  PARNASS is an executive officer of FUND II and solicited individuals to invest in FUND II, for which he received a direct or indirect transaction based fee.  PARNASS is not certified as a securities broker dealer within the State of California.

19.     PLAINTIFFS are informed and believe, and thereon allege, that FUND II, MANAGEMENT, SMITHDENNISON, DENNISON, SYLVIA, LANDIS, CASAULT, PARNASS and Does 1 through 50, inclusive, are, and at all times mentioned herein were, the alter-ego of each other, in that there now exists, and at all times mentioned herein there existed, such unity of interest in ownership between these DEFENDANTS, and each of them, such that any individuality and separateness has ceased in that each of the DEFENDANTS is, and at all times mentioned herein was, a mere shell, instrumentality and conduit through which each of the other DEFENDANTS carry on their business in the corporate name, exercising such control and

-4-

dominance of each of the other DEFENDANTS to such an extent that any individuality or separateness of a defendant did not and does not exist. Any further adherence to the fiction of a separate existence of these several DEFENDANTS as entities distinct from each of the other DEFENDANTS would permit an abuse of the corporate privilege and would sanction fraud on PLAINTIFFS. PLAINTIFFS are further informed and believe that said DEFENDANTS managed and operated the corporate and affiliate entities and intermingled the assets of each to suit their convenience by placing and conveying assets fraudulently among the DEFENDANTS in order to evade payment of obligations and to render one or more of the other DEFENDANTS insolvent and unable to meet their obligations to PLAINTIFFS.

20.    PLAINTIFFS do not now know the true names and capacities of the DEFENDANTS sued as Does 1 through 50, inclusive, and therefore sue those DEFENDANTS by these fictitious names. Plaintiff will amend this Complaint to allege these DEFENDANTS' true names and capacities when the same have been ascertained.

21.    Does 1 through 50, inclusive, have acted or failed to act in concert with each of the other DEFENDANTS as alleged in this Complaint and are responsible in some manner for the injuries suffered by Plaintiff. At all times relevant to this action, DEFENDANTS sued herein as Does 1 through 50, inclusive, were the agents of each of the other DEFENDANTS, and in doing the acts and things alleged in this Complaint, those DEFENDANTS were acting within the course and scope of that agency and with the permission and consent of each of the other DEFENDANTS.

## INTRODUCTION

22.    Beginning in or about June 2007, DEFENDANTS solicited PLAINTIFFS to invest in FUND II. PLAINTIFFS, and each of them, invested in FUND II in amounts typically ranging from $25,000.00 to $150,000.00 per investor.

23.    Unbeknownst to PLAINTIFFS, DEFENDANTS had used false information regarding, among other things, the experience of DENNISON and the investment return track record of Landwin. As a result of DEFENDANTS' improper and fraudulent representations, the value of PLAINTIFFS' investments in FUND II have fallen substantially. PLAINTIFFS

-5-

1  are therefore entitled to rescission and/or damages for DEFENDANTS' fraud.

2      24.    Further, once FUND II received PLAINTIFFS' money, DEFENDANTS, who

3  were not registered broker-dealers in California, paid themselves direct or indirect transaction

4  fees for effectuating transactions in securities in violation of California law, thus entitling

5  PLAINTIFFS to rescission, treble damages and attorneys fees.

6                       **STATEMENT OF RELEVANT FACTS**

7      25.    FUND II was formed on May 25, 2007, by DENNISON, LANDIS and its

8  sponsors, SYLVIA AND SMITHDENNISON.   At the time of its formation, LANDIS was the

9  CEO and DENNISON was the President and COO of FUND II.   Additionally, FUND II's asset

10  manager and property manager was MANAGEMENT.   At the time of its formation, CASAULT

11  and PARNASS were officers of FUND II.

12      26.    LANDWIN GROUP formed FUND II as a "blind pool" investment opportunity,

13  meaning it was formed as an entity used to invest in unidentified real estate properties.

14      27.    On July 1, 2007, FUND II commenced a private placement offering ("FUND II

15  PPM") of limited liability company membership units pursuant to an exemption from registration

16  requirements under Rule 506 of Regulation D promulgated pursuant to Section 4(2) of the

17  Securities Act of 1933, as amended.   A true and correct copy of the FUND II PPM is attached

18  hereto as Exhibit "A."   The FUND II PPM provided for a minimum offering of $5,000,000.00

19  and a maximum offering of $20,000,000.00 at a typical investment price of $50,000.00 per Unit.

20                        **Solicitation of Investors**

21      28.    Beginning in or about June 2007, DEFENDANTS began recruiting investors to

22  invest in FUND II.

23      29.    DEFENDANTS solicited PLAINTIFFS by way of direct verbal communications,

24  emails, flyers, and other written materials provided to PLAINTIFFS who attended "seminars"

25  hosted by the Marshall Reddick Network ("Reddick").   At the seminars hosted by Reddick, a

26  Reddick representative would introduce a member of FUND II (either DENNISON, LANDIS,

27  CASAULT OR PARNASS) to promote the investment.   The "seminars" were held weekly from

28  the last week of June 2007 until the close of the FUND II offering.

COMPLAINT

30.   Beginning in or about June 2007, DEFENDANTS, including DENNISON, LANDIS, CASAULT and PARNASS, began contacting PLAINTIFFS via telephone and/or email and soliciting them to invest in FUND II.

31.   DEFENDANTS would contact potential investors, including PLAINTIFFS, via email and invite them to attend seminars regarding potential investment opportunities.   All of the investment "seminars" were held in California.   Further, more than 90% of investors solicited by DEFENDANTS were located in California.

32.   In   their   email   soliciting   PLAINTIFFS   to   attend   their   "seminars" DEFENDANTS encouraged PLAINTIFFS to invest in FUND II immediately.

33.   The   emails   also   instructed   PLAINTIFFS   to   send   payments   directly   to LANDWIN,   and   provided   PLAINTIFFS   with   a   "NEXT   STEP   CHECKLIST   FOR INVESTING THROUGH A SELF-DIRECTED IRA/401k".

34.   To   further   facilitate   investments,   DEFENDANTS   encouraged   potential investors, including PLAINTIFFS, to contact Landwin directly to invest, and provided PLAINTIFFS   with   a   toll-free   phone   number   to   facilitate   the   ease   of   contacting DEFENDANTS.

35.   DEFENDANTS'   emails   further   "invited"   potential   investors,   including PLAINTIFFS,   to   call   or   email   LANDWIN   directly   to   discuss   their   investment. DEFENDANTS advised PLAINTIFFS that by calling LANDWIN they could, "*also get help with unlocking underperforming assets, such as equity-in-properties, or cash in IRAs and 401Ks.*"

36.   In addition to soliciting via email, DEFENDANTS also used their purported "seminars"   to   solicit   PLAINTIFFS   to   invest   various   LANDWIN   opportunities,   including FUND II.

37.   While attending the "seminars," PLAINTIFFS were offered "instruction" by DENNISON,   LANDIS,   CASAULT   and/or   PARNASS   regarding   various   LANDWIN investment opportunities, including FUND II.   DEFENDANTS presented PLAINTIFFS with information   regarding   the   FUND   II   investment,   and   offered   their   opinions   regarding

-7-

LANDWIN's track record and viability as an investment. DEFENDANTS then presented PLAINTIFFS with detailed information regarding the investment opportunities with FUND II, including the financial obligations and returns on the investment.

38.     DEFENDANTS further prepared a PowerPoint presentation regarding the various LANDWIN Investments, including FUND II, which was presented in person at the seminar.

39.     DEFENDANTS, including DENNISON, LANDIS, CASAULT, PARNASS and/or other FUND II representatives showed a PowerPoint presentation at their "seminars" which promoted the FUND II investment.

40.     DENNISON, LANDIS, CASAULT, PARNASS and FUND II represented to potential investors, including PLAINTIFFS, through their verbal contacts, direct emails and their PowerPoint presentations at their various "seminars," in part, that no investor had every lost money throughout LANDWIN's 21-year track record and that LANDWIN's returns far exceed 30% per year.

41.     After each "seminar" PLAINTIFFS were further solicited via follow up emails from DEFENDANTS to PLAINTIFFS in California. These follow up emails further instructed PLAINTIFFS to contact either the individuals and/or LANDWIN directly regarding investing.

42.     DEFENDANTS advised PLAINTIFFS on how much to invest in FUND II, and how to use their self-directed retirement accounts to invest in the project.

43.     As a result of DEFENDANTS solicitation and representations, PLAINTIFFS, and each of them, invested in FUND II.

44.     Throughout the term of the investment in FUND II, DEFENDANTS remained PLAINTIFFS' primary contacts regarding the FUND II investment.

45.     Once PLAINTIFFS investment in FUND II was secured, DEFENDANTS received a direct or indirect transaction based fees.

46.     As a result of DEFENDANTS solicitation and actions as unlicensed broker dealers, PLAINTIFFS invested a total of $525,000.00 in FUND II from approximately July 2007 through April 2008.

-8-

COMPLAINT

47.     Unfortunately, after collectively investing $525,000.00 in FUND II, PLAINTIFFS investment(s) are now valued at a significant discount, as described further below.

48.     PLAINTIFFS only learned that DEFENDANTS had been acting as unlicensed broker dealers sometime around approximately March 2010 through July 2010.

49.     On April 4, 2008, FUND II consummated the close of the offering, by accepting and executing subscription agreements from investors investing an aggregate of $3,050,000.00, and distributed these funds from their escrow account.

### Payment of Formation Fee

50.     Pursuant to FUND II's "Formation Fee Agreement," dated May 25, 2007, states, "In exchange for providing the Formation Services, [FUND II] shall pay to each of the Sponsors [i.e., SYLVIA and SMITHDENNISON] a fee...of $661,000.00."   Pursuant to FUND II's Supplement No. 1 to FUND II's PPM, this "formation fee" was reduced to $99,000.00 payable to each of the Sponsors (i.e., SMITHDENNISON and SYLVIA).  Thus, DEFENDANTS were to receive a total of $198,000.00 in "formation fees."  According to the FUND II PPM, these "formation services" include, "work related to the Funds formation and organization, including the hiring and, until the Initial Closing, managing, of lawyers, accountants, and the Manager [themselves]; the drafting of this Memorandum, and; the development of the Fund's business plan."  However, the FUND II PPM further states, "their formational and organizational work *does not include participating in the offering, marketing or sales of any securities*." (Emphasis added.)

51.     In truth, because DEFENDANTS solicited investors to invest in FUND II as discussed in greater detail in the preceding paragraphs, DEFENDANTS "formation fee" was a direct or indirect transaction based fee to DEFENDANTS.

52.     Further, DEFENDANTS knew that the "formation fee" could and/or would be considered a transaction based fee at the time they drafted the FUND II PPM, and failed to disclose the risk of such classification to potential investors, including PLAINTIFFS. DEFENDANTS were aware of this risk because DEFENDANTS were previously involved in an

investment opportunity with substantially similar facts, wherein they were advised that, in order to avoid registration as a broker dealer under Section 15(a) of the 1934 Act, DEFENDANTS were not to make sales presentations and were not to participate in the sale of securities in any way while also accepting a "formation fee," as follows:

    a.   In or about November 2005, SMITHDENNISON, SYLVIA, DENNISON and LANDIS were involved in the formation of Landwin REIT, Inc., a Maryland Corporation ("REIT"), which was also formed as an entity meant to fund real estate investments.

    b.   In connection with the formation of REIT, SMITHDENNISON and SYLVIA were each to receive a $1,250,000.00 "closing fee." However, when the Securities Exchange Commission learned of the proposed "closing fee," they requested additional information regarding the services to be performed in consideration for the "closing fee" and inquired as to why DEFENDANTS should not be required to register as broker dealers.

    c.   In an attempt to circumvent the necessity to register as broker dealers, REIT changed the definition of the "closing fee" to be paid to SMITHDENNISON and SYLVIA to a "formation fee," and assured the Securities Exchange Commission that these formation fees would not relate to the activities of DENNISON and LANDIS in the sale of REIT's securities.

    d.   In response to this change, the Securities Exchange Commission again wrote to REIT and reiterated that, "neither Mr. DENNISON nor Mr. LANDIS would be speakers at the residential real estate classes they teach for the members of their database." Thus, the Securities Exchange Commission made it clear that, to avoid registration as broker dealers under Section 15(a) of the 1934 Act, DEFENDANTS were not to make sales presentations at meetings of database members and were not to participate in the sale of the securities of the REIT in any way.

53.    As a result of their participation in the REIT offering, DEFENDANTS knew it

1    was risky for any company associated with SMITHDENNISON, DENNISON, SYLVIA and/or

2    LANDIS to pay a "formation fee" to those DEFENDANTS while allowing DENNISON and

3    LANDIS to solicit investors.

4        54.    Despite this knowledge, DEFENDANTS agreed to pay SYLVIA and

5    SMITHDENNISON a $99,000.00 "formation fee" each.

6        55.    Further, despite their representation that "their formational and organizational

7    work *does not include participating in the offering, marketing or sales of any securities*,"

8    DEFENDANTS knew this was not true.  In fact, DENNISON and LANDIS, who were both

9    members and officers in SMITHDENNISON and SYLVIA respectively, were soliciting

10   investors to invest in FUND II, as discussed in greater detail above.

11       56.    DEFENDANTS knew that by paying SMITHDENNISON and SYLVIA a total

12   $198,000.00 "formation fee" while allowing DENNISON and LANDIS to solicit investors for

13   FUND II they were subjecting FUND II, and thus all investors therein, including PLAINTIFFS,

14   to potential risk.  This included the risk that the Securities Exchange Commission would

15   investigate and take enforcement action against FUND II.  Such enforcement action could result

16   in a cease and desist letter to FUND II and/or the remaining DEFENDANTS, which could result

17   in all of PLAINTIFFS funds being "frozen."  DEFENDANTS were also risking being sanctioned

18   criminally and/or civilly for their unlawful behavior, which would necessarily have an adverse

19   effect on PLAINTIFFS' investments.

20       57.    Despite knowing these risks, DEFENDANTS allowed DENNISON and LANDIS

21   to solicit investors while paying SMITHDENNISON and SYLVIA the total $198,000.00

22   "formation fee" in connection with the FUND II offering, and failed to inform PLAINTIFFS of

23   these substantial known risks.

### Prior Performance Narrative and Tables

25       58.    Throughout their solicitation of potential investors, including PLAINTIFFS,

26   DEFENDANTS represented that, "*IN 21 YEARS, NO INVESTOR HAS EVER LOST MONEY IN*

27   *ANY LANDWIN INVESTMENT and LANDWIN's OVERALL RETURNS FAR EXCEED 30%*

28   *PER YEAR.*"

-11-

59.     Because FUND II was a "blind pool" offering, the investor documents did not contain sufficient information about the investment objectives (i.e., company history and/or identified properties) in order to allow the potential investors to make an informed decision regarding the value of the investment and its potential return.  Consequently, potential investors, including PLAINTIFFS had to rely on other relevant information material to the investment including information regarding the prior performance of the sponsor, manager and principals of the company.   In that regard, DEFENDANTS should have provided PLAINTIFFS with documentation supporting their assertions that they were experienced investors and had a purported track record of obtaining 30% returns.

60.     The FUND II offering document did not provide any supporting documentation, such as financial or investment data concerning the specific real estate investments, to substantiate DEFENDANTS' purported track record of obtaining returns in excess of 30% per annum.

61.     DEFENDANTS failure to provide such information is particularly telling, because DEFENDANTS had such information readily available.   Prior to engaging in the offering for FUND II, DEFENDANTS were involved in sponsoring the REIT offering, for which they were required to prepare a "Prior Performance of the General Partners and Affiliates" which included a summary of the "track record" of the LANDWIN and Prior Performance Tables.

62.     DEFENDANTS failed to include any of this prior performance information in the FUND II PPM.  DEFENDANTS failed to provide this information because it showed that their track record was for obtaining a return substantially less than the 30% return they were claiming they had previously obtained.

63.     Not only did DEFENDANTS fail to include their already prepared prior performance tables in the FUND II PPM, thus concealing the fact that their track record depicted significantly less than a 30% return, but the information that was provided included incomplete and fraudulent information, as indicated below.

///

///

-12-

COMPLAINT

**Failure to Disclose Landwin Management, LLC's Investment History**

64.     As discussed above, MANAGEMENT is the business manager, investment manager, asset manager and property manager for FUND II.  To induce PLAINTIFFS to invest in FUND II's blind offering, DEFENDANTS included a summary of MANAGEMENT's experience and track record as an investment manager.  This was meant to induce PLAINTIFFS into believing that MANAGEMENT was a successful investment entity and manager, thus encouraging PLAINTIFFS to invest in FUND II.

65.     Much like FUND II, MANAGEMENT was created as an entity used to invest in real estate on behalf of multiple investors.

66.     The initial close of the vast majority of investments in MANAGEMENT occurred on June 2, 2005.  The final close for the remainder of money invested in MANAGEMENT occurred in or about August 2005.  The MANAGEMENT investment offering closed with $13,800,000.00, which was to be used for investment in real estate offerings.

67.     Through MANAGEMENT, DEFENDANTS accepted $13,800,000.00 from investors and failed to acquire a single piece of real estate for more than two (2) years, from the date of the closing of MANAGEMENT, through the closing of FUND II.

68.     In the FUND II PPM, dated July 1, 2007, DEFENDANTS failed to disclose that FUND II's "business manager, investment manager, asset manager and property manager" MANAGEMENT, which had been in possession of investment funds for nearly two (2) years, had failed to purchase a single piece of real estate.

69.     At the final close of FUND II, on April 4, 2008, FUND II's "asset manager" still had failed to invest in a single parcel of real estate.

70.     Again, since the FUND II offering was a "blind pool" offering, PLAINTIFFS relied on DEFENDANTS' full and complete disclosure regarding the principles involved in running FUND II.  In that regard, DEFENDANTS should have informed PLAINTIFFS that MANAGEMENT, which was created for investment purposes nearly identical to that of FUND II, and which was run by the same individuals running FUND II, had failed to invest in a single parcel of real estate for over two (2) years.

71.   Further, because SMITHDENNISON, DENNISON, SYLVIA and LANDIS were the managers of both MANAGEMENT and FUND II, they should have disclosed to PLAINTIFFS their investment history with MANAGEMENT (i.e., that they failed to purchase a single parcel of investment property on behalf of MANAGEMENT). They failed to disclose any such information.

### Misrepresentations and Omissions Regarding Dennison's Experience

72.   Because FUND II was a "blind pool" offering, PLAINTIFFS had little information to rely on in determining the value and risk associated with their FUND II investment. As a "blind pool," no real property was designated for acquisition in the FUND II PPM. Therefore, PLAINTIFFS could not evaluate the real property to be acquired and had to rely solely on the representations made by the DEFENDANTS, including oral representations and the information contained in the offering documents, including the PPM, regarding DEFENDANTS' purported experience and reputation in making an informed decision regarding the value of the investment.

73.   In FUND II's PPM, dated July 1, DEFENDANTS stated the following regarding DENNISON's experience and reputation:

> Seán Dennison, is a proven chief executive of private companies and President and Chief Financial Officer of a public company, with a 26 year business career beginning in a family real estate development and construction business, and coming full circle into real estate investment advisory, development and management. After working many years in the contracting business and earning a B.A. degree from C.U.N.Y., Queens, NY, Mr. Dennison co-founded in 1990, Mission Viejo, CA-based software company, Synchronized Data Systems, Inc., which later merged into Salt Lake City, UT-based, X10sion, Inc., before being acquired in 1997 by Boston, MA-based, Keane, Inc., a multi-billion dollar, publicly traded software company (KEA-AMEX). Following this, Mr. Dennison established [SMITHDENNISON's] business as a successful consulting practice with clients ranging from Fortune 500 corporations to start-up ventures. Services included equity capital funding, corporate finance and development, marketing and operations management consulting. Projects comprised over $250 million in transactions. In addition, beginning in 1995, [SMITHDENNISON] began to invest in real estate and form and manage capital for real estate investment opportunities, leveraging a growing network of relationships with individual and institutional investors. Early success led [SMITHDENNISON] to focus exclusively on commercial real estate in 2000, which in 2002 led to SDC's

-14-

COMPLAINT

*partnership with Sylvia, Inc., which, in turn, led to the joint formation and
management of The Landwin Group, LLC; Landwin Management, LLC; Landwin
Partners Fund I, LLC; Landwin Advisors, LLC; Landwin REIT, Inc., and
Landwin Partners Fund II, LLC. ...Mr. Dennison has held Registered Investment
Advisor and other financial services licenses earned while at Merrill Lynch and
Morgan Stanley...*

74.     However, DENNISON's biography in FUND II's PPM contains several misstatements and inaccuracies and differs from statements previously made by DENNISON regarding his experience in various other disclosures and filings, some of which were under the penalty of perjury.

75.     DEFENDANTS represented in FUND II's PPM that DENNISON's business, SMITHDENNISON, was established in 1995.  This is untrue.  In fact, SMITHDENNISON was not established until June 4, 2003, when it was registered with the California Secretary of State.

76.     DEFENDANTS further represented in FUND II's PPM, "*beginning in 1995, [SMITHDENNISON] began to invest in real estate and form and manage capital for real estate investment opportunities, leveraging a growing network of relationships with individual and institutional investors.   Early success led [SMITHDENNISON] to focus exclusively on commercial real estate in 2000, which in 2002 led to [SMITHDENNISON's] partnership with Sylvia, Inc...*"  Again, this representation is fraudulent and untrue, since SMITHDENNISON was not even formed until 2003.  DEFENDANTS' representation that SMITHDENNISON was investing in real estate beginning in 1995 is therefore a material misrepresentation.

77.     To further confuse the issue, DEFENDANTS stated in the PPM for MANAGEMENT that DENNISON was the President of SMITHDENNISON from October 2002 to the date of the PPM, February 1, 2005.  This contradicts the statements made in FUND II's PPM that Smith DENNISON was established in 1995 and contradicts the true facts of the situation, that SMITHDENNISON was not formed until June 2003.

78.     DEFENDANTS' misrepresentations regarding the formation and business of DENNISON's company, SMITHDENNISON did not end there.  In the initial disclosure for REIT, dated November 7, 2005, DEFENDANTS state that "Sean Dennison has been the Chief Executive Officer of SmithDennison Capital, LLC...from 2002 to the present."  Approximately

-15-

five (5) months later, in April 2006, when DEFENDANTS issued REIT's final disclosure, DEFENDANTS modified their representation to state that, "Sean Dennison has served as Chief Executive Officer of SmithDennison, LLC (SDC), from its formation in June 2003 to the present."

79.     Given the broad range of dates attributable to SMITHDENNISON's investment history, it is clear that DEFENDANTS had trouble keeping up with their own fraudulent representations.   In any event, DEFENDANTS' statement in the FUND II PPM, which PLAINTIFFS relied on when determining whether to invest in FUND II, contained incorrect and fraudulent information regarding DENNISON's experience.

80.     In addition to the affirmative misrepresentations contained in FUND II's PPM, DEFENDANTS' statement regarding DENNISON's experience also failed to include several material facts, which should have been disclosed to PLAINTIFFS prior to their investment.

81.     DEFENDANTS failed to specifically disclose in the FUND II PPM that DENNISON was a principal in Signature Consulting Group.   DENNISON's biography in the MANAGEMENT PPM discloses that DENNISON was the Principal of Signature Consulting Group from November 1997 to October 2002.   This information is also reflected on the Initial Disclosure/Form S-11 dated November 7, 2005, filed for REIT.   However, this information was deleted when DEFENDANTS issued the April 2006, final disclosure for REIT.

82.     It is not clear why DEFENDANTS deleted the mention of Signature Consulting Group from DENNISON's experience listed in the REIT disclosure and/or why they failed to specifically mention Signature Consulting Group in the FUND II PPM.

83.     DEFENDANTS further failed to disclose to PLAINTIFFS that DENNISON had filed bankruptcy on February 18, 2000.   In fact, PLAINTIFFS had no notice, constructive or otherwise, that DENNISON had previously filed bankruptcy because, in addition to failing to disclose it on the FUND II PPM, DENNISON misspelled his own name as "Denninson" on the bankruptcy petition, and therefore PLAINTIFFS could not have discovered the bankruptcy while performing a search of public records.

///

-16-

84.     DENNISON's bankruptcy petition was executed under the penalty of perjury. When subjected to the penalty of perjury, DENNISON disclosed numerous facts which DEFENDANTS then failed to disclose on the FUND II PPM.   Further, DENNISON's bankruptcy petition cast doubts on certain assertions made by DEFENDANTS in the FUND II PPM.

85.     DEFENDANTS either failed to disclose, or misrepresented, the following facts discovered in DENNISON's bankruptcy petition:

a.  DENNISON's bankruptcy petition stated that DENNISON had no income in 1998 and had income of $122,000.00 in 1999 from Signature Entertainment, where he acted as a master of ceremonies and disk jockey and from his employment at Computer Associates, Inc.  DENNISON's bankruptcy petition further stated that DENNISON's income in 2000 was only $2,000.00 and that the sole source of his income was Signature Entertainment.  DEFENDANTS failed to mention in the FUND II PPM that DENNISON made no money whatsoever from his real estate investments in 1998, 1999 or 2000.

b.  DENNISON stated in his bankruptcy petition that he was unemployed and made no income whatsoever in 1998.  DEFENDANTS failed to disclose this fact in the FUND II PPM.

c.  DENNISON stated in his bankruptcy petition that he worked for Computer Associates, Inc. in 1999.  DEFENDANTS failed to disclose this fact in the FUND II PPM.

d.  DENNISON stated in his bankruptcy petition that his primary position from 1990 to 2000 was his position at Signature Entertainment and that he earned $48,000 per year.  DEFENDANTS failed to disclose this fact in the FUND II PPM.

86.     DEFENDANTS further state in the FUND II PPM, "*Mr. Dennison has held Registered Investment Advisor and other financial services licenses earned while at Merrill Lynch and Morgan Stanley...*"  DEFENDANTS failed to provide the dates that DENNISON worked for Merrill Lynch and Morgan Stanley in the FUND II PPM.  In fact, DENNISON

-17-

worked at Merrill Lynch for less than four (4) months, from October 2001 to January 2002. DENNISON worked at Morgan Stanley for less than a year, from January 2002 to October 2002.

87.     As with DENNISON's experience with SMITHDENNISON, DEFENDANTS continually misstated DENNISON's experience with Morgan Stanley and Merrill Lynch throughout several documents related to the various LANDWIN enterprises. For example, DEFENDANTS stated in the MANAGEMENT PPM that DENNISON developed $20,500.00 in business credit financing, $8,000,000.00 in business cash management and over $36,000,000.00 in individual investors' equity. In the final amendment to the Form S-11 filed for REIT, DEFENDANTS disclosed that DENNISON chose to <u>not</u> practice as a financial advisor with any brokerage firm. The disclosures made in the MANAGEMENT PPM, REIT Forms and the FUND II PPM are inconsistent.

88.     Further, DENNISON secured his position as an investment advisor for Merrill Lynch not because of his prowess as an investor, but because he was friends with someone who worked there. Nevertheless, while working at Merrill Lynch, DENNISON failed to attract any material business. DENNISON's friend thereafter procured a position for DENNISON at Morgan Stanley. DENNISON again failed to produce significant business at Morgan Stanley. DEFENDANTS failed to disclose this material information.

89.     From April 2005 to December 2005 DENNISON "hung" his securities salesman's licenses with the brokerage firm Grant Bettingen, Inc., a California registered broker dealer. During this time period, DENNISON was selling interests in DEFENDANTS' offering in MANAGEMENT without the knowledge, permission or due diligence effort of Grant Bettingen, Inc. As such, DENNISON was fired by Grant Bettingen, Inc. in December 2005 for "selling away." DEFENDANTS failed to disclose these material facts in the FUND II PPM.

90.     DEFENDANTS disclosed DENNISON's purported work history beginning in 1990 in the FUND II PPM. DEFENDANTS were obligated to disclose DENNISON's entire work history therein. They failed to do so, instead opting to lie about the extent of DENNISON's experience in real estate investment and hide DENNISON's true primary sources of income and work history in other occupations unrelated to real estate investments.

-18-

COMPLAINT

91.     In addition to the misstatements and omissions in the FUND II PPM, DEFENDANTS stated orally in investor seminars and in other conversations with investors that DENNISON was a successful entrepreneur in Signature Consulting from 1997 to 2002. This is untrue. DENNISON did not list his interest in Signature Consulting as an asset in his bankruptcy petition.

92.     DEFENDANTS intentionally misstated DENNISON's experience and omitted information regarding DENNISON's work history, in order to induce the PLAINTIFFS to invest in FUND II.

93.     The FUND II PPM was a "blind pool" offering of real estate. No real property was designated in the PPM for acquisition. Therefore, the PLAINTIFFS could not evaluate the real property to be acquired and had to rely upon the expertise of DENNISON and his track record in business. PLAINTIFFS relied upon the statements concerning DENNISON's work history in making their investment decisions.

94.     If PLAINTIFFS had been aware of these misstatements and omissions of which they relied upon in making an investment, PLAINTIFFS would not have invested in the FUND II PPM.

### PLAINTIFFS' Investments

95.     As a result of DEFENDANTS solicitation and fraud, as discussed in greater detail above, PLAINTIFFS were induced to invest in FUND II.

96.     Plaintiff Robert Adams invested $50,000.00.

97.     Plaintiff Katherine Altieri invested $150,000.00.

98.     Plaintiff Thomas Durbin invested $50,000.00.

99.     Plaintiff Jason Li invested $25,000.00.

100.    Plaintiff Carol Pacheco invested $50,000.00.

101.    Plaintiff Honey Bee Meadow, LP, a Utah limited partnership, invested $50,000.00.

102.    Plaintiff Leland Warner invested $150,000.00.

///

-19-

**Plaintiffs' Have Experienced a Substantial Loss in the Value of Their Investments**

103.   As discussed above, pursuant to FUND II's "Formation Fee Agreement," dated May 25, 2007, "In exchange for providing the Formation Services, [FUND II] shall pay to each of the Sponsors [i.e., SYLVIA and SMITHDENNISON] a fee...of $661,000.00."   This "formation fee" was reduced to $99,000.00 each via the Supplement No. 1 to the FUND II PPM. Thus, immediately upon the acceptance of the PLAINTIFFS' subscriptions, the PLAINTIFFS interests in FUND II were diluted by the pro rata share of the $198,000.00 note payable as an alleged "formation fee" to SMITHDENNISON and SYLVIA . The $198,000.00 note was paid one (1) year later to SMITHDENNISON and SYLVIA . As a result of the alleged "formation fee," paid either directly or indirectly to DEFENDANTS, PLAINTIFFS' interests were diluted 6.49% (i.e., the pro rata share of the "formation fee").

104.   As discussed above, PLAINTIFFS allege that the "formation fee" charged by DEFENDANTS is in fact an improper commission on the sale of security interests in FUND II. The value of PLAINTIFFS' investment in FUND II has been reduced as a result of this improper payment of a direct or indirect transaction fee.

105.   Furthermore, PLAINTIFFS' investments in FUND II are restricted securities with no public market. The FUND II Operating Agreement provides at Section 15.3 that *"no Member shall assign, convey, sell encumber or in any way alienate all or any part of their respective Membership Units without registration under applicable federal and state securities laws, unless they deliver and opinion of counsel satisfactory to the Manager that such registration under such laws is not required."*

106.   As a result of this restriction on the sale of the FUND II investment, the value of the investment itself has been substantially discounted. PLAINTIFFS are unable to sell their investment in FUND II freely on the open market and instead, in order to trade their interest in FUND II, must incur the substantial expense of registering it under federal and state securities laws. Even if PLAINTIFFS' investment in FUND II is registered, there is no assurance that a market will be created for its sale. If PLAINTIFFS secured an opinion of counsel that registration is not required, there is still no assurance that a market for restricted securities will

-20-

COMPLAINT

1    be created.

2         107.    Additionally, the interests of PLAINTIFFS are also subject to FUND II's

3    Operating Agreement, at Sections 15 and 16, which restricts the transferability of the interests of

4    the PLAINTIFFS.  Under Section 16, PLAINTIFFS would have to grant a "right of first refusal"

5    in favor of all the other members of FUND II according to terms mutually agreeable to the

6    selling and buying members.  If no transaction is consummated with a member, the interests may

7    only be sold to a "qualifying investor" accepted by MANAGEMENT.  The expense and process

8    of complying with the right of first refusal necessarily discounts the value of PLAINTIFFS'

9    investments in FUND II.

10        108.    In or about January 2009, MANAGEMENT offered to purchase a $50,000.00

11   Unit in FUND I for $35,000.00, a 30% discount, subject to them raising the necessary capital.

12   This offer, contingent on raising capital demonstrates the potential value in the eyes of the

13   DEFENDANTS as of January 26, 2009.

14        109.    On January 30, 2009, FUND II sent out a notice of right of first refusal to all of

15   the members, offering to allow members to purchase units being sold by other investors at a 30%

16   discount.  Unfortunately, while several members were willing to sell their investment in FUND

17   II for this price, only a few members expressed a non-binding interest to purchase at this price,

18   and in fact, no sales were consummated, indicating that the price was actually too high.  This

19   further demonstrates that the value of PLAINTIFFS' investment in FUND II as of February 13,

20   2009, was actually less than DEFENDANTS' own suggested value of $35,000.00, and

21   substantially less than the $50,000.00 per investment paid by PLAINTIFFS.

22        110.    Pursuant to the FUND II Operating Agreement, at Section 17, FUND II may only

23   be dissolved by: (i) the determination of the Manager and the majority-in-interest of the

24   members, or (ii) the tenth anniversary of the initial closing of the FUND II PPM.  Therefore,

25   regardless of the book value or fair market value of the assets of FUND II, PLAINTIFFS could

26   not direct the dissolution of FUND II without the consent of MANAGEMENT, an entity

27   controlled by DEFENDANTS.   In or about July 2010, several PLAINTIFFS individually

28   contacted DENNISON and FUND II requesting that their interests in FUND II be repurchased.

COMPLAINT

In response to their request, DEFENDANTS declined to repurchase the Units.  PLAINTIFFS' investment in FUND II is further discounted because of these provisions.

111.    As a result of the several provisions of the FUND II Operating Agreement and the failure of any members to consummate a sale/purchase of units in March 2009, the units are necessarily substantially discounted to below $35,000 and the pro rata book value of the units bears no relationship to the value of the units in the hands of PLAINTIFFS if they were to sell to a willing buyer.

112.    PLAINTIFFS' purchase of the interests based upon material misstatements and omissions of fact of the DEFENDANTS is the proximate cause of the interests being substantially discounted in value with no buyer willing to purchase such interests at the book value.  The PLAINTIFFS have lost at least $15,000.00 per each $50,000.00 Unit based upon the totality of the circumstances.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 [§10B-5]

### (By All PLAINTIFFS Against FUND II, MANAGEMENT, SMITHDENNISON, DENNISON, SYLVIA and LANDIS)

113.    PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-112 above, as though fully set forth herein.

114.    DEFENDANTS violated Section 10(b)  of the Securities Exchange Act of 1934 (the "Act") and Rule 10(b)(5) by:

    a.  employing devices, schemes, and artifices to defraud;

    b.  making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading: and/or

    c.  engaging in acts, practices, and courses of business which operated as a fraud or deceit upon the PLAINTIFFS in connection with their investment in FUND II.

115.    PLAINTIFFS' investment in FUND II is a security subject to provisions of the Act.

-22-

116.    As set forth in greater detail above, DEFENDANTS, directly or indirectly, singly or in concert, engaged in a scheme to defraud the PLAINTIFFS and induce them to invest in FUND II in violation of the Act as follows:

a.  DEFENDANTS sent numerous emails to potential investors, including PLAINTIFFS, between June 2007 and April 2008, wherein they encouraged PLAINTIFFS to invest in FUND II via false statements that, "*IN 21 YEARS, NO INVESTOR HAS EVER LOST MONEY IN ANY LANDWIN INVESTMENT and LANDWIN's OVERALL RETURNS FAR EXCEED 30% PER YEAR.*" DEFENDANTS knew this statement was untrue at the time they made it.

b.  In an attempt to hide their false and misleading assertions regarding LANDWIN's purported track record, DEFENDANTS failed to include prior performance narratives and tables in the FUND II PPM, dated July 1, 2007, despite the fact that these narratives were already prepared and available to DEFENDANTS.

c.  DEFENDANTS, either directly or indirectly, paid themselves a $198,000.00 "formation fee," made payable to SMITHDENNISON and SYLVIA . This fee was purportedly for formation services provided to FUND II.  However, as a result of their previous experience with REIT, DEFENDANTS knew that this purported "formation fee" could be considered a transaction based fee, thus requiring DEFENDANTS to register as a broker-dealer in California.

d.  DEFENDANTS fraudulently represented to PLAINTIFFS in the FUND II PPM, dated July 1, 2007, that "[SMITHDENNISON and SYLVIA's] formational and organizational work does not include participating in the offering or selling of our securities."

e.  Despite knowing that DENNISON and LANDIS were soliciting investors to invest in FUND II, thus putting the purported "formation fee" at risk of being interpreted as a transaction based fee, DEFENDANTS failed to disclose this risk to PLAINTIFFS.

COMPLAINT

f. DEFENDANTS failed to inform PLAINTIFFS that FUND II's asset and property manager, MANAGEMENT (which was created as an entity to invest in real estate), had failed to invest in a single piece of commercial real estate for over two (2) years.

g. DEFENDANTS, in the FUND II PPM, dated July 1, 2007, fraudulently indicated that DENNISON's business, SMITHDENNISON, was established in 1995. SMITHDENNISON was not established until June 4, 2003.

h. DEFENDANTS, in the FUND II PPM, dated July 1, 2007, failed to truthfully disclose DENNISON's work history, including failing to specifically disclose the fact that DENNISON was a principle of Signature Consulting Group from November 1997 to October 2002.

i. DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON had filed bankruptcy in February 2000.

j. DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON made no money whatsoever from any purported real estate investments in 1998, 1999 or 2000.

k. DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON was unemployed and had no income whatsoever in 1998.

l. DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON worked for Computer Associates, Inc. in 1999.

m. DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON's primary work position from 1990 to 2000 was his position at Signature Entertainment.

n. DEFENDANTS failed to fully and adequately disclose DENNISON's work history with Merrill Lynch and Morgan Stanley in the FUND II PPM.

117. The above misrepresentations and omissions constitute material misrepresentations of fact and material omissions of fact in that the FUND II offering was a "blind pool" offering, and thus investor documents did not contain sufficient information about

-24-

COMPLAINT

specific parcels of real estate to be acquired and potential investors had to rely on information provided by the DEFENDANTS regarding the prior performance of the sponsor and principals of the company in determining whether to invest in FUND II.

118.    DEFENDANTS engaged in these fraudulent acts, practices and courses of business in an effort to induce PLAINTIFFS to invest in FUND II in violation of Section 10(b) of the Act and Rule 10b-5.  These DEFENDANTS are sued as primary participants in the wrongful and illegal conduct charged herein.  The individual DEFENDANTS are also sued as controlling persons of FUND II, as alleged below.

119.    In addition to the duties of full disclosure imposed on DEFENDANTS as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to potential investors, including PLAINTIFFS, DEFENDANTS each had a duty to promptly disseminate truthful information that would be material to investors, including accurate and truthful information with respect to FUND II's sponsor, managers and principles, so that the market price of the "blind pool" securities offering would be based on truthful, complete and accurate information.

120.    FUND II and each of the DEFENDANTS, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the sponsor, manager and/or principals of FUND II.

121.    The DEFENDANTS each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to induce PLAINTIFFS to invest in FUND II, a "blind pool" offering, and to assure investors of FUND II's value, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about FUND II and its sponsors, managers and principals in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the investors in FUND II, including PLAINTIFFS.

COMPLAINT

122. Each of the individual DEFENDANTS primary liability, and controlling person liability, arises from the following facts: a) at all times relevant herein each of the individual DEFENDANTS was a high-level executive and/or director at FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA; b) each of the individual DEFENDANTS, by virtue of his responsibilities and activities as a senior executive officer and/or director of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA, was privy to and participated in the creation, development, and reporting of FUND II's PPM; and c) each of the individual DEFENDANTS was aware of FUND II's dissemination of information, including the FUND II PPM, to the investing public, including PLAINTIFFS, which each knew or recklessly disregarded was materially false and misleading.

123. Each of the DEFENDANTS had actual knowledge of the misrepresentations and omissions of material facts set forth throughout this Complaint, or acted with reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though sufficient facts were available to each of them. Such DEFENDANTS' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness and for the purpose and effect of concealing the true facts regarding FUND II, its sponsor, managers and/or principals from the investigating public and supporting the artificially inflated price of its securities. As demonstrated by DEFENDANTS' misstatements and omissions throughout the information disseminated, including the FUND II PPM, each of the individual DEFENDANTS, if he did not have actual knowledge of the misrepresentations and omissions alleged, was deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

124. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, PLAINTIFFS were induced to invest in FUND II at a market price which was artificially inflated at the time of its sale. In ignorance of the facts, including, but not limited to the fact that the price of FUND II's securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by DEFENDANTS, or upon the integrity of the FUND II PPM, and/or on the absence of

-26-

material adverse information that was known to or disregarded with deliberate recklessness by DEFENDANTS but not disclosed by the DEFENDANTS, PLAINTIFFS acquired their interest in FUND II at an artificially high price and were damaged thereby, as evidenced by, among others, the inability to sell their FUND II interest at a substantially lower price on or about March 2009.

125.    At the time of said misrepresentations and omissions, PLAINTIFFS were ignorant of their falsity and believed them to be true.  Had PLAINTIFFS known of the true facts which were not disclosed by DEFENDANTS, PLAINTIFFS would not have purchased or otherwise acquired their FUND II interest and/or would not have done so at the artificially inflated price which they paid.

126.    By virtue of the foregoing, DEFENDANTS have each violated Section 10(b) of the Act and Rule 10b-5 promulgated there under.

127.    As detailed more fully in the preceding paragraphs, as a direct and proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS have suffered damages in connection with their respective purchases of an interest in FUND II.

## SECOND CAUSE OF ACTION

## CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES

## EXCHANGE ACT

### (By All PLAINTIFFS Against DENNISON and LANDIS)

128.    PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-127 above, as though fully set forth herein.

129.    DENNISON individually and through his control of SMITHDENNISON, and LANDIS individually and through his control of SYLVIA, each acted as a controlling person of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA , participation in and/or awareness of FUND II's operations and/or intimate knowledge of FUND II's fraudulent dissemination of information regarding FUND II's sponsors, managers and principals, DENNISON and LANDIS

-27-

---

had the power to influence and control and did influence and control, directly or indirectly, the decision making of FUND II, including the content and dissemination of the various statements which PLAINTIFFS contend are false and misleading.  DENNISON and LANDIS each were provided with or had unlimited access to copies of FUND II's communications, including FUND II's PPM, and other statements alleged by PLAINTIFFS to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

130.   In addition, DENNISON and LANDIS each had direct involvement in the day-to-day operations of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA  and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

131.   As set forth above, DEFENDANTS each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, DENNISON and LANDIS are each liable pursuant to Section 20(a) of the Exchange Act.  As detailed more fully in the preceding paragraphs, as a direct and proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS suffered damages in connection with their purchases of Units in FUND II.

### THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA CORPORATE SECURITIES LAWS [§25401, §25501]

### (By All PLAINTIFFS Against FUND II)

132.   PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-131 above, as though fully set forth herein.

133.   The DEFENDANTS' sale of the interest in FUND II is in violation of California Corporations Code §§25401 and 25501 and thus justifies rescission, injunctive relief, restitution, interest, attorneys' fees and damages against DEFENDANTS.

///

///

///

-28-

# FOURTH CAUSE OF ACTION

## CONTROL PERSON LIABILITY UNDER CALIFORNIA CORPORATIONS CODE

### (By All PLAINTIFFS Against DENNISON and LANDIS)

134.    PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-133 above, as though fully set forth herein.

135.    California Corporations Code §25504 provides:

> *Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.*

136.    DENNISON individually and through his control of SMITHDENNISON, and LANDIS individually and through his control of SYLVIA, each acted as a controlling person of FUND II, MANAGEMENT and SMITHDENNISON AND SYLVIA  within the meaning of California Corporations Code §25504, as alleged herein.   DENNISON and LANDIS were principals and/or officer/directors of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA , and these individuals shaped the organization of FUND II and the FUND II PPM, and disseminated information to prospective investors, including PLAINTIFFS, regarding their investment in FUND II.

137.    DENNISON and LANDIS, individually and by virtue of their control over SMITHDENNISON and SYLVIA and as the principals and/or officers and/or directors of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA, exercised further control over FUND II, including financial and operational management.

138.    By virtue of their high-level positions with FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA, participation in and/or awareness of FUND II's operations and/or intimate knowledge of FUND II's fraudulent dissemination of information regarding

-29-

COMPLAINT

FUND II's sponsors, managers and principals, DENNISON and LANDIS had the power to influence and control and did influence and control, directly or indirectly, the decision making of FUND II, including the content and dissemination of the various statements which PLAINTIFFS contend are false and misleading.

139.   DENNISON and LANDIS each were provided with or had unlimited access to copies of FUND II's communications, including FUND II's PPM, and other statements alleged by PLAINTIFFS to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

140.   Further, much of the fraudulent information disseminated or omitted directly related to the experience, or lack thereof, of DENNISON.   Thus, DENNISON clearly had knowledge of the material misstatements and omissions and had control over the dissemination of such information.

141.   In addition, DENNISON and LANDIS each had direct involvement in the day-to-day operations of FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the violations alleged herein, and exercised the same.

142.   DENNISON and LANDIS exercised "control" over FUND II, MANAGEMENT, SMITHDENNISON and SYLVIA's management policies.   These individuals exercised control and influence over the creation of FUND II's communications, including FUND II's PPM, the marketing and advertising of the sale of the FUND II investment opportunity, and other wrongdoing alleged within this Complaint.   As such, these individuals, jointly and severally, bear "control person" liability pursuant to California Corporations Code §25504 for their companies' primary violations of California Corporations Code §25501 as alleged in the preceding paragraphs and set forth herein.

143.   As a direct and proximate result of DEFENDANTS' wrongful conduct, PLAINTIFFS suffered damages in connection with their purchases of interest in FUND II.

///

///

COMPLAINT

## FIFTH CAUSE OF ACTION

## FRAUD

### (By All PLAINTIFFS Against FUND II, MANAGEMENT, SMITHDENNISON, DENNISON, SYLVIA and LANDIS)

144.   PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-143 above, as though fully set forth herein.

145.   DEFENDANTS, individually, and in their capacity as sponsors, managers and/or principals of FUND II, by the conduct alleged made representations to PLAINTIFFS of important facts.

146.   FUND II, by and through its sponsors (SMITHDENNISON and SYLVIA) its manager (MANAGEMENT) and its principals (DENNISON and LANDIS), SYLVIA, by and through LANDIS, SMITHDENNISON, by and through DENNISON, LANDIS, individually and through SYLVIA, FUND II and MANAGEMENT, and DENNISON individually and by and through SMITHDENNISON, FUND II and MANAGEMENT, each knowingly and willingly conspired and agreed among themselves to perform the acts alleged above made misrepresentations of material facts and omissions to PLAINTIFFS for the purpose of inducing PLAINTIFFS to purchase an interest in FUND II.

147.   Those misrepresentations and omissions, as detailed more fully in the preceding paragraphs, included the following:

     a.   DEFENDANTS sent numerous emails to potential investors, including PLAINTIFFS, between June 2007 and April 2008, wherein they encouraged PLAINTIFFS to invest in FUND II via false statements that, "*IN 21 YEARS, NO INVESTOR HAS EVER LOST MONEY IN ANY LANDWIN INVESTMENT and LANDWIN's OVERALL RETURNS FAR EXCEED 30% PER YEAR.*" DEFENDANTS knew this statement was untrue at the time they made it.

     b.   In an attempt to hide their false and misleading assertions regarding LANDWIN's purported track record, DEFENDANTS failed to include prior performance

-31-

COMPLAINT

narratives and tables in the FUND II PPM, dated July 1, 2007, despite the fact that these narratives were already prepared and available to DEFENDANTS.

   c.  DEFENDANTS, either directly or indirectly, paid themselves a $198,000.00 "formation fee," made payable to SMITHDENNISON and SYLVIA . This fee was purportedly for formation services provided to FUND II. However, as a result of their previous experience with REIT, DEFENDANTS knew that this purported "formation fee" could be considered a transaction based fee, thus requiring DEFENDANTS to register as a broker-dealer in California.

   d.  DEFENDANTS fraudulently represented to PLAINTIFFS in the FUND II PPM, dated July 1, 2007, that "[SMITHDENNISON and SYLVIA's] formational and organizational work does not include participating in the offering or selling of our securities."

   e.  Despite knowing that DENNISON and LANDIS were soliciting investors to invest in FUND II, thus putting the purported "formation fee" at risk of being interpreted as a transaction based fee, DEFENDANTS failed to disclose this risk to PLAINTIFFS.

   f.  DEFENDANTS failed to inform PLAINTIFFS that FUND II's asset and property manager, MANAGEMENT (which was created as an entity to invest in real estate), had failed to invest in a single piece of commercial real estate for over two (2) years.

   g.  DEFENDANTS, in the FUND II PPM, dated July 1, 2007, fraudulently indicated that DENNISON's business, SMITHDENNISON, was established in 1995. SMITHDENNISON was not established until June 4, 2003.

   h.  DEFENDANTS, in the FUND II PPM, dated July 1, 2007, failed to truthfully disclose DENNISON's work history, including failing to specifically disclose the fact that DENNISON was a principle of Signature Consulting Group from November 1997 to October 2002.

      i.   DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON had filed bankruptcy in February 2000.

      j.   DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON made no money whatsoever from any purported real estate investments in 1998, 1999 or 2000.

      k.   DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON was unemployed and had no income whatsoever in 1998.

      l.   DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON worked for Computer Associates, Inc. in 1999.

      m.  DEFENDANTS failed to disclose in the FUND II PPM, dated July 1, 2007, that DENNISON's primary work position from 1990 to 2000 was his position at Signature Entertainment.

      n.   DEFENDANTS failed to fully and adequately disclose DENNISON's work history with Merrill Lynch and Morgan Stanley in the FUND II PPM.

148.    Those facts disclosed were untrue and or contained material misrepresentations and omissions.

149.    At the time they made the above representations, DEFENDANTS knew that the representations were false and/or that they had omitted material facts important to PLAINTIFFS.

150.    DEFENDANTS intentionally asserted facts that DEFENDANTS knew were false, incomplete and or/which they had no reasonable grounds for believing.

151.    At the time DEFENDANTS made the above misrepresentations and omissions, they did so with the intention of inducing PLAINTIFFS to invest in FUND II.

152.    PLAINTIFFS actually and justifiably relied on each of DEFENDANTS' representations.  In reliance on DEFENDANTS' representations, PLAINTIFFS each invested in FUND II.

153.    As a direct and proximate cause of the fraud and deceit alleged, PLAINTIFFS were induced to purchase an interest in FUND II and have been damaged in an amount in excess of $157,500.00, in an amount to be proven at trial.

-33-

COMPLAINT

154.   The aforementioned acts of DEFENDANTS were oppressive, willful, wanton, malicious and fraudulent, with the intent to cause PLAINTIFFS harm, and justify an award of exemplary damages in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**CONSPIRACY TO COMMIT FRAUD**

**(By All PLAINTIFFS Against FUND II, MANAGEMENT, SMITHDENNISON,**

**DENNISON, SYLVIA and LANDIS)**

155.   PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-154 above, as though fully set forth herein.

156.   DEFENDANTS knowingly and willingly conspired and agreed among themselves to perform acts alleged above, by furtherance of a scheme to perpetuate the sale of interest in FUND II.

157.   Pursuant to a wrongful scheme to mislead and deceive investors into purchasing an interest in FUND II, DEFENDANTS committed the acts and omissions indicated in the preceding paragraphs above.

158.   DEFENDANTS intentionally asserted facts that DEFENDANTS knew were either false or incomplete or had no reasonable grounds for believing them to be true, and concealed copies of prior performance narratives for LANDWIN and its principals. DEFENDANTS further concealed the fact that: (1) the purported "formation fee" for the formation of FUND II could be considered a transaction based fee, thus requiring DEFENDANTS to register as a broker-dealer in California; (2) FUND II's asset and property manager, MANAGEMENT (which was created as an entity to invest in real estate), had failed to invest in a single piece of commercial real estate for over two (2) years; (3) DENNISON was a principle of Signature Consulting Group from November 1997 to October 2002; (4) DENNISON had filed bankruptcy in February 2000; (5) DENNISON made no money whatsoever from any purported real estate investments in 1998, 1999 or 2000; (6) DENNISON was unemployed and had no income whatsoever in 1998; and (7) DENNISON's primary work position from 1990 to 2000 was his position at Signature Entertainment.

-34-

159.   Plaintiff justifiably relied on the representations made by DEFENDANTS related to the FUND II offering when purchasing an interest in FUND II.

160.   As a proximate result of the fraud and deceit alleged, PLAINTIFFS were induced to purchase an interest in FUND II and have been damaged in an amount in excess of $157,500.00, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (By All PLAINTIFFS Against FUND II, MANAGEMENT, SMITHDENNISON, DENNISON, SYLVIA and LANDIS)

161.   PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-160 above, as though fully set forth herein.

162.   DEFENDANTS, individually and in their capacities as sponsors, managers and principals of FUND II, in the course of their business, supplied PLAINTIFFS with false and incomplete information for the guidance of PLAINTIFFS and to induce PLAINTIFFS to purchase a security interest in FUND II.

163.   This false information and these material omissions were meant to induce PLAINTIFFS to invest in FUND II, a "blind pool" offering for the sale of a security.

164.   The facts and information provided to PLAINTIFFS were false and incomplete. DEFENDANTS failed to exercise reasonable care or competence in obtaining and communicating this false and incomplete information to PLAINTIFFS.   These negligent representations and omissions are alleged with particularity in the preceding paragraphs alleged above.

165.   DEFENDANTS had no reasonable grounds for believing their representations were true and complete when they made them.

166.   DEFENDANTS made these representations on behalf of FUND II, intending that PLAINTIFFS would rely on these representations.

167.   PLAINTIFFS did reasonably rely on DEFENDANTS' representations, and each of them, and purchased a Unit in FUND II.

-35-

COMPLAINT

168.    DEFENDANTS knew or should have known at the time these representations and omissions were made to PLAINTIFFS that PLAINTIFFS would rely upon and be misled by these representations and omissions.

169.    PLAINTIFFS allege that due to their reliance on DEFENDANTS' misrepresentations, PLAINTIFFS purchased a Unit in FUND II at an inflated price and which has a substantially reduced value at this time.

170.    PLAINTIFFS' reliance on DEFENDANTS' representations was a substantial factor in causing PLAINTIFFS' harm.

171.    As a direct, foreseeable and proximate cause of DEFENDANTS' negligent misrepresentations and omissions, PLAINTIFFS have suffered and continue to suffer substantial financial losses, all of PLAINTIFFS' damages in an amount to be proven at trial.

172.    The DEFENDANTS' misrepresentations and omissions have damaged PLAINTIFFS and continue to damage PLAINTIFFS in an amount in excess of $157,500.00, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA CORPORATIONS CODE §25501.5

## (By All PLAINTIFFS Against DENNISON, LANDIS, CASAULT, and PARNASS)

173.    PLAINTIFFS hereby incorporate by reference and re-alleges Paragraphs 1-172 above, as though fully set forth herein.

174.    California Corporations Code §25501.5, Section (a)(1) provides:

*A person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate under Part 3 (commencing with Section 25200), that is in effect at the time of the sale or purchase authorizing that broker-dealer to act in that capacity, may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages.*

175.    Beginning in or about June 2007, DEFENDANTS solicited PLAINTIFFS to invest substantial sums of money in FUND II.

///

-36-

COMPLAINT

176.   From approximately June 2007 through April 2008, DEFENDANTS sold PLAINTIFFS securities consisting of Units in FUND II.  PLAINTIFFS collectively invested $525,000.00 in FUND II.

177.   At the time of PLAINTIFFS investments, DEFENDANTS were acting as broker dealers and effecting transactions within the meaning of California Corporations Code §25004 by:

    (a) Directly soliciting PLAINTIFFS to invest in FUND II via verbal communications and emails sent to PLAINTIFFS;

    (b) Being introduced at a Reddick "seminar" and informing PLAINTIFFS of a great new investment opportunity with FUND II;

    (c) Contacting PLAINTIFFS directly via telephone and email and inviting them to attend a "seminar" regarding the potential investment in FUND II;

    (d) Acting as presenters at the "seminars" and instructing clients as to the benefits of investing in FUND II by falsely stating to PLAINTIFFS in part, that no investor had every lost money throughout LANDWIN's 21-year track record and that LANDWIN's returns far exceed 30% per year;

    (e) Acting as presenters at the "seminars" and extolling the experience and past performance of LANDWIN and the real estate experience of LANDIS and DENNISON;

    (f) Instructing PLAINTIFFS at the "seminars" as to how to invest in FUND II;

    (g) Sending follow-up emails to PLAINTIFFS again soliciting PLAINTIFFS to invest in FUND II;

    (h) Providing PLAINTIFFS with the terms of their investment in FUND II;

    (i) Instructing PLAINTIFFS on how to use their self-directed retirement accounts to invest in FUND II;

    (j) Instructing PLAINTIFFS to send payments for the investment in FUND II directly to LANDWIN; and

    ///

-37-

COMPLAINT

(k) Receiving a direct or indirect transaction based fee from FUND II for all investments received from PLAINTIFFS.

178.    At the time of the above investments by PLAINTIFFS, DEFENDANTS were not registered broker dealers in the State of California, as defined by California Corporations Code §§25004 and 25210.

179.    DEFENDANTS' conduct alleged above is unlawful and thus has violated California Corporations Code §25501.5.

180.    DEFENDANTS' conduct as described herein is in violation of California Corporations Code §§25004 and 25210 in that DEFENDANTS were acting as unregistered broker dealers, thus entitling PLAINTIFFS to relief under California Corporations Code §25501.5.

181.    DEFENDANTS sold securities in the form of Limited Liability Company interests (i.e., the Units). Limited Liability Company interests are securities pursuant to California Corporations Code §25019.

182.    As a direct and proximate result of DEFENDANTS' said violation of California Corporations Code §25501.5, PLAINTIFFS have been damaged in an amount to be proven at trial, and in no event less than $525,000.00, plus lawful interest.

183.    Pursuant to the provisions of California Corporations Code §25501.5, PLAINTIFFS are entitled to rescind the sale of the securities described above and recover from DEFENDANTS the consideration paid for the securities, plus interest at the legal rate, less the amount of any income received on the securities by PLAINTIFFS.

184.    Pursuant to the provisions of California Code of Civil Procedure §1029.8, PLAINTIFFS, and each of them, are entitled to treble damages in the amount of $10,000.00 per Plaintiff (i.e., $70,000.00) or in an amount authorized by the Court.

185.    California Corporations Code §25501.5 authorizes the Court, in its discretion, to award reasonable attorneys' fees and costs to prevailing PLAINTIFFS.

///

///

COMPLAINT

## NINTH CAUSE OF ACTION

## RESCISSION

### (By By All PLAINTIFFS Against FUND II)

186.    PLAINTIFFS hereby incorporate by reference and re-allege Paragraphs 1-185 above, as though fully set forth herein.

187.    DEFENDANTS' conduct as described herein was in violation of California Corporations Code §25501.5, due to the fact that DEFENDANTS were acting as unlicensed broker dealers in the State of California.

188.    Pursuant to California Corporations Code Section 25501.5, PLAINTIFFS, and each of them, are entitled to rescind the securities described herein and recover from DEFENDANTS the consideration paid in the sum of $525,000.00, plus interest at the legal rate.

189.    Before entry of the Judgment in this action, PLAINTIFFS will tender to DEFENDANTS any consideration received from DEFENDANTS.

190.    Pursuant to the provisions of California Code of Civil Procedure §1029.8, PLAINTIFFS, and each of them, are entitled to treble damages in the amount of $10,000.00 per Plaintiff (i.e., $70,000.00) or in an amount authorized by the Court.

191.    California Corporations Code §25501.5 authorizes the Court, in its discretion, to award reasonable attorneys' fees and costs to prevailing PLAINTIFFS.

**WHEREFORE,** PLAINTIFFS prays for Judgment against DEFENDANTS, and requests relief as follows:

**AS TO THE FIRST CAUSE OF ACTION**

1.      For rescission, injunctive relief and restitution;

2.      For compensatory damages according to proof at the time of trial;

3.      For punitive damages;

**AS TO THE SECOND CAUSE OF ACTION**

1.      For rescission, injunctive relief and restitution;

2.      For compensatory damages according to proof at the time of trial;

3.      For punitive damages;

-39-

COMPLAINT

**AS TO THE THIRD CAUSE OF ACTION**

1. For rescission, injunctive relief, restitution, prejudgment interest, attorneys fees and damage pursuant to California Corporations Code §25110;

2. For compensatory damages according to proof at the time of trial;

3. For punitive damages;

4. For reasonable attorneys' fees and costs;

**AS TO THE FOURTH CAUSE OF ACTION**

1. For rescission, injunctive relief, restitution, prejudgment interest, attorneys fees and damage pursuant to California Corporations Code §25110;

2. For compensatory damages according to proof at the time of trial;

3. For punitive damages;

**AS TO THE FIFTH CAUSE OF ACTION**

1. For compensatory damages according to proof at the time of trial, in an amount not less than $157,500.00;

2. For punitive damages;

**AS TO THE SIXTH CAUSE OF ACTION**

1. For compensatory damages according to proof at the time of trial, in an amount not less than $157,500.00;

2. For punitive damages;

**AS TO THE SEVENTH CAUSE OF ACTION**

1. For compensatory damages according to proof at the time of trial;

**AS TO THE EIGHTH CAUSE OF ACTION**

1. For rescission, injunctive relief, restitution, prejudgment interest, attorneys fees and damage pursuant to California Corporations Code §25110;

2. For compensatory damages according to proof at the time of trial, in an amount not less than $525,000.00;

3. For treble damages in an amount not less than $70,000.00;

4. For punitive damages;

-40-

COMPLAINT

5.     For interest thereon at the legal rate;

6.     For reasonable attorneys' fees and costs;

**AS TO THE NINTH CAUSE OF ACTION**

1.     For rescission of the securities described herein and ordering DEFENDANTS to pay PLAINTIFFS the sum of $525,000.00, the consideration paid for the securities plus interest at the legal rate, less the amount of any income received by PLAINTIFFS on the security;

2.     For treble damages in an amount not less than $70,000.00;

3.     For interest thereon at the legal rate;

4.     For reasonable attorneys' fees and costs;

**AS TO THE ALL CAUSES OF ACTION**

1.     For costs of suit herein incurred;

2.     For interest as permitted by law;

3.     For attorneys fees and costs herein incurred;

4.     For such other and further relief as the Court may deem proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, PLAINTIFFS hereby demand a trial by jury.


Dated: July 20, 2010                     WEINTRAUB LAW GROUP, PC

                                   BY:                                                        
                                        Richard A. Weintraub,
                                        Attorney for PLAINTIFFS

COMPLAINT

**EXHIBIT A**

NAME OF OFFEREE:                  COPY NUMBER:

_____          _____

# LANDWIN PARTNERS FUND II, LLC
## (A DELAWARE LIMITED LIABILITY COMPANY)

# CONFIDENTIAL
# PRIVATE PLACEMENT MEMORANDUM

# OFFERING
# LIMITED LIABILITY COMPANY UNITS

## JULY 1, 2007

This Private Placement Memorandum ("Memorandum" or "PPM") is provided on a confidential basis solely for the information of those persons to whom it is transmitted so that they may consider an investment in units of limited liability company interests ("Units") in Landwin Partners Fund II, LLC (the "Fund" or "Partners Fund II") described herein, and is not to be reproduced or used for any other purpose. Prospective investors are not to construe the contents of this Memorandum (including Exhibits hereto) as legal or tax advice and no legal, tax or other advisors have been engaged by the Fund, its Sponsors, Manager or Officers to represent investors. Each prospective investor should consult his, her, or its own advisors as to legal, tax, financial, ERISA, and all other matters, including matters related to an investment in the Units. The Units are being sold only to investors who qualify as "accredited investors" within the meaning of Regulation D under the Securities Act of 1933, as amended ("Accredited Investors"). If you do not qualify as an Accredited Investor, this investment is not suitable for you and you will not be permitted to invest in Partners Fund II.

Exhibit A
p. 1

CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

**LANDWIN PARTNERS FUND II, LLC**
**(A DELAWARE LIMITED LIABILITY COMPANY)**

**400 Units – Current Maximum Offering**
**100 Units – Minimum Offering**
**Minimum Purchase – 1 Unit ($50,000)**

This Private Placement Memorandum (this "Memorandum" or "PPM") is provided on a confidential basis solely for the information of those persons to whom it is transmitted so that they may consider an investment in limited liability company interests ("Units") in Landwin Partners Fund II, LLC, a Delaware limited liability company (the "Fund" or "Partners Fund II") described herein, and is not to be reproduced or used for any other purpose. Prospective investors are not to construe the contents of this Memorandum (including the Exhibits hereto) as legal advice and neither the Fund nor its sponsors, Sylvia, Inc., a California Corporation ("Sylvia"), and SmithDennison Capital, LLC, a California Limited Liability Company ("SDC" and together with Sylvia, the "Sponsors"), nor the Fund's business manager, investment manager, asset manager and property manager, Landwin Management, LLC, a Delaware Limited Liability Company ("Landwin Management" or the "Manager"), nor the Fund's non-employee officers ("Principals Officers" and "Officers"), have engaged any legal, tax, or other advisors to represent investors. Therefore, each prospective investor should consult his, her or its own advisors as to legal, tax, financial, ERISA and related matters concerning an investment in the Units.

AN INVESTMENT IN THE UNITS INVOLVES SIGNIFICANT RISKS.  SEE "RISK FACTORS" ON PAGE 12.

In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated hereby, including the merits and risks involved.  The Units have not been recommended by any federal, state or other securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

The Units offered hereby have not been, and will not be, registered under the Securities Act of 1933, as amended (the "Securities Act"), or any foreign, state or other securities laws, and will be offered and sold for investment only to qualifying recipients of this Memorandum pursuant to the exemption from the registration requirements of the Securities Act provided by Section 4(2) thereof and in compliance with any applicable state or other securities laws. The Units are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or any exemption therefrom.  The transferability of the Units will be further restricted by the terms of the operating agreement of Landwin Partners Fund II, LLC (the "Operating Agreement").  Investors should be aware that they may be required to bear the financial risks of an investment in the Units for an indefinite period of time.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Units in any state or other jurisdiction where such offer or solicitation is unlawful or not authorized.

No person has been authorized to give any information or to make any representation concerning Partners Fund II or the offer of the Units other than the information contained in this Memorandum, and, if given or made, such information or representation must not be relied upon as having been authorized by Partners Fund II or its Sponsors, Manager, Principal Officers or Officers.  The information contained in this Memorandum relating to Partners Fund II, its Sponsors, Manager, Principal Officers and Officers has been compiled as of the date set forth on the cover of this Memorandum (unless otherwise stated herein) from sources believed to be reliable.

Exhibit A
p. 2

1

# TABLE OF CONTENTS

..........3

Offering Summary...................................................................11

Investment Highlights...........................................................12

Risk Factors..........................................................................19

Securities Laws.....................................................................19

Who May Invest and Suitability.............................................21

How to Subscribe..................................................................22

Conflicts of Interest..............................................................23

Management and Management Agreement............................26

Compensation of the Sponsors and Manager.......................28

Description of the Units and the Operating Agreement..........30

Federal Income Tax Consequences.......................................40

Reports and Accounting Matters...........................................40

Additional Information...........................................................43

Index to Exhibits to the PPM.................................................44

EXHIBIT "A"-OPERATING AGREEMENT...................................64

    EXHIBIT A TO THE OPERATING AGREEMENT-MEMBERS LIST..........65

    EXHIBIT B TO THE OPERATING AGREEMENT-MANAGENT AGREEMENT...............70

EXHIBIT "B" -FORMATION FEE AGREEMENT............................72

    EXHIBIT A TO THE FORMATION FEE AGREEMENT-PROMISSORY NOTE.........76

EXHIBIT "C"-INSTRUCTIONS FOR SUBSCRIBING.....................77

EXHIBIT "D"-SUBSCRIPTION AGREEMENT..............................83

EXHIBIT "E"-CONSENT OF SPOUSE........................................84

EXHIBIT "F"- FORM W-9........................................................

Exhibit A
p. 3

2

## OFFERING SUMMARY

The following is a brief summary of certain information contained in this Memorandum. It is not intended to be complete and is qualified in its entirety by the detailed information appearing elsewhere in this Memorandum and by the Exhibits hereto and other related documents. To the extent this Memorandum contains summaries of certain terms of certain documents, reference is made to the actual documents (copies of which are at the office of the Manager) for complete information concerning the terms thereof. All such summaries are qualified in their entirety by this reference. All documents relating to this investment will be made available to prospective investors for inspection upon request. Each prospective Investor is urged to read this entire Memorandum (including the Exhibits and any supplements hereto) before investing in Partners Fund II.

### The Fund

Landwin Partners Fund II, LLC, a Delaware limited liability company ("Partners Fund II" or the "Fund""), was formed on May 25, 2007. Partners Fund II intends to provide investors who have become its limited liability company members (the "Members") with potential for income and growth through investment in a portfolio of unidentified (i) real estate properties, focusing both on existing and to-be-developed properties that will produce current income and the opportunity for capital appreciation, collectively referred to herein as "real estate" investments, and (ii) real estate mortgage loans secured by, or preferred equity investments in entities that own, the same types of properties that the Fund may acquire directly, collectively referred to herein as, "real estate related" investments. The Fund intends to operate and be treated for tax purposes as a partnership. The Fund's mailing address is 1340 E. Route 66, Suite 205, Glendora, California 91740. The Fund's telephone number is 626-335-8606, and its facsimile number is 626-335-8605. The Fund's email address is invest@landwin.com.

### The Fund's Sponsors, Manager, and Officers

Partners Fund II is sponsored by Sylvia, Inc., a California corporation ("Sylvia"), and SmithDennison Capital, LLC, a California limited liability company ("SDC" and together with Sylvia, the "Sponsors"). The principal officer of Sylvia is Martin Landis ("ML"), and the principal officer of SDC is Seán Dennison ("SD"). As the Fund's Sponsors, Sylvia and SDC together perform work related to the formation and organization of the Fund, including the hiring of lawyers, accountants, and the Fund's Manager; assistance in drafting this Memorandum, and; development of the Fund's business plan. The Sponsors' formational and organizational work does not include participating in the offering or selling of the Fund's securities. The Sponsors and their respective principals and affiliates have extensive experience in the real estate and real estate related investment, development and management business, collectively producing a successful performance record since 1987 including overall average annual returns of greater than 31% per year, although this past performance is not an indication of any future performance of Partners Fund II.

Prior to becoming operational, and in instances after becoming operational whenever required, ML and SD are the Fund's principal non-employee executive officers ("Principal Officers"), meaning they, along with Jack Andrews ("JA"), Tom Casault ("TC"), Gabriela de Marinis ("GD"), David Hunnewell ("DH"), Chris Parnass ("CP"), Megan McAlpine ("MM"), and others as may be appointed from time to time by the Principal Officers (collectively, "Officers"), are the individuals within the issuer authorized to directly offer, market and sell the Fund's Units. However, neither the Principal Officers nor the Officers shall receive any compensation for the marketing and sales of the Fund's Units. Furthermore, only the Principal Officers (ML and SD) may serve as binding signatories for the Fund in any instance where such authority and/or signatures are required. In any such case, both Principal Officers' signatures are required. Once operational, Partners Fund II's business manager, investment manager, asset manager and property manager is Landwin Management, LLC, a Delaware limited liability company ("Landwin Management" or "Manager"). As such, Landwin Management supervises and manages the Fund's day-to-day business operations and all Fund investments, assets and properties. The Manager will select and, as property manager ("Property Manager"), manage all real estate and real estate related investments for the Fund except those selected and managed by the Manager's managers, Sylvia and SDC (the "Manager's Managers"), and/or ML and SD, pursuant to the management agreement between Landwin Management and Sylvia and SDC, which provides that the Manager's Managers and their principal officers may each select and manage one (1) real estate or real estate related investment per year with any party, including Partners Fund II, independent of the Manager. In any such case, the Manager's Managers and/or their respective principals shall have all rights and powers of the Manager under the Fund's operating agreement attached hereto as Exhibit "A" ("Operating Agreement"). The Manager will also provide all marketing, sales and client services on behalf of the Fund. The mailing address of Landwin Management is: 1340 E. Route 66, Suite 205, Glendora, California 91740. The Manager's telephone number is 626-335-8606 and the facsimile number is 626-335-8605. The Manager's email address is invest@landwin.com, and its website address is www.landwin.com.

Exhibit A

p. 4

## The Fund's Offering

Partners Fund II is offering, solely to investors who qualify as Accredited Investors, a minimum of $5,000,000 (the "Minimum Offering Amount") and a maximum of $20,000,000 (the "Maximum Offering Amount") of limited liability company interests ("Units") in Partners Fund II (the "Offering"). Up to 400 Units are currently being offered to investors at the initial per Unit price of $50,000, with a minimum subscription requirement of one (1) Unit per investor (unless such minimum subscription is reduced in the sole discretion of the Principal Officers), for an current aggregate maximum investment of $20,000,000. The Fund intends to raise $20,000,000 but may, in the Fund's sole discretion, close the Offering after having sold only 100 Units, for an aggregate minimum investment of $5,000,000, or raise more than $20,000,000 providing the total number of Members in the Fund does not exceed 499 investors.

## The Fund's Initial Closing and Final Closing

The Offering will terminate on the earlier of (a) the date upon which subscriptions for $20,000,000 of Units have been accepted, unless the Fund, in its sole discretion, raises more than $20,000,000 as provided herein, or (b) December 31, 2007, unless extended in the Fund's sole discretion. The Fund expects an initial closing (the "Initial Closing") to occur in September 2007, but it must occur no later than December 31, 2007. Investors may subscribe for Units after the Initial Closing up until a final closing (the "Final Closing"), which the Fund expects to occur in December 2007, but which must occur no later than July 1, 2008, at a per Unit price of $50,000 plus an amount equal to 7% per annum of the amount of the initial per Unit price, compounded daily beginning from the date of the Initial Closing to the date such investors subscribe for Units.

## The Sponsors' Formation Fee

Partners Fund II has been formed and organized by the Sponsors, Sylvia and SDC, which have performed work related to the Fund's formation and organization, including the hiring and, until the Initial Closing, managing, of lawyers, accountants, and the Manager; the drafting of this Memorandum, and; the development of the Fund's business plan. In consideration for these services, Partners Fund II will pay each of the Sponsors a fee of $661,000 (the "Formation Fee") pursuant to the Formation Fee agreement (the "Formation Fee Agreement") attached hereto as Exhibit "B", and in the form of the promissory note (the "Note"), attached hereto as an Exhibit to the Formation Fee Agreement, which shall be due within one (1) year from the date of the Fund's Initial Closing. The Sponsors reserve the right to reduce the Formation Fee or to extend the term of the Note in their sole discretion, and their formational and organizational work does not include participating in the offering, marketing or sales of any securities.

## The Fund's Term and Liquidation

Unless earlier dissolved or terminated in accordance with the terms of the Operating Agreement of Landwin Partners Fund II, LLC (the "Operating Agreement"), Partners Fund II will terminate within 10 years of its Final Closing, or not later than December 31, 2018 (unless extended by a vote of the Members owning a majority of the Units), at which time the Fund must either: (a) liquidate assets, distribute proceeds and be dissolved; (b) consummate an initial public offering of its Units, or; (c) be acquired by or merged into another entity such that the Units of the Members of Partners Fund II are exchanged for the securities of such other entity on terms acceptable to the Members owning a majority of the Fund's Units.

## The Fund's Use of Proceeds

Upon the Initial Closing, the proceeds of the Minimum Offering Amount of $5,000,000 and, thereafter until the Final Closing, all subsequent Offering proceeds received and accepted, will be immediately released to the Manager for use in the direct acquisition of real estate and/or real estate related investments, as described above and elsewhere herein. As of the date of this Memorandum, no such real estate and/or real estate related investments have been identified for acquisition by the Fund, and any such real estate and/or real estate related investments to be acquired by the Fund through this Offering will be sourced, evaluated, selected, secured, acquired, managed, re-secured, disposed of, and replaced by the Manager, or the Manager's Managers or their principal officers, as the case may be, in its/their sole discretion, for the exclusive benefit of Partners Fund II and its Members.

## The Fund's Investment Objectives

Generally, the investment objectives of Partners Fund II are:

Exhibit A
p. 5

- to preserve and return the Members' capital contributions (collectively, the "Capital Contributions");
- to pay cash distributions to the Members;
- to realize growth in the value of the Fund's assets upon the ultimate sale of such assets, and;
- to provide the Members with liquidity for their investment according to the Fund's liquidation strategy.

## The Fund's Targeted Real Estate and Real Estate Related Investments

As of the date of this Memorandum, the Fund has neither acquired nor contracted to acquire any real estate or real estate related investments. Generally, the Fund will seek to acquire a portfolio of real estate and/or real estate related investments, focusing primarily on the acquisition of properties that produce current income and/or the opportunity for capital appreciation, including a diverse range of existing and to-be-developed real estate product types, such as:

- Retail shopping centers and malls ("Retail")
- Office buildings ("Office")
- Industrial properties ("Industrial")
- Multi-family apartments ("Multi-family")
- Mixed-use properties ("Mixed-use"), and
- Other investments selected in the sole discretion of the Manager.

In addition, Partners Fund II may make or acquire mortgage loans secured by, or preferred equity investments in entities that own, the same types of properties that the Fund may acquire directly, which are referred to collectively as real estate related investments. Partners Fund II is not limited in the percentage of its assets which may be invested in real estate related investments, nor is the Fund limited in the amount it may invest in subordinated loans, uninsured and non-investment grade mortgage loans, sub-prime loans and balloon loans. However, Landwin Management will monitor these investments to ensure the Fund's compliance with the Investment Company Act of 1940, as amended (the "Investment Company Act"), which may require Landwin Management to impose limitations on the investment activities of Partners Fund II, including limiting the percentage of the Fund's assets that may fall into certain categories specified in the Investment Company Act. In general, there no limitations in the amount that may be invested in permitted investments.

Partners Fund II may also make real estate and/or real estate related investments either alone or through joint ventures with third party developers or others. Traditionally, funds under the management of the Manager incur indebtedness of up to eighty percent (80%) debt-to-twenty percent (20%) equity per property investment, but Partners Fund II may, in the Manager's sole discretion, utilize more or less leverage than traditionally utilized.

## The Fund's Distributions and Distribution Priority

Distributions made to the Members by Partners Fund II will be made net of the Fund's obligations, expenses and reserves on a pro rata basis in accordance with each Member's Units owned, beginning after the Fund has acquired sufficient investments to sustain such distributions, and as determined in the Manager's sole discretion. Distributions will be derived from sources including, but not limited to: (a) cash flow from rental income and loan repayments from real estate or real estate related investments owned by the Fund ("Operational" sources), and; (b) proceeds from financings, refinancings, sales or liquidations of real estate or real estate related investments owned by the Fund ("Transactional" sources). The Manager will, in its sole discretion, determine the designation of distributions, subject to applicable laws and rules, and distributions will be made in the following priority:

a) From Operational Cash Flow:

   i. First, 100% of cash flow distributions from operations of the Fund's real estate and real estate related investments each calendar year, will be distributed to the Members net of obligations, expenses and reserves until each Member has received 7% of their Capital Contribution, as adjusted each calendar year for any return of Capital Contributions made (each Member's "Capital Balance"), as a preferential return (the "Preferential Return" or "Preference"), and;

   ii. In addition to the 7% Preferential Return, thereafter, 70% of cash flow distributions will be distributed to the Members and 30% to the Manager.

b) From Transactional Proceeds:

Exhibit A
p. 6

i.   First, 100% of transactional proceed distributions from any financings, refinancings, sales or liquidations of the Fund's real estate and real estate related investments, will be distributed to the Members net of obligations, expenses and reserves until each Member has received a full return of their Capital Contribution, with each of such distributions reducing by its same amount the Capital Balance upon which the 7% Preference is calculated each calendar year, and with such Preference ceasing once all Members have received the full return of their original Capital Contribution, and;

ii.  In addition to a full return of the Members' Capital Contributions, thereafter, 70% of all distributions will be distributed to the Members and 30% to the Manager.

**Allocation of the Fund's Net Income and Net Loss**

Allocations of the Fund's income, gains, losses, deductions and credits will be made for Federal income tax purposes in accordance with applicable regulations under the Internal Revenue Code and generally in a manner consistent with the foregoing distribution provisions.

**The Fund's Offering Expenses**

Partners Fund II is responsible for all its own expenses, including those relating to this Offering. Based on current estimates, expenses, which are in addition to the Formation Fee, are not expected to exceed $475,000.

**The Manager's Existing Funds and Existing Portfolio of Assets Under Management**

The following is a summary description of selected existing real estate and real estate related investments under the Manager's management as of the date of this Memorandum (each, an "Existing Fund" or "Existing Investment" under the Manager's management, and collectively, the "Existing Funds" and "Existing Investments" under the Manager's management). Partners Fund II has no interest or involvement in the Existing Funds or Existing Investments under the Manager's management, and the investment performance of any of the Existing Funds or Existing Investments under the Manager's management is not indicative of the future performance of Partners Fund II or any investments to be made for the benefit of Partners Fund II. Information regarding each Existing Fund and/or Existing Investments under the Manager's management is provided for informational purposes only and as examples of the general types of real estate and real estate related investments the Manager has historically made for the benefit of the Existing Funds under its management. The selection of Existing Funds or Existing Investments under the Manager's management is as follows:

1. **Ilikai Waikiki Hotel**, Honolulu, HI. The property is a classic deluxe 3-acre oceanfront hotel and condominium conversion project situated on the *Ala Wai Yacht Marina* at the edge of Waikiki, Honolulu, Hawaii, approximately five miles east of the Honolulu International Airport, for which Landwin Management, LLC, is a debt investor, providing the condominium conversion developers with a loan of $2,000,000 secured by two office buildings located in Irvine, California, as well as a loan broker and a marketing consultant.

2. **The Russ Lyon Realty Office Building**, Phoenix, AZ. The property is a 10,000 square foot office building uniquely located on the corner of 32nd Street and Lincoln Boulevard on the border of Phoenix and Paradise Valley, Arizona, an affluent community with strong demographics, high traffic counts, and substantial barriers to entry for future competition.

3. **Verizon Wireless Regional Headquarters**, Chandler Freeways Business Park, Chandler, AZ. The property was purchased for Owner, Landwin Chandler, LLC, and is managed by Landwin Management, LLC pursuant to the Management and Leasing Services Agreement ("MLSA") dated in February 2005. It is a two-story, 170,647 square foot office building fully occupied by Verizon Wireless on a long-term lease, and is utilized as a 24-hour national call center and Regional Headquarters.

4. **Williams Centre Technology Campus**, Tucson, AZ: The property was purchased for Owner, 5401 Williams Owner, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in October, 2002. It includes four separate office buildings, each comprising 50,000 square feet of Class "A" office space anchored by large, nationally-credited tenants, including AOL, Federal Express, Dun and Bradstreet, and The Fluor Corporation.

5. **Tempe Square**, Tempe, AZ: The property was purchased for Owner, Watavision II, LLC, and is managed by

6

Exhibit A
p. 7

Landwin Management, LLC, pursuant to the MLSA dated in August 2004. It is a 105,180 square foot neighborhood retail shopping center anchored by Stein Mart and Trader Joe's along with a well-balanced mix of other nationally-credited tenants, such as, Baskin Robbins, Walgreen's, and AFLAC Insurance, and local tenants, such as Wildflower Bread, and Changing Hands Bookstore.

6. **Kyrene Village**, Chandler, AZ: The property was purchased for Owner, Kyray, LLC, and is managed by Landwin Management, LLC and Arizona Partners pursuant to the MLSA dated in January 2003. It is a 165,000 square foot multi-use neighborhood center anchored by Basha's Grocery, Arizona's largest independent grocer, and the Kyrene Lanes entertainment complex. It has a well-balanced mix of other retail and commercial tenants offering a wide variety of services and merchandise to an upwardly-trending, family-oriented community.

7. **Randolph Plaza**, Tucson, AZ: The property was purchased for Owner, Kyray, LLC, and is managed by Landwin Management, LLC and Arizona Partners pursuant to the MLSA dated in January 2003. It is a 180,000 square foot neighborhood retail shopping center with a mix of nationally-credited and local tenants, including Fry's Supermarket, Arizona's 2nd largest independent grocer, Denny's Restaurant, Carl's Jr., Big Lots, Peter Piper Pizza, Blockbuster Video, Payless Shoes, Sally's Beauty Supply, Greenbacks Dollar Store and Radio Shack.

8. **Lincoln View Plaza**, Phoenix, AZ: The property was purchased for Owner, Evergreen Valley Plaza, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in January 2001. It is a 51,406 square foot mixed-use retail shopping center and office property in a community with strong demographics, high traffic counts, and substantial barriers to entry for future competition. It is anchored by Loehmann's clothing store, Coldwell Banker Real Estate, and Russ Lyon Realty, with a mix of other tenants, including the addition of a 5,000 square foot Chase Manhattan bank branch under construction as of the date of this Memorandum.

9. **Parkway Plaza**, Petaluma, CA: The property was purchased for Owner, Landwin/Ocotillo Marketplace, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in July 2004. It is a 79,512 square foot Class A neighborhood in-fill shopping center anchored by G & G Grocery, a strong-performing, family owned and operated grocer with a second location in Santa Rosa, California. It is located adjacent to a community college, city park, and up-scale neighborhood providing strong traffic counts and consumer patronage. Local tenants include restaurants such as East Side Grill, Romeo's Pizza and Pasta, and Chunky's Taqueria and Grill.

ANY REAL ESTATE AND/OR REAL ESTATE RELATED INVESTMENTS TO BE ACQUIRED THROUGH THIS OFFERING ARE UNIDENTIFIED AS OF THE DATE OF THIS MEMORANDUM AND INVESTORS MUST RELY SOLELY ON THE DISCRETION OF THE MANAGER IN THE IDENTIFICATION, ANALYSIS, SELECTION, FINANCING, ACQUISITION, MANAGEMENT, LEASING, DEVELOPMENT, REDEVELOPMENT, RENOVATION, REFINANCING, DISPOSITION AND REPLACEMENT OF SUCH REAL ESTATE AND REAL ESTATE RELATED INVESTMENTS.

**Prior Investment Programs of the Manager, the Manager's Managers and/or Their Respective Principal Officers**

The Sponsors of Partners Fund II, Sylvia and SDC, which are also the Manager's Managers, and their respective principal officers, ML and SD, have collectively sponsored and successfully managed numerous real estate and other investment programs since 1969 and 1989, respectively. In the case of Sylvia and its principal officer, ML, prior programs include, but are not limited to, the development, construction, marketing, sales and management of approximately three million (3,000,000) square feet of multi-family condominium/apartment units in the Los Angeles, California market, and approximately seven million (7,000,000) square feet of diverse commercial real estate property types, including retail, office, industrial, multi-family, mixed-use and special-use properties, throughout the United States. No investor has ever lost principal invested through any of the Sponsors' prior real estate programs.

For summary informational purposes solely, this Memorandum contains discussion only of those prior real estate investment programs sponsored by one or both the Sponsors which are, as of the date of this Memorandum, currently operational, meaning they currently hold their investments and have not yet disposed of them. Other prior programs have all successfully disposed of their assets and reinvested in like-kind investments through 1031 exchanges. In aggregate, the prior programs of the Sponsors have completed fundraising of over $125,000,000 in equity capital contributions (and raised an additional $4,731,767 in equity capital contributions collectively from Landis, LLC, the principal holding company of the Landis family, also managed by ML, and Dennison, LLC, the principal holding company of the Dennison family, also managed by SD, with such investments being made on the same terms and conditions as those made by outside investors) from approximately 1,513 individual investors (although numerous investors have invested in more than one program). The

Exhibit A
p. 8

7

investment objectives of these prior programs have all been similar to the investment objectives of Partners Fund II, though again, the performance of these prior programs is not indicative of the future performance of Partners Fund II.

The performance of any prior program sponsored and managed by the Sponsors, the Manager or the Manager's Managers, or their respective principal officers or affiliates, is not indicative of the ultimate performance of Partners Fund II, and thus, prospective investors and Members in the Fund should not assume they will experience financial performance and returns comparable to those experienced by investors and members in such prior programs.

## The Manager's Fees-for-Services and Distribution Sharing Rights

At the Initial Closing of Partners Fund II, the Fund will have entered into its Operating Agreement, attached hereto as Exhibit "A", and into the General Management and Property Management Agreement, attached hereto as Exhibit B to the Operating Agreement. Collectively, these agreements are among the Fund, on the one hand, and the Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, Martin Landis and Seán Dennison, on the other hand. The Operating Agreement and the General Management and Property Management Agreement set forth Landwin Management as the Manager of Partners Fund II, and provide, among other provisions, that the Manager has the general responsibility of overseeing and managing all aspects of the Fund's operations, including sourcing, assessing, selecting, financing, acquiring, managing, leasing, developing, redeveloping, renovating, repositioning, refinancing, disposing of, and exchanging or replacing any real estate or real estate related investments of Partners Fund II, except for those selected and managed by the Manager's Managers and/or respective principal officers pursuant to the management agreement between Landwin Management and the Manager's Managers in which the Manager's Managers and their principal officers may each select and manage one (1) real estate or real estate related investment per year with any party or entity, including Partners Fund II. In any such case, the Manager's Managers or their respective principal officers, as the case may be, shall have all rights and powers conferred upon the Manager under the Fund's Operating Agreement.

In consideration thereof, the Manager shall be entitled to receive the following fees for services (the Manager's "Fees-for-Services") which are in addition to any third party fees, including, but not limited to, brokerage and lender fees, and the Manager's share in cash distributions made by the Fund:

a) Acquisition Fees: 2.5% of the total purchase price (equity plus debt) of any real estate investment purchased by Partners Fund II, paid in cash at the closings of such transactions;

b) Property Management Fees: The greater of 5.5% of the actual gross monthly rent collections from any real estate investment of Partners Fund II, or $5,000 per month;

c) Leasing Fees: Negotiated on a case-by-case basis subject to factors including, but not limited to, term lengths of leases, creditability of tenants, location of space within properties, competition, and market rates, but not less than 5% of the rent per lease with: (i) renewal commissions being not less than 2.5% of the rent per lease for renewals on the same amount of space, and not less than 5% of the rent per lease for renewals on any additional space; (ii) month-to-month lease commissions being 50% of the first month's rent and in no event less than $500, and; (iii) all lease-related administration fees being in addition to all the foregoing;

d) Financing and Refinancing Fees: Not to exceed 1% of the amount of new and refinanced loans secured;

e) Development, Redevelopment and/or Construction Management Fees: Negotiated on a case-by-case basis subject to factors related to projects, typically a minimum of 5% of amounts expended;

f) Disposition Fees: 2.5% of the total sales price of any real property sold by Partners Fund II, paid in cash at the closings of such transactions, and;

g) Distribution Sharing Payments: 30% of all operational cash flow distributions after the Members have received the 7% Preferential Return and 30% of all distributions after the Members have received a full return of their Capital Contributions, as set forth in the PPM.

## Withdrawal from the Fund and Transfer of the Units

Members in Partners Fund II may not withdraw from the Fund. In addition, a Member may not transfer or assign

8

Exhibit A
p. 9

any portion of interest in Partners Fund II without (i) the prior written consent of the Manager, which consent may be given or withheld in the Manager's sole discretion, and (ii) in compliance with certain other limitations.

## Removal of the Manager

The Manager may be removed by the Fund only upon the final adjudication of intentional wrongful acts to the Fund's substantial detriment.

## Liability/Indemnification of the Manager

The Fund is obligated pursuant to the General Management and Property Management Agreement to indemnify and hold harmless the Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, and the Property Manager, and any affiliates, consultants, employees, agents, owners, members, and purchasers, for all losses or liabilities, other than for the final adjudication of intentional wrongful acts to the Fund's substantial detriment. The Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their principal officers, and the Property Manager and any affiliates, consultants, employees, agents, owners, members, and purchasers will not be liable to the Fund or its Members except for the final adjudication of intentional wrongful acts to the substantial detriment of the Fund, and a successful claim for such indemnification would deplete the Fund's assets by any amounts paid.

## Subscription Procedures

Cash tendered by investors in payment for Units will be held in the Fund's interest-bearing account at Wells Fargo Bank in Glendora, California (the "Partners Fund II Account"), pending the Initial Closing. All such subscription payments, while held in the Partners Fund II Account, will earn interest, and upon the Initial Closing, such subscription payments, together with such interest, will be released to the Manager for the uses described herein. In the event the Initial Closing has not occurred prior to December 31, 2007, unless extended in the sole discretion of the Fund's Principal Officers, or the earlier termination of the Offering, then: (i) none of the Units will be sold; (ii) all such subscription payments will be refunded in full to each subscriber; and (iii) all actual interest earned on the subscription payments while held in the Partners Fund II Account will be distributed equitably to each subscriber based on the amount of funds and number of days such funds were held in the Partners Fund II Account.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit A
p. 10

**Partners Fund II's Structure**

The following chart indicates the relationship among the Fund and its Members, the Sponsors, the Manager, and the Fund's targeted real estate and real estate-related investments:



Exhibit A
p. 11

## INVESTMENT HIGHLIGHTS

An investment in Partners Fund II offers certain benefits, however, there can be no assurance given that any of these benefits will be realized or will result in profits or even a return of capital to Members. See "Risk Factors."

**Experience of the Manager, the Manager's Managers and their Respective Principal Officers, and the Fund's Principal:** The Manager and the Manager's Managers, Sylvia and SDC, and their respective principal officers, ML and SD (the "Principal Officers"), who together with Jack Andrews, Tom Casault, Chris Parnass, David Hunnewell, Gabriela de Marinis, Megan McAlpine, and others as may be appointed by the Principal Officers (collectively, the "Officers"), have substantial experience in real estate advisory, investment, asset management, property management, and private equity fund formation, organization, syndication and management, as well as in real estate development, redevelopment, renovation and construction management, and general business management and entrepreneurship. The Officers, through various entities and affiliates, have formed, organized, sponsored, syndicated and managed multiple limited liability companies, limited partnerships, corporations and businesses, including multiple prior and existing real estate investment fund programs and operating companies. However, their past performance is not indicative of the future performance of Partners Fund II.

**Benefits of Investing in Partners Fund II:** Members in Partners Fund II are anticipated to receive the benefits of equity ownership interest in an investment entity which will hold direct ownership in real estate and real estate related investments, entitling such Members to their pro rata share in distributions made derived from sources including, but not limited to: (a) rental income and loan repayments from real estate or real estate related investments ("Operational" sources), and; (b) financings, refinancings, sales or liquidations of real estate or real estate related investments ("Transactional" sources). Members will receive 100% of Operational cash flow distributions each year until they have received 7% of their Capital Contribution as a Preferential Return, and 100% of Transactional proceeds until they have received a full return of Capital.

**The Fund's Investment Objectives:** Partners Fund II's investment objectives are (i) to preserve and return Members' Capital Contributions; (ii) to pay Members cash distributions; (iii) to realize growth in the value of its assets, and; (iv) to provide Members with liquidity through the Fund's liquidation strategy.

**Description of the Fund's Targeted Investments:** The Fund intends to invest in a diverse portfolio of real estate and real estate related investments, focusing primarily on properties that produce current income and the opportunity for capital appreciation, such as the following existing and to-be-developed property types:

*Retail.* The Manager will generally seek well-located shopping center, mall, neighborhood/community and strip center opportunities serving local markets and anchored by a supermarket, drug or discount store.

*Office.* The Manager will generally seek multi-tenant and net leased office building opportunities in excess of 50,000 square feet located in established markets with expected future job growth and/or some barriers to entry.

*Industrial.* The Manager will generally seek industrial warehouse and distribution building opportunities in excess of 50,000 square feet located in major markets with a focus on transportation hubs and gateway cities.

*Multi-Family.* The Manager will generally seek apartment and condominium project opportunities of various sizes located in markets expected to exhibit future household formation and job growth with some barriers to entry.

*Mixed Use.* The Manager will generally seek mixed-use property opportunities in strong, expanding markets typically combining retail, multi-family and/or office properties.

In addition, the Fund may make or acquire mortgage loans secured by, or preferred equity investments in entities that own, the same types of properties that it may acquire directly, which are referred to collectively as real estate related investments. The Fund may also make real estate and/or real estate related investments either alone or in joint ventures with third party developers and others. The Fund expects to incur indebtedness of up to eighty percent (80%) debt-to-twenty percent (20%) equity per property investment, but may, in the Manager's sole discretion, utilize more or less leverage.

While the Fund will generally seek to acquire investments of the types described above, the Manager will select investments that in its sole estimation best enable Partners Fund II to meet its investment objectives, taking into account the diversification of its portfolio at the time, relevant real estate and financial factors, the location, income-producing capacity and the prospects for long-range appreciation of a particular investment and other considerations. As a result, Partners Fund II may acquire investments other than the types described above, including, for example, medical office buildings, hotels or motels, parking lots and structures, restaurant facilities, self-storage properties, or special purpose properties, such as, manufacturing facilities. In addition, the Fund may acquire properties that vary from the parameters described above for a particular property type, although significant variation from those parameters is not expected. For instance, the Fund may acquire more large than small properties, or more new development projects than existing properties.

Exhibit A
p. 12

11

## RISK FACTORS

Investors should be aware that an investment in the Units is a speculative investment involving certain risks. Investors should carefully read this Memorandum prior to making an investment and should be able to bear the complete loss of their investment.

### Risks Relating to the Partners Fund II Offering

Landwin Partners Fund II, LLC ("Partners Fund II" or the "Fund") is a blind pool fund, meaning that as of the date of this Memorandum, no real estate investments have been identified for acquisition by the Fund. The proceeds of this Offering are intended to be invested in real estate and real estate related investments which, as of the date of this Memorandum, have not been selected by the Manager. Additionally, no assurances can be given that the Fund will be successful in obtaining suitable investments or that, if investments are made for the benefit of Partners Fund II, that the Fund's investment objectives will be achieved. Investors in Partners Fund II must rely solely on the ability of the Manager to source and transact future real estate and/or real estate-related investments for the benefit of the Fund. Accordingly, investors will not have the ability to review specific future real estate and/or real estate-related investments prior to investing in Partners Fund II.

The Unit price has been set on an arbitrary basis bearing no relationship to any pre-determined or previously established valuation criteria. The Sponsors determined the selling price of the Fund's Units and such price bears no relationship to any pre-determined or previously established criteria for valuing issued or outstanding limited liability company units. The Unit price may not be indicative of the price at which the Units would trade if they were listed on an exchange or actively traded by brokers, nor of the proceeds that an investor would receive if the Fund were liquidated or dissolved. In addition, the Manager, in its sole discretion, may reduce or decline to reduce the minimum investment for any investor by dividing or fractionalizing the Units.

The risk that the Fund will not be able to accomplish its business objectives will increase if only the minimum number of Units is purchased in this Offering. As a recently formed entity, Partners Fund II may not be able to solicit sufficient investors to purchase the maximum number of Units the Fund is offering. Accordingly, the Fund is subject to the risk that all of the Units offered hereby may not be sold. If Partners Fund II only sells the Minimum Offering Amount, the Fund will only be able to make a minimal number of investments, and the actual number of such investments cannot be pre-determined because the amount of each investment depends on a number of factors. In such an event, Partners Fund II would have less diversification in terms of the number and types of investments it would own and in terms of the geographic regions in which its investments would be located. If the investments of Partners Fund II are not diversified, its operations and ability to make distributions would be dependent on the success of a smaller number of investments. Therefore, if the Fund is only sells a small number of Units in this Offering, it may lack a diversified portfolio of investments and its fixed operating expenses, such as general and administrative expenses (as a percentage of gross income), would be higher and the Fund may not achieve the benefits associated with a larger real estate portfolio.

If, through the Manager, Partners Fund II is unable to find suitable investments, then the Fund may not be able to achieve its investment objectives or pay distributions. The ability of Partners Fund II to achieve its investment objectives and pay distributions to Members is dependent upon the performance of the Manager in the identification of investments and the determination and securitization of any financing arrangements. Except for the investments described in one or more supplements to this Memorandum, investors have no prior opportunity to evaluate the terms of transactions or other economic or financial data concerning the Fund's investments. Investors must rely entirely on the ability of the Manager, and it cannot be guaranteed that the Manager will, in fact, be successful in obtaining suitable investments on financially attractive terms, or that, if the Manager makes investments on behalf of the Fund, that the Fund's investment objectives will be achieved. If, through the Manager, Partners Fund II is unable to find suitable investments, it will be solely at the discretion of the Manager what action, if any, will be taken, and in such an event, the Fund's ability to achieve its investment objectives and pay distributions to Members may be adversely affected.

Investors who subscribe to the Offering by providing funds in advance of the Initial Closing lose the use of those funds pending the Initial Closing. In subscribing to the Partners Fund II Offering, investors must provide their subscription payment at the time their subscription agreement (the "Subscription Agreement") is submitted, though the funds provided to make such payment may not be actually invested in Partners Fund II until as late as December 31, 2007 with respect to the Initial Closing (unless the Initial Closing is extended), and thereafter, subscription payments may be accepted and released to the Manager upon receipt and review. If the Initial Closing does not occur, subscription payments are

Exhibit A
p. 13

expected to be returned to such investors with interest. On the other hand, if the Initial Closing does occur, any interest earned on accepted subscription payments deposited into the Partners Fund II's interest-bearing account, will go to the Fund.

**Investors who subscribe to the Offering by providing funds in advance of the Initial Closing and prior to the Final Closing will experience a dilution of their percentage interest in the Fund as subsequent investors are accepted.** At the Initial Closing, Partners Fund II will have received and accepted the first $5,000,000 in subscription payments made by investors who will at that time receive Units representing 100% of the total number of Units then outstanding. To the extent that additional investors subscribe to the Partners Fund II Offering following the Initial Closing, and are accepted and become Members in Partners Fund II, the Members who had participated in the Offering prior to the Initial Closing will experience a dilution of their original percentage ownership interest in Partners Fund II. For example, assuming the Offering was fully subscribed and the Final Closing was conducted with the maximum Offering amount of $20,000,000 having been received and accepted, those Members who had participated in the Offering prior to the Initial Closing on the first $5,000,000 accepted would necessarily experience a dilution in their original percentage interest from 100% to approximately 20% of the total number of Units then outstanding.

**Investors who provide funds after the Initial Closing and prior to the Final Closing will pay an increased effective per unit price for the Units.** The effective price per unit for Units in the Partners Fund II Offering increases by 7% per annum compounding daily from the date of the Initial Closing to the date of the Final Closing. Accordingly, investors who provide funds after the Initial Closing will pay an increased unit price for Units over that paid by investors who subscribed to the Offering by providing funds and were accepted in advance of the Fund's Initial Closing.

### Risks Relating to the Fund's Sponsors and Officers

**Partners Fund II will pay its Sponsors a Formation Fee for work related to the formation and organization of the Fund.** Partners Fund II will pay each of its two Sponsors a Formation Fee of $661,000, which amounts will be payable pursuant to the terms of the Formation Fee Agreement attached hereto as Exhibit "B" in the form of the Promissory Note attached thereto as Exhibit A to the Formation Fee Agreement,, due and payable within one (1) year from the date of the Initial Closing. At any time subsequent to the Initial Closing, the Manager, in its sole discretion, is entitled to cause Partners Fund II to pay the Formation Fee to the Sponsors in full, including from the Fund's Offering proceeds and prior to the availability of any other source from which to pay such Formation Fee. To the extent the Manager causes Partners Fund II to pay the Formation Fee to the Sponsors from the Fund's Offering proceeds, the Fund's Offering proceeds available for investment in its targeted real estate and/or real estate related investments will be reduced by the amount of such Formation Fee so paid. The Sponsors are also the Manager's Managers, and because the Formation Fee will be payable to the Sponsors, whose principal officers are also the Fund's Principal Officers, the principal officers of the Sponsors will be entitled to share in any benefits of the Formation Fee net of their own respective expense reimbursement, though the Sponsors reserve the right to reduce the Formation Fee or to extend the term of the Note in their sole discretion.

**The Sponsors, the Manager and the Manager's Managers and their respective principal officers, and the Principal Officers of the Fund are affiliates, and, as such, may face potential conflicts of interest.** The Sponsors are also the Manager's Managers, and, through an affiliate, each hold an indirect ownership interest in the Manager. In addition, the respective principal officers of the two Sponsors are also the Principal Officers of Partners Fund II. Accordingly, the Sponsors and their principal officers, as well as the Manager and the Manager's Managers and their respective principal officers, along with the Principal Officers of the Fund, may face potential conflicts of interest related to their various roles, relationships, fiduciary duties and responsibilities.

**Indemnification of the Sponsors and their respective principal officers and all affiliates.** Partners Fund II is obligated pursuant to its Operating Agreement, attached hereto as Exhibit "A", to indemnify and hold harmless the Sponsors and their respective principal officers, shareholders and members, and their respective affiliates, as well as any consultants, employees, agents and associates related thereto, for any and all losses or liabilities, other than for final adjudication of intentional wrongful acts to the Fund's substantial detriment. As a result, the Sponsors and their respective principal officers, shareholders and members, and all affiliates are fully indemnified from the Fund's assets to the extent any of the foregoing suffers any losses or incurs any liabilities unless there has occurred such final adjudication of intentional wrongful acts to the Fund's substantial detriment, and any successful claim for such indemnification would deplete the Fund's assets by any amounts paid. The Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, and the Property Manager and any affiliates, consultants, employees, agents, owners, members, and purchasers will not be liable to the Fund or its Members except for such final adjudication of intentional wrongful acts to the substantial detriment of the Fund, and any successful claim for such indemnification would deplete the Fund's assets by any amounts paid.

**Risks Relating to the Fund's Manager and the Manager's Managers and their Respective Principal Officers**

**The Manager, Landwin Management, LLC, also manages other funds, investments and properties as a full-service real estate investment business management, asset management and property management operating business originally established in 1987, and is anticipated to continue managing other future funds, investments and properties in addition to Partners Fund II and any investments and properties it may acquire. Accordingly, the Manager may face potential conflicts of interest in also serving as asset manager and property manager to other funds.** The Manager is a real estate investment business management, asset management and property management business originally established in 1987. Accordingly, it has been, is, and will continue to be, in the business of serving its investor clientele by seeking engagements as manager of fund entities in which investor clientele become members, partners and/or shareholders through their purchase of the securities of such fund entities. Therefore, the Manager has fiduciary duties to existing investor clientele and to the other fund entities in which such clientele are members. As of the date of this Memorandum, the Manager serves as manager of twelve (12) such existing investment entities (the "Existing Funds") through which individual investor clientele hold ownership in twelve (12) real estate and/or real estate related investments. In addition, the Management Agreement between Partners Fund II and the Manager, Landwin Management, LLC, attached hereto as Exhibit A to the Operating Agreement, places no limitations on the Manager's right to be engaged, in its sole discretion, as manager of other future fund entities or other investments, notwithstanding its fiduciary duty to Partners Fund II. Accordingly, while engaged as the Manager, Landwin Management, LLC, will also continue to serve as manager of the Existing Funds, and anticipates serving as manager of other future fund entities in addition to Partners Fund II. Therefore, the Manager may face potential conflicts of interest extending from its various roles and fiduciary duties as manager of multiple fund entities whose members may not always be the same investor clientele. While it is the intention of the Manager that such other future fund entities will co-invest, or joint venture, with Partners Fund II in acquiring real estate and real estate-related investments whenever such joint ventures are possible, appropriate and mutually advantageous, there can be no guarantees made herein that such joint ventures will occur or will always be possible, appropriate or mutually advantageous. Furthermore, pursuant to the Management Agreement, the Manager has the sole discretion to determine which real estate and/or real estate-related investments Partners Fund II will acquire and what percentage of the available equity ownership interest in any such joint venture investment will be acquired by Partners Fund II. See "Conflicts of Interest."

**The success of Partners Fund II is dependent upon the performance of the Manager, and, as the case may be, the Manager's Managers and/or their respective principal officers.** While engaged as the Manager pursuant to the General Management and Property Management Agreement, all decisions regarding the management of the affairs of Partners Fund II, including, but not limited to, negotiating any terms of loans and managing the Fund's day-to-day operations, will be made exclusively by the Manager, except for those investments selected and managed by the Manager's Managers and/or their respective principal officers pursuant to the management agreement between the Manager and the Manager's Managers and their respective principal officers, under which the Manager's Managers and their respective principal officers may select and manage one (1) real estate and/or real estate investment per year with any party or entity, including Partners Fund II, and in such cases shall have all rights and powers conferred upon the Manager under the Fund's Operating Agreement. None of the investors who become Members in Partners Fund II shall have any decision-making rights, powers or authority with respect to the management of the affairs of Partners Fund II, other than with respect to matters expressly put before such Members by the Manager, or the Manager's Managers or their respective principal officers, as the case may be, in their sole discretion, for a Member vote. Accordingly, no person should purchase Units in Partners Fund II unless that person is willing to entrust all aspects of the Fund's management to the Manager, or the Manager's Managers and/or their respective principals, as the case may be.

**The Manager's Managers and their respective principal officers may each select and manage one (1) real estate and/or real estate related investment per year with any party or entity, including Partners Fund II, independent of the Manager pursuant to the management agreement between the Manager and the Manager's Managers.** Pursuant to the management agreement between the Manager, Landwin Management, LLC, and its managers, Sylvia, Inc., and SmithDennison Capital, LLC, the managers of the Manager and their respective principal officers may each select and manage one (1) real estate and/or real estate related investment per year with any party or entity, including Partners Fund II, independently of the Manager, and accordingly, the Manager's Managers and/or their respective principal officers may, in their sole discretion, exercise their rights thereto and be entitled to all benefits that may have otherwise been received by the Manager.

**The Manager's experience in managing blind pool funds is limited.** Though the Manager and its managers and their respective principals have substantial collective experience in operating an asset management and property management business and in making multiple successful real estate investments on behalf of clientele through specified-asset funds

14

Exhibit A
p. 15

organized as special-purpose, single-asset, limited liability companies, the Manager has experience managing multi-asset ~~id~~ pool funds, such as Partners Fund II, which is limited to Landwin Partners Fund I, LLC, the predecessor fund of ~~Partners~~ Fund II.

**The Manager may only be terminated under certain circumstances.** The Manager may only be removed as Manager of Partners Fund II upon the final adjudication of intentional wrongdoing to the Fund's substantial detriment. Since the Manager will manage the Fund's day-to-day affairs, and the Members will not be involved with such affairs in order to preserve the limitations on their liability as passive members of a limited liability company, it is up to the Manager to enforce this provision.

**Indemnification of the Manager, the Manager's Managers and their respective principal officers and affiliates.** Partners Fund II is obligated pursuant to the General Management and Property Management Agreement to indemnify and hold harmless the Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, shareholders and members, and all affiliates thereof, as well as any consultants, employees, agents and affiliates, for all losses or liabilities, other than for final adjudication of intentional wrongful acts to the Fund's substantial detriment. As a result, the Manager and the Manager's Managers and their respective principal officers and affiliates will be fully indemnified from the Fund's assets to the extent they suffer any losses or incur any liabilities unless there has occurred such final adjudication of intentional wrongful acts to the Fund's substantial detriment, and any successful claim for such indemnification would deplete the Fund's assets by any amounts paid.

**The Manager's prior performance is not an indication of Partners Fund II's future results.** Although the Manager and its managers and their respective principals have organized and/or managed multiple real estate and other investments, Partners Fund II is a new entity with no prior performance, and the prior performance of past real estate and other investments managed by the Manager and/or their managers and respective principals is no indication of the Partners Fund II's future results. Therefore, investors must rely upon their independent evaluations of Partners Fund II, its business plan, its Manager's background and the backgrounds of its Manager's managers and their respective principals, as well as the structure of this Offering as described herein, performing all necessary due diligence to determine the appropriateness of an investment in Partners Fund II.

**~~Risks~~ Relating to the Formation, Organization and Operation of Partners Fund II**

**Partners Fund II classifies as a speculative investment since there are no guarantees of cash distributions.** Because Partners Fund II is a new entity with no prior performance structured as a blind pool fund, no guarantees can be given that it will meet its investment objectives, or that Members in the Fund will realize a return on their investment, or that Members will not lose their entire investment in the Fund. Each investor should consult with his or her own attorney or business advisor prior to making any investment. There can be no assurance that distributions will, in fact, be made or, if made, that distributions will be made when or in amounts anticipated. The Manager intends to distribute sufficient cash from the Fund's investments activities to enable the Members to pay any taxes imposed on any taxable income generated by the Fund; however, there can be no assurances given that the Manager will be able to do so.

**Neither the Fund nor the Manager has or will retain any legal, tax or other representation for prospective investors, subscribers or Members in the Fund.** Legal, tax and other representation for Partners Fund II, its Sponsors, its Manager or its managers and their respective principals and affiliates, does not represent, and shall not be deemed to have represented, or to be representing, any of the investors, subscribers or Members of Partners Fund II in any respect whatsoever. All investors, subscribers and Members in Partners Fund II are encouraged to seek their own legal, tax and other representation.

**Partners Fund II may be involved with third parties, and, accordingly, there may be risk of third party-related litigation.** Partners Fund II may, in the sole discretion of the Manager, co-invest, joint venture, or otherwise structure relationships with third parties. Such activities may involve risks not present where third parties are not involved, including the possibility that a co-investor, joint venture partner, or other third party, may at any time have other business interests and investments other than the co-investment, joint venture, or other relationship with Partners Fund II, or may have economic or business goals different from those of Partners Fund II. In addition, Partners Fund II may be considered liable for actions of its co-investors, joint venture partners or other third parties. The Fund's investment activities may subject it to ~~the~~ normal risks of becoming involved in litigation related to such third parties, and the expense of defending against such ~~claims~~, and paying any amounts pursuant to the settlement or judgment of such litigation, is borne by Partners Fund II and any such costs or payments made would reduce the Fund's net assets. Subject to conditions described elsewhere herein, the Manager and others are fully indemnified in connection with any such litigation.

Exhibit A
p. 16

**Risks Relating to Private Offerings and their Lack of Liquidity**

**There is a limited transferability of the Units.** Each investor who becomes a Member in Partners Fund II by having their subscription to the Offering accepted will be required to represent that he or she is acquiring their Units for investment purposes only and not with a view to distribution or resale, and that such Member understands the Units are not freely transferable and, in any event, that such investor must bear the economic risk of their investment in Partners Fund II for an indefinite period of time. Under applicable law, Units cannot be sold unless they are subsequently registered for resale (which the Fund has no obligation or intention to do) or an exemption from such registration is available. There will be no market for the Units of Partners Fund II, and investors cannot expect to be able to liquidate their investment in case of an emergency or for any other reason. Furthermore, the sale of the Fund's Units may have adverse federal income tax consequences. Finally, Members in Partners Fund II will be required to obtain the prior written consent of the Manager in order to transfer their Units, and the Manager may, in its sole discretion, withhold or delay such consent. Therefore, investors should not invest in Partners Fund II unless they are prepared to hold their Units for an indefinite period of time.

**The Offering is exempt from registration and is not registered with the Securities and Exchange Commission or any State securities authorities.** This Offering of Units in Partners Fund II has not been, and will not be, registered with the Securities and Exchange Commission or the securities agency of any State, and is being offered in reliance upon an exemption from the registration provisions and state securities laws applicable only to offers and sales of securities to certain investors who meet certain suitability requirements, as set forth herein. As a result, no agency or authority has passed on the accuracy or determined the adequacy of this Memorandum. Further, the terms and conditions of this Offering may not comply with the guidelines and regulations established for real estate programs that are required to be registered and qualified with those agencies or authorities.

**Risks Related to Real Estate Investments**

To the extent Partners Fund II acquires any real estate or real estate related investments, any or all of the following risks may be applicable.

**Investment in real property is subject to many risks.** Fluctuations in vacancy rates, rent schedules, and operating expenses can adversely affect operating results or render the sale or refinancing of property difficult or unattractive. No assurance can be given as to the future levels of occupancy of any properties anticipated to be owned by Partners Fund II as to the cost of tenant improvements, or as to the future costs of operating the properties or other items, events and factors that are beyond our control or the control of the Manager. Such factors include, but are not limited to, continued validity and enforceability of the leases, vacancy rates for properties, financial resources of tenants, rent levels, adverse changes in local population trends, market conditions, neighborhood values, local, regional, national and global economic and social conditions, supply and demand for property, competition from similar properties, interest rates and real estate tax rates, governmental rules, regulations, fiscal policies, the enactment of unfavorable real estate, rent control, environmental, or zoning laws, hazardous material laws, uninsured losses, effects of inflation, and other risks.

**The presence of toxic and hazardous materials, and lack of environmental indemnity, could severely impact the Fund's profitability.** Federal, state and local laws impose liability on a landowner for releases or the otherwise improper presence on the premises of hazardous substances. This liability is without regard to fault for, or knowledge of, the presence of such substances. A landowner may be held liable for hazardous materials brought onto a property before he, she or it acquired title and for hazardous materials that are not discovered until after he, she or it sells a property. The sellers of properties will make only limited representations, if any, as to the absence of hazardous substances. If any hazardous materials are found at any time within any portion of any properties to be acquired by Partners Fund II in violation of law, the profitability of Partners Fund II may be severely affected.

**Interest rates may rise, negatively impacting the Fund's profitability.** If there is an increase in interest rates, or if lenders impose restrictive terms and conditions, debt servicing on real estate investments could be significantly higher than anticipated, which could negatively impact the cash flow of underlying real properties owned by Partners Fund II and the corresponding income to Partners Fund II.

**Tax Risks**

**Tax Risks.** There are risks associated with the federal income tax aspects of an investment in Partners Fund II. Counsel will not render an opinion on tax issues affecting the Units, and a ruling has not been obtained from the Internal Revenue Service ("IRS"). In addition, the IRS has continued to examine numerous tax issues that could affect Partners Fund

Exhibit A
p. 17

II and/or one or more of any of its future real estate and/or real estate related investments. Moreover, the income tax consequences of an investment in Partners Fund II are complex, and tax legislation is pending that could make substantive revisions to the Internal Revenue Code (the "Code"). The following paragraphs summarize some of the tax risks to the Members who own Units. A further discussion of the tax aspects (including other tax risks) of an investment in Partners Fund II is set forth in "Federal Income Tax Consequences". Because the tax aspects of this Offering are complex and certain of the tax consequences may differ depending on individual tax circumstances, each investor must consult with and rely on his, her or its own independent tax advisor concerning the tax aspects of this Offering and his, her or its individual situation.

**NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER IS MADE WITH RESPECT TO THE ACCEPTANCE BY THE IRS OF THE TREATMENT OF ANY ITEM BY PARTNERS FUND II OR ANY INVESTOR.**

**Risk of Audit.** Partners Fund II's federal information returns may be audited by the IRS. Such audit may result in the challenge and disallowance of some of the deductions or increase in the taxable income described in such returns. No assurance or warranty of any kind can be made with respect to the deductibility or taxability of any such items in the event of either an audit or any litigation resulting from an audit.

**Tax Classification of Partners Fund II.** Partners Fund II intends to be taxed as a partnership for federal income tax purposes. If the Fund were to be treated for tax purposes as a corporation, the tax benefits associated with an investment in Partners Fund II, if any, would not be available to the Members. Partners Fund II would, among other things, pay income tax on its earnings in the same manner and at the same rate as a corporation, and losses, if any, would not be passed through to, and deductible by, the Members (see "Federal Income Tax Consequences - Tax Consequences Regarding Partners Fund II-- Status as Partnership").

**Possible Disallowance of Various Deductions.** The availability, timing and amount of deductions or allocations of income of Partners Fund II will depend not only upon general legal principles but also upon various determinations that are subject to potential controversy on factual and other grounds. Such determinations could include, among other things, whether fees paid to its Sponsors or Manager or affiliates are deductible on the ground that such payments are excessive or constitute nondeductible distributions to the Sponsors, Manager or affiliates or otherwise, or could relate to the allocation of basis to the assets of Partners Fund II. If the IRS were successful, in whole or in part, in challenging Partners Fund II on these issues, the federal income tax benefits of an investment in Partners Fund II could be materially reduced (see "Federal Income Tax Consequences").

**Limitations on Losses from Passive Activities.** Deductions in excess of income (i.e., losses) from passive trade or business activities generally may not be used to offset "portfolio income", i.e., interest, dividends and royalties, or salary or other active business income. Deductions from passive activities generally may be used to offset income from passive activities. Interest deductions attributable to passive activities are treated as passive activity deductions, and not as investment interest. Thus, such interest deductions are subject to limitation under the passive activity loss rule and not under the investment interest limitation. Credits from passive activities generally are limited to the tax attributable to the income from passive activities. Passive activities include trade or business activities in which the taxpayer does not materially participate, which would include holding an interest as a Member in Partners Fund II. Thus, Partners Fund II's net income and net loss probably will constitute income and loss from a passive activity (see "Federal Income Tax Consequences - Limitations on Losses from Passive Activities").

**Allocation of Net Income and Net Losses.** In order for the allocations of income, gains, deductions, losses and credits under the Operating Agreement to be recognized for tax purposes, such allocations must possess substantial economic effect. No assurance can be given that the IRS will not claim that such allocations lack substantial economic effect. If any such challenge to the allocation of losses to any Member were upheld, the tax treatment of the investment for such Member could be adversely affected (see "Federal Income Tax Consequences - Tax Consequences Regarding Partners Fund II- Allocations of Net Income and Net Loss").

**Taxable Income in Excess of Cash Receipts and Transfer of Units.** It is possible that a Member's taxable income resulting from his, her or its interest in Partners Fund II will exceed the cash distributions attributable thereto. This may occur because funds received by Partners Fund II may be taxable income to Partners Fund II while Partners Fund II may use such funds for nondeductible operating or capital expenses ("Capital Expenses"). Thus, there may be years in which a Member's tax liability exceeds his, her or its share of cash distributions from Partners Fund II (See "Federal Income Tax Consequences"). The same tax consequences may result from the sale or transfer of a Member's Units, whether voluntary or involuntary, and may produce ordinary income or capital gain or loss (see "Federal Income Tax Consequences - Tax

Exhibit A
p. 18

Consequences Regarding Partners Fund II -- Treatment of Gain or Loss on Disposition of Units; - General Considerations -- Alternative Minimum Tax"). Members must also be aware that they will not be able to roll over any gain recognized on the disposition of their Units under a Section 1031 of the Code, given that the Units are treated as interests in a partnership for tax purposes, which are not eligible for a Section 1031 like-kind exchange.

**Potential Limitation of Net Loss.** Investors should be aware that the Members will only be able to use net loss up to the amount of the tax basis in their Units.

**Alternative Minimum Tax.** The alternative minimum tax applies to designated items of tax preference. The limitations on the deduction of passive losses also applies for purposes of computing alternative minimum taxable income (See "Federal Income Tax Consequences - General Considerations -- Alternative Minimum Tax").

**Accuracy Related Penalties and Interest.** In the event of an audit that disallows Partners Fund II deductions, investors should be aware that the IRS could assess significant penalties and interest on tax deficiencies. The Code provides for penalties relating to the accuracy of tax returns equal to 20.00% of the portion of the underpayment to which the penalty applies. The penalty applies to any portion of any understatement which is attributable to: (i) negligence; (ii) any substantial understatement of income tax; or (iii) any substantial valuation overstatement. Additional interest may be imposed on underpayments relating to tax shelters. Partners Fund II believes it is not a "tax shelter", as defined, and that there is substantial support for the positions to be taken by Partners Fund II on its returns. However, no assurance can be given that the IRS will agree with these positions.

**Changes in Federal Income Tax Law.** Congress could make substantial changes in the future to the income tax consequences with respect to an investment in Partners Fund II. Congress is currently analyzing and reviewing numerous proposals regarding changes to the Federal income tax laws. The extent and effect of such changes, if any, is uncertain. The discussion of tax aspects contained in this Memorandum is based on laws presently in effect and certain proposed Treasury Regulations. Nonetheless, investors should be aware that new administrative, legislative or judicial action could significantly change the tax aspects of Partners Fund II, and such change could have a material adverse affect on Partners Fund II and its Members, and that Partners Fund II will not obtain a tax opinion with respect to tax issues affecting investors or Members.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

## SECURITIES LAWS

**Securities Act of 1933**

The Units will not be registered under the Securities Act in reliance upon the exemption contained in Section 4(2) of the Securities Act and in Rule 506 of Regulation D promulgated under the Securities Act. Accordingly, Units will only be offered and sold to "accredited investors" within the meaning of Regulation D ("Accredited Investors").

**State Securities Laws**

The Units will not be registered under any state securities laws in reliance on exemptions from registration. Units are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under applicable state securities laws pursuant to registration or an available exemption.

**Investment Company Act**

Partners Fund II does not intend, and the Manager has agreed not to cause the Fund, to be engaged primarily in the business of investing in securities, nor will the Fund or the Manager knowingly permit Partners Fund II to invest in, own or hold securities having a value exceeding 40% of the value of the total assets of Partners Fund II. As a result, the Fund and the Manager do not believe that Partners Fund II will constitute an "investment company" as defined in the Investment Company Act of 1940.

## WHO MAY INVEST AND SUITABILITY

**Accredited Investors Only**

The offer and sale of Partners Fund II's Units is being made in reliance upon an exemption from the registration requirements of the Securities Act. See "Securities Laws – Securities Act of 1933" above. Accordingly, distribution of this Memorandum has been strictly limited to persons who meet the requirements and make the representations set forth below. The Fund reserves the right, in its sole discretion, to declare any prospective investor ineligible to purchase Units based on any information that may become known or available to the Fund concerning the suitability of such prospective investor, for any other reason, or for no reason.

**Units are being sold only to "accredited investors," within the meaning of Regulation D under the Securities Act ("Accredited Investors").** In order for an investor to qualify as an Accredited Investor, and be accepted as a Member in Partners Fund II, one or more of the following statements MUST be true:

(i)     The investor is a natural person whose individual "net worth" or joint "net worth" with his or her spouse, at the time of the investment, is in excess of $1,000,000. For purposes of this calculation, net worth is defined as the difference in value between all assets and all liabilities of such person (or such person and spouse), and includes homes owned by the investor (but only to the extent of that the actual value of the home exceeds the mortgage and other debt on the home, for example, the equity value only).

(ii)    The investor is a natural person who had individual income in excess of $200,000 in each of the two most recent years, or joint income with his or her spouse in excess of $300,000 in each of those years, and has a reasonable expectation of reaching the same income level in the year in which the investment is made.

(iii)   The investor is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units, whose purchase is directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of an investment in Units.

(iv)    The investor is an entity in which ALL of the equity owners are Accredited Investors.

**IF AN INVESTOR DOES NOT QUALIFY AS AN ACCREDITED INVESTOR AS DESCRIBED IN AT LEAST ONE OF THE FOUR PARAGRAPHS IMMEDIATELY ABOVE, THIS INVESTMENT IS NOT SUITABLE FOR SUCH INVESTOR AND SUCH INVESTOR WILL NOT BE PERMITTED TO INVEST IN PARTNERS FUND II.**

Exhibit A
p. 20

**Investor Suitability Requirements**

An investment in the private, or non-registered, offering of limited liability company units, such as the Units of Partners Fund II, can involve a high degree of risk and is suitable only for persons of substantial financial means who have no need for liquidity in the investment. Partners Fund II Units will be sold in this Offering only to investors who represent in writing that they meet the investor suitability requirements set forth herein and described below, and as may be required under federal or state law.

In addition to confirming that such investor is an Accredited Investor, each investor must represent in writing that he, she or it meets, among others, all of the following additional requirements:

(a) Such investor has received, read, and fully understands this Memorandum and all Exhibits and supplements hereto. Such investor is basing his, her or its decision to invest in the Units solely on this Memorandum and the Exhibits and supplements hereto. Such investor has relied solely on the information contained in these specific materials and has not relied upon any other information or representations made by any person.

(b) Such investor understands that an investment in Partners Fund II Units involves risks and such investor is fully cognizant of and understands all of the risk factors relating to a purchase of the Units, including, without limitation, those risks set forth below in the section entitled "Risk Factors".

(c) Such investor's overall commitment to investments that are not readily marketable is not disproportionate to his, her or its individual net worth, and the investor's investment in the Units will not cause such overall commitment to become excessive.

(d) Such investor has adequate means of providing for his, her or its financial requirements, both current and anticipated, and has no need for liquidity in this investment in the Units.

(e) Such investor can bear and is willing to accept the economic risk of losing his, her or its entire investment in the Units.

(f) Such investor is acquiring the Units for his, her or its own account and for investment purposes only and has no intention, agreement or arrangement for the distribution, transfer, assignment, resale or subdivision of the Units.

(g) Such investor has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Units.

Representations with respect to the foregoing and certain other matters must be made by each prospective investor in the Subscription Agreement attached hereto as Exhibit "B" before such investor may be accepted as a Member in Partners Fund II. The Fund will rely on the accuracy of each investor's representations set forth in the Subscription Agreement and may require additional evidence that an investor meets the applicable standards at any time prior to the acceptance of an investor's subscription. An investor is not obligated to supply any information so requested by the Fund, but the Fund may reject a Subscription Agreement from any investor who fails to supply any information so requested, or for any reason, or no reason.

The investor suitability requirements summarized in this section represent minimum suitability requirements for an investment in the Units. However, satisfaction of these requirements by an investor will not necessarily mean that the Units are a suitable investment for such investor, or that an investor will be accepted as a Member in Partners Fund II. Furthermore, such requirements may be modified and such modification may raise the suitability requirements for investors.

The Fund reserve the right, in its sole discretion, to refuse any Subscription Agreement for Units if it is believed that an investor does not meet the applicable investor suitability requirements, that our Units otherwise constitute an unsuitable investment for such investor, or for any other reason, or for no reason.

**IF AN INVESTOR DOES NOT MEET THE REQUIREMENTS DESCRIBED IN THIS SECTION, SUCH INVESTOR IS HEREBY INSTRUCTED TO READ NO FURTHER AND IMMEDIATELY RETURN THIS MEMORANDUM TO PARTNERS FUND II. IN SUCH EVENT, THIS MEMORANDUM SHALL NOT CONSTITUTE AN OFFER TO SELL THE UNITS OF PARTNERS FUND II OR ANY OTHER UNSUITABLE SECURITIES TO SUCH INVESTOR.**

Exhibit A
p. 21

**Investments by Qualified Retirement Plans or IRAs**

**Suitability for Qualified Retirement Plans.** Partners Fund II Units may or may not be suitable investments for a qualified retirement plan or an individual retirement account (hereinafter each referred to as, a "retirement plan, and collectively as, "retirement plans"), or other tax-exempt entities. In addition to the investor suitability requirements set forth above and the other issues and risk factors explained in this Memorandum, a potential investor must take into consideration the following when investing on behalf of a retirement plan or tax exempt entity.

**Unrelated Business Income.** Income to a tax-exempt entity or a retirement plan, which is unrelated to the entity's or plan's exempt purpose, may not be exempt from taxation. Generally speaking, income received by a tax-exempt entity or retirement plan is not subject to taxation. If, however, such an entity or plan receives "unrelated business income" within the meaning of Section 512 of the Code, the entity or plan will be required to pay income tax on that income at the same tax rates applicable to non-exempt entities. These investors should consult with their respective financial and tax advisors as to the effect and tax treatment which an investment in Units would have on their organization or plan.

**Fiduciary Obligations.** Any person or entity investing assets on behalf of a retirement plan must comply with the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). ERISA requires, among many other things, that the fiduciary in charge of investing the retirement plan assets act with the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with investment matters would use in the conduct of an enterprise of a like character and with like aims. ERISA Section 404(a)(1)(B). Furthermore, ERISA requires that the fiduciary diversify "the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent to do so..." ERISA Section 404(a)(1)(C). The retirement plan fiduciary is also required to ensure that the plan has sufficient liquidity to permit distributions in accordance with the terms of the Plan, and that the retirement plan assets yield a fair return as per Department of Labor Regulations Section 2550.404a-1(b)(2). Furthermore, the fiduciary and investor must ensure that an investment in the Units does not conflict with the documents and instruments governing the retirement plan or the other provisions of ERISA. ERISA Section 404(a)(1)(D).

The above is not intended to be an exhaustive list or explanation of the factors and issues that a potential investor must consider when investing in the Units on behalf of a retirement plan or tax-exempt entity. Again, such investors and fiduciaries should consult with their respective financial, legal and tax advisors as to the effect and tax treatment of such an investment.

## HOW TO SUBSCRIBE

Prospective investors who wish to subscribe for Partners Fund II Units must first carefully read this Memorandum and the Exhibits hereto. Then, investors must complete, execute and deliver the Subscription Agreement attached hereto as Exhibit "B" along with their check payable to: "Landwin Partners Fund II, LLC" in the amount of the purchase price for the Units purchased on the date of such purchase. These documents should be mailed or delivered to:

**Landwin Partners Fund II, LLC**
**1340 E. Route 66, Suite 205, Glendora, California 91740**
**Telephone: 626.335.8606   Facsimile: 626.335.8605**

Upon receipt of the signed Subscription Agreement, verification of the investor's investment qualifications, and acceptance of the Subscription Agreement, which shall be given or withheld in the Fund's sole discretion, the investor may confirm the Fund's receipt of his, her or its Subscription Agreement and payment, and will be notified of acceptance following the Initial Closing. Cash tendered to Partners Fund II by investors in payment for Units in the Fund will be held in the interest-bearing Partners Fund II Account at Wells Fargo Bank in Encino, California, pending the Initial Closing. All subscription payments, while held in the Partners Fund II Account, will earn interest, and upon the Initial Closing, such subscription payments together with such interest will be released to the Manager and taken under its management for the benefit of Partners Fund II and its Members. In the event the Initial Closing has not occurred prior to December 31, 2007, unless extended in the Fund's sole discretion, the Offering is terminated earlier, then: (i) none of the Units will be sold; (ii) all subscription payments will be refunded in full to each subscriber; and (iii) all actual interest earned on the subscription payments while held in the Partners Fund II Account will be distributed equitably to each subscriber based on the amount of funds and number of days such funds were held in the Partners Fund II Account.

Exhibit A
p. 22

## CONFLICTS OF INTEREST

The Manager, and with certain limitations, its managers and their respective principals and their affiliates, may act as managers, advisors and/or controlling parties of other limited liability companies, limited partnerships, real estate investment trusts, and/or other entities from time to time. Such entities may presently own real estate and/or real estate related investments similar to those targeted for acquisition by Partners Fund II, and which may compete with the types of investments targeted for acquisition by the Fund, and these entities may acquire additional investments in the future that may also compete with investments targeted for acquisition or actually acquired by Partners Fund II. The Manager may also have existing responsibilities and, in the future, may have additional responsibilities to provide its services to a number of other entities. Furthermore, the Manager's Managers, Sylvia and SDC, and their respective principal officers, ML and SD, may, pursuant to the management agreement between the Manager and the Manager's Managers, select and manage one (1) real estate and/or real estate related investment per year with any party or entity, including Partners Fund II, independently of the Manager. Members in Partners Fund II may choose not to acquire interests in any such future entities or investments, and in this event, it is possible that investments acquired by Partners Fund II could be adversely affected by potential conflicts of interests. See "Risk Factors." The principal areas in which conflicts may be anticipated to occur are as follows:

**Competition and Allocation of Investments**

In addition to identifying, originating and effecting investments for Partners Fund II, the Manager and its managers and their respective principals and affiliates will continue to acquire real estate and real estate related investments for the accounts of other affiliated and unaffiliated investors. As a result, the Manager may face potential conflicts of interest in allocating investment opportunities among Partners Fund II and others, particularly in the event the Manager's profit or loss interest in such other investments is different than the Manager's profit and loss interest in Partners Fund II.

Because the Manager manages other funds and entities with similar investment strategies, competition for appropriate investments is a potential conflict of interest, and though the Manager intends to manage this potential conflict by providing a pipeline of real estate and real estate related investment opportunities sufficient to support all of its activities, and to co-invest, or joint venture, multiple funds together in investments, no guarantees can be given that the Manager will always be able to do so or that it will successfully avoid this potential conflict of interest or manage it should it arise.

**Competition for Tenants**

The Manager and its managers and their respective principals and affiliates may also acquire additional investments in the future that may compete with the targeted investments of Partners Fund II, and although it is the intention of the Manager to co-invest, or joint venture, Partners Fund II with other funds under its management together into investments, no assurances can be given that the Manager will always be able to do so or that it will successfully avoid this competition or manage it successfully should it arise. In such event, it is possible that there may be competition for tenants in competing properties.

**Tax Audit Proceedings Representation**

Situations may arise in which the Manager may act as Tax-Matters Partner on behalf of Partners Fund II in administrative and judicial proceedings involving the IRS or other regulatory or enforcement authorities. Such proceedings may involve or affect other entities for which the Manager or its managers or their respective principals or affiliates may act as manager. In such situations, positions taken by the Manager may have differing effects on Partners Fund II and such other entities, and any decisions made by the Manager with respect to such matters will be in good faith.

**Legal Representation**

Counsel to Partners Fund II and the Manager in connection with this Offering is the same, and it is anticipated that such multiple representation will continue in the future. Counsel may also represent additional entities formed by the Manager and/or its managers or their respective principals and affiliates in the future. As a result, conflicts may arise in the future, and if those conflicts cannot be resolved or the consent of the respective parties obtained to the continuation of the multiple representations after full disclosure of any such conflict, such counsel may withdraw from representing one or more of the conflicting interests with respect to the specific matter involved. No such counsel is responsible to the Members of Partners Fund II as a result of its representation of Partners Fund II or the Manager.

22

## Resolution of Conflicts of Interest

The Manager has not developed, and does not expect to develop, any formal process for resolving conflicts of interest other than its good faith best efforts. While the foregoing potential conflicts could materially and adversely affect the Members of Partners Fund II, the Manager, in its sole judgment and discretion, will seek to mitigate such potential adversity by the exercise of sound business judgment in the fulfillment of its fiduciary obligations.

**THERE CAN BE NO ASSURANCE THAT THE INTENTIONS OF THE MANAGER OR THEIR EXERCISE WILL PREVENT ADVERSE CONSEQUENCES RESULTING FROM POTENTIAL CONFLICTS OF INTEREST.**

## MANAGEMENT AND THE MANAGEMENT AGREEMENT

Partners Fund II will be managed by the Manager pursuant to the Management Agreement, the form of which is attached hereto as Exhibit A to the Operating Agreement. The Manager, the Manager's Managers and their respective principal officers collectively bring substantial experience and expertise to Partners Fund II, as described below.

### The Manager and its Managers and their Respective Principals

**The Manager.** Landwin Management, LLC, is a real estate investment business management, asset management and property management operating company. As such, the Manager will supervise and manage the day-to-day operations of Partners Fund II and will select all real estate and real estate related investments for the benefit of Partners Fund II, except any selected and managed by the Manager's Managers or their respective principal officers pursuant to the management agreement between the Manager and the Manager's Managers which provides that the Manager's Managers and their respective principal officers may each select and manage one (1) real estate and/or real estate related investment per year with any party or entity, including Partners Fund II, independently of the Manager. The Manager will also provide marketing, sales and client services on behalf of Partners Fund II. The Manager's Managers are Sylvia and SDC. The principal officer of Sylvia is ML, and the principal officer of SDC is SD.

The Manager's real estate investment business management, asset management and property management business was originally established by ML in 1987 and acquired in June 2005 by Landwin Management, LLC, which was formed by Sylvia and SDC in December 2004 for the specific purpose of acquiring and growing the established business. Landwin Management generates fees-for-services and distribution-sharing income by providing a full range of services to investor clientele through fund entities formed for the purpose of holding ownership interests in real estate or real estate related investments selected and managed by Landwin Management. Investor clientele become members in the fund entities by purchasing the securities of such fund entities. These fund entities may be structured as limited liability companies (LLCs), limited partnerships (LPs), real estate investment trusts (REITs), or other such structures or in other types of co-mingled or separately-managed accounts. Once an offering is subscribed sufficiently for an initial closing of that fund, the fund entity will have entered into a management agreement with Landwin Management, and upon such initial closing, the proceeds from the sale of the fund entity's securities are released to Landwin Management for the uses described in that particular fund entity's investment documents, similar to this Memorandum. Traditionally, proceeds, net of expenses, are used as the equity capital investment in, or down-payment on, real property acquisitions, but may also be used as loan proceeds or in other applicable real estate related investments. Landwin Management provides a full range of management services to investor clientele and the fund entities in which they invest, and with respect to the actual real estate and real estate related investments made, these services include, but are not limited to:

(a) Engaging as manager of investment fund entities and other asset accounts (equity funding)
(b) Providing marketing, sales, operations and client management services
(c) Identifying investment asset targets
(d) Assessing investment valuations
(e) Drafting and submitting acquisition offers
(f) Negotiating and securing debt investment (debt financing)
(g) Performing investment asset due diligence
(h) Negotiating and transacting asset acquisitions (purchases)
(i) Managing assets and properties once acquired
    i. Overseeing tenant leasing and relations

Exhibit A
p. 24

    ii.    Overseeing rent and/or loan payment collection
    iii.   Overseeing all bookkeeping and accounting
    iv.   Overseeing payment of all expenses
    v.    Overseeing any development, redevelopment, repositioning or renovation and construction projects
    vi.   Overseeing property maintenance
(j) Managing all investor client relations and communications
(k) Negotiating and securing any debt refinancing
(l) Paying cash flow and profit distributions to investor clients (distributions),
(m) Negotiating and transacting dispositions (sales), and
(n) Identifying, negotiating and transacting replacement property acquisitions (1031 exchanges).

The following is a summary description of selected existing real estate and real estate-related investments under the Manager's management as of the date of this Memorandum (each, an "Existing Fund" or "Existing Investment" under the Manager's management, and collectively, the "Existing Funds" and "Existing Investments" under the Manager's management). Partners Fund II has no interest or involvement in the Existing Funds or Existing Investments under the Manager's management, and the investment performance of any of the Existing Funds or Existing Investments under the Manager's management is not indicative of the future performance of Partners Fund II or any investments to be made for the benefit of Partners Fund II. Information regarding each Existing Fund and/or Existing Investments under the Manager's management is provided for informational purposes only and as examples of the general types of real estate and real estate-related investments the Manager has historically made for the benefit of the Existing Funds under its management. The selection of Existing Funds or Existing Investments under the Manager's management is as follows:

1.   **Ilikai Waikiki Hotel**, Honolulu, HI.  The property is a classic deluxe 3-acre oceanfront hotel and condominium conversion project situated on the *Ala Wai Yacht Marina* at the edge of Waikiki, Honolulu, Hawaii, approximately five miles east of the Honolulu International Airport, for which Landwin Management, LLC, is a debt investor, providing the condominium conversion developers with a loan of $2,000,000 secured by two office buildings located in Irvine, California, as well as a loan broker and a marketing consultant.

2.   **The Russ Lyon Realty Office Building**, Phoenix, AZ.  The property is a 10,000 square foot office building uniquely located on the corner of 32nd Street and Lincoln Boulevard on the border of Phoenix and Paradise Valley, Arizona, an affluent community with strong demographics, high traffic counts, and substantial barriers to entry for future competition.

3.   **Verizon Wireless Regional Headquarters**, Chandler Freeways Business Park, Chandler, AZ.  The property was purchased for Owner, Landwin Chandler, LLC, and is managed by Landwin Management, LLC pursuant to the Management and Leasing Services Agreement ("MLSA") dated in February 2005. It is a two-story, 170,647 square foot office building fully occupied by Verizon Wireless on a long-term lease, and is utilized as a 24-hour national call center and Regional Headquarters.

4.   **Williams Centre Technology Campus**, Tucson, AZ: The property was purchased for Owner, 5401 Williams Owner, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in October, 2002. It includes four separate office buildings, each comprising 50,000 square feet of Class "A" office space anchored by large, nationally-credited tenants, including AOL, Federal Express, Dun and Bradstreet, and The Fluor Corporation.

5.   **Tempe Square**, Tempe, AZ:  The property was purchased for Owner, Watavision II, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in August 2004. It is a 105,180 square foot neighborhood retail shopping center anchored by Stein Mart and Trader Joe's along with a well-balanced mix of other nationally-credited tenants, such as, Baskin Robbins, Walgreen's, and AFLAC Insurance, and local tenants, such as Wildflower Bread, and Changing Hands Bookstore.

6.   **Kyrene Village**, Chandler, AZ:  The property was purchased for Owner, Kyray, LLC, and is managed by Landwin Management, LLC and Arizona Partners pursuant to the MLSA dated in January 2003. It is a 165,000 square foot multi-use neighborhood center anchored by Basha's Grocery, Arizona's largest independent grocer, and the Kyrene Lanes entertainment complex.  It has a well-balanced mix of other retail and commercial tenants offering a wide variety of services and merchandise to an upwardly-trending, family-oriented community.

7.   **Randolph Plaza**, Tucson, AZ:  The property was purchased for Owner, Kyray, LLC, and is managed by

Exhibit A
p. 25

Landwin Management, LLC and Arizona Partners pursuant to the MLSA dated in January 2003. It is a 180,000 square foot neighborhood retail shopping center with a mix of nationally-credited and local tenants, including Fry's Supermarket, Arizona's 2nd largest independent grocer, Denny's Restaurant, Carl's Jr., Big Lots, Peter Piper Pizza, Blockbuster Video, Payless Shoes, Sally's Beauty Supply, Greenbacks Dollar Store and Radio Shack.

8. **Lincoln View Plaza**, Phoenix, AZ: The property was purchased for Owner, Evergreen Valley Plaza, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in January 2001. It is a 51,406 square foot mixed-use retail shopping center and office property in a community with strong demographics, high traffic counts, and substantial barriers to entry for future competition. It is anchored by Loehmann's clothing store, Coldwell Banker Real Estate, and Russ Lyon Realty, with a mix of other tenants, including the addition of a 5,000 square foot Chase Manhattan bank branch under construction as of the date of this Memorandum.

9. **Parkway Plaza**, Petaluma, CA: The property was purchased for Owner, Landwin/Ocotillo Marketplace, LLC, and is managed by Landwin Management, LLC, pursuant to the MLSA dated in July 2004. It is a 79,512 square foot Class A neighborhood in-fill shopping center anchored by G & G Grocery, a strong-performing, family owned and operated grocer with a second location in Santa Rosa, California. It is located adjacent to a community college, city park, and up-scale neighborhood providing strong traffic counts and consumer patronage. Local tenants include restaurants such as East Side Grill, Romeo's Pizza and Pasta, and Chunky's Taqueria and Grill.

**ANY REAL ESTATE AND/OR REAL ESTATE RELATED INVESTMENTS TO BE ACQUIRED THROUGH THIS OFFERING ARE UNIDENTIFIED AS OF THE DATE OF THIS MEMORANDUM AND INVESTORS MUST RELY SOLELY ON THE DISCRETION OF THE MANAGER IN THE IDENTIFICATION, ANALYSIS, SELECTION, FINANCING, ACQUISITION, MANAGEMENT, LEASING, DEVELOPMENT, REDEVELOPMENT, RENOVATION, REFINANCING, DISPOSITION AND REPLACEMENT OF SUCH REAL ESTATE AND REAL ESTATE RELATED INVESTMENTS.**

**The Manager's Managers and their Respective Principal Officers.** The Manager's Managers and their respective principal officers and affiliates have extensive expertise overseeing the many aspects of the real estate business. Following is a summary of the backgrounds of the Manager's Managers and their respective principal officers:

Sylvia, Inc., is a real estate investment principal, sponsor, advisor and manager whose principal officer, Martin Landis, is a seasoned chief executive of public and private corporations with a career extending across 38 years in real estate investment, development and management industry, as well as other successful businesses. After graduating from Hofstra University, Hempstead, NY, and The IBM Institute, Endicott, NY, Mr. Landis began his entrepreneurial career began in 1959 when he founded and served as Chairman & CEO of D.L. Blair, Inc., a New York, NY-based marketing company which he led to become the largest marketing company in the U.S. After D.L. Blair's acquisition in 1969, Mr. Landis relocated to Los Angeles, CA to form and serve as Chairman & CEO of The Prosher Corporation, a Century City, CA-based real estate development company which he took public in the 1970s, and through which Mr. Landis developed over 10 million square feet of diverse commercial properties, including over 3,000 units of apartment and condominium property in the Los Angeles, California market alone. Following his service at Prosher, Mr. Landis served, beginning in 1979, as General Partner of DMR Investments, LP, a private real estate development and investment management company he established with his former partners from Prosher to focus on family investments. By 1986, Mr. Landis began to manage family friends' investments, establishing Landwin Management's business in early 1987, as a full service real estate investment asset management and property management company. Assets under management grew steadily for the benefit of high net worth individual investor clientele, and in 2002, Sylvia established a partnership with SmithDennison Capital, LLC, which has thus far led to the joint formation and management of The Landwin Group, LLC; Landwin Management, LLC; Landwin Partners Fund I, LLC; Landwin Advisors, LLC; Landwin REIT, Inc., and; Landwin Partners Fund II, LLC. In addition to serving as CEO of Sylvia, Mr. Landis is also an arbitrator on the Board of Arbitrators of the National Association of Securities Dealers (NASD) and a member of the International Council of Shopping Centers (ICSC). He resides with his wife, Leslie, in Malibu, California, and has three happily married daughters and eight grandchildren.

SmithDennison Capital, LLC, is a real estate investment principal, sponsor, advisor and manager whose principal officer, Seán Dennison, is a proven chief executive of private companies and President and Chief Financial Officer of a public company, with a 26 year business career beginning in a family real estate development and construction business, and coming full circle into real estate investment advisory, development and management. After working many years in the contracting business and earning a B.A. degree from C.U.N.Y., Queens, NY, Mr. Dennison co-founded in 1990, Mission

Exhibit A
p. 26

Viejo, CA-based software company, Synchronized Data Systems, Inc., which later merged into Salt Lake City, UT-based, X10sion, Inc., before being acquired in 1997 by Boston, MA-based, Keane, Inc., a multi-billion dollar, publicly-traded software company (KEA-AMEX). Following this, Mr. Dennison established SDC's business as a successful consulting practice with clients ranging from Fortune 100 corporations to startup ventures. Services included equity capital funding, corporate finance and development, marketing and operations management consulting. Projects comprised over $250 million in transactions. In addition, beginning in 1995, SDC began to invest in real estate and form and manage capital for real estate investment opportunities, leveraging a growing network of relationships with individual and institutional investors. Early success led SDC to focus exclusively on commercial real estate in 2000, which in 2002 led to SDC's partnership with Sylvia, Inc., which, in turn, led to the joint formation and management of The Landwin Group, LLC; Landwin Management, LLC; Landwin Partners Fund I, LLC; Landwin Advisors, LLC; Landwin REIT, Inc., and; Landwin Partners Fund II, LLC. From June 2004 to the date of this Memorandum, Mr. Dennison has formed over $56,000,000 for Landwin's operating entities and real estate and real estate related investment opportunities, expanding Landwin's base of investors to over 1,100 high net worth individuals, and institutions. In addition to his B.A. degree, Mr. Dennison has also held Registered Investment Advisor and other financial services licenses earned while at Merrill Lynch and Morgan Stanley, attended the Executive MBA program in Finance at Claremont Graduate University, Claremont, CA, and completed the California Real Estate Broker license program. He resides with his wife Carol and their three children in Glendora, California.

### The General Management and Property Management Agreement

**General.** Upon the Initial Closing of Partners Fund II, the Fund will have entered into the General Management and Property Management Agreement with Landwin Management, the Manager. The description of the General Management and Property Management Agreement contained in this Memorandum is qualified in its entirety by reference to the form of the General Management and Property Management Agreement as Exhibit B to the Operating Agreement of Partners Fund II, a copy of which is attached hereto as Exhibit "A". The General Management and Property Management Agreement provides, among other things, that the Manager, as Partners Fund II's general business manager, asset manager, and property manager ("Property Manager"), has the general responsibility to manage and oversee all operations, investments, assets and properties of Partners Fund II. In consideration thereof, the Manager will receive certain Fees-for-Services and distribution-sharing income, as described herein under "Compensation of the Sponsors and the Manager." The Management Agreement is for a 10-year term, beginning upon the Fund's Initial Closing.

**Removal of the Manager.** The Manager may only be removed by the Fund upon the final adjudication of intentional wrongful acts to the Fund's substantial detriment.

**The Liability/Indemnification of the Manager.** Partners Fund II is obligated pursuant to the Operating Agreement and the General Management and Property Management Agreement to indemnify and hold harmless the Manager, the Manager's Managers and their respective principal officers and affiliates, consultants, employees, agents, and owners for all losses or liabilities, other than for the final adjudication of intentional wrongful acts to the Fund's substantial detriment. The Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, and the Property Manager, and any affiliates, consultants, employees, agents, owners, members, and purchasers will not be liable to the Fund or its Members except for such final adjudication of intentional wrongful acts to the substantial detriment of the Fund, and any successful claim for such indemnification would deplete the Fund's assets by any amounts paid.

### The Fiduciary Duty of the Manager

The Manager is responsible for the control and management of Partners Fund II and must exercise good faith and integrity in handling all Partners Fund II affairs. The Manager has a fiduciary responsibility for the safekeeping and use of all funds and assets of Partners Fund II, whether or not in its immediate possession and control, and may not use or permit others to use such funds or assets in any manner except for the exclusive benefit of Partners Fund II.

## COMPENSATION OF THE SPONSORS AND THE MANAGER

The Sponsors and the Manager of Partners Fund II will receive certain compensation and other benefits directly or indirectly from Partners Fund II, as described below:

### The Sponsors' Formation Fee

Exhibit A
p. 27

For work related to the formation and organization of Partners Fund II, including the hiring and prior to the Initial Closing, the management, of attorneys, accountants, and the Manager, the drafting of this Memorandum, and the development of the Fund's business plan, the Sponsors will each receive a Formation Fee of $661,000, payable pursuant to the terms of the Formation Fee Agreement attached hereto as Exhibit "B" in the form of the Note attached thereto as Exhibit A to the Formation Fee Agreement which is due and payable within one (1) year from the Initial Closing of Partners Fund II's Offering. The Sponsors reserve the right to reduce the Formation Fee or to extend the term of the Note in their sole discretion, and their formational and organizational work does not include participating in the offering, marketing or sales of any securities.

### The Manager's Fees-for-Services and Distribution Sharing Rights

At the Initial Closing of Partners Fund II, the Fund will have entered into its Operating Agreement, attached hereto as Exhibit "A", and into the General Management and Property Management Agreement, attached hereto as Exhibit B to the Operating Agreement. Collectively, these agreements are among the Fund, on the one hand, and the Manager, Landwin Management, LLC, and the Manager's Managers, Sylvia, Inc., and SmithDennison Capital, LLC, and their respective principal officers, Martin Landis and Seán Dennison, on the other hand. The Operating Agreement and the General Management and Property Management Agreement set forth Landwin Management as the Manager of Partners Fund II, and provide, among other provisions, that the Manager has the general responsibility of overseeing and managing all aspects of the Fund's operations, including sourcing, assessing, selecting, financing, acquiring, managing, leasing, developing, redeveloping, renovating, repositioning, refinancing, disposing of, and exchanging or replacing any real estate or real estate related investments of Partners Fund II, except for those selected and managed by the Manager's Managers and/or their respective principal officers pursuant to the management agreement between Landwin Management and the Manager's Managers in which the Manager's Managers and their principal officers may each select and manage one (1) real estate or real estate related investment per year with any party or entity, including Partners Fund II. In any such case, the Manager's Managers or their respective principal officers, as the case may be, shall have all rights and powers conferred upon the Manager under the Fund's Operating Agreement.

In consideration thereof, the Manager shall be entitled to receive the following Fees-for-Services which are in addition to any third party fees, including, but not limited to, brokerage and lender fees, and in addition to the Manager's share in distributions made by the Fund, as described elsewhere herein:

(a) Acquisition Fees: 2.5% of the total purchase price (equity plus debt) of any real property acquired by the Manager for the benefit of Partners Fund II and its Members, paid in cash at closing;

(b) Property Management Fees: 5.5% of actual gross monthly receipts from any real property acquired and taken under management by the Manager for the benefit of Partners Fund II and its Members;

(c) Leasing Fees: Negotiated on a case-by-case basis subject to factors including, but not limited to, lease term lengths, tenant creditability, property space location, competition, market rates, etc.;

(d) Financing and Refinancing Fees: Not to exceed 1% of the amount of new and refinanced loans secured by the Manager for the benefit of Partners Fund II and its Members;

(e) Development, Redevelopment and/or Construction Management Fees: Negotiated on a case-by-case basis subject to factors related to specific projects, typically a minimum of 5% of the amounts expended, and;

(f) Disposition Fees: 2.5% of the total sales price of any real property sold by the Manager for the benefit of Partners Fund II and its Members, paid in cash at closing.

### Other Benefits

Except as described above, Partners Fund II will enter into no transaction, or convey any benefit, directly or indirectly, to the Sponsors, the Manager or the Manager's Managers or their respective principal officers, or any party unless specifically approved by the Members of Partners Fund II holding a majority of the Fund's Units.

Exhibit A
p. 28

## DESCRIPTION OF THE UNITS AND THE OPERATING AGREEMENT

**The Units**

The Units represent equity interests in Partners Fund II and entitle the holder thereof to participate in certain Partners Fund II allocations and distributions. Persons or entities whose purchase of the Units of Partners Fund II is accepted shall become Members in Partners Fund II. See "The Operating Agreement" below.

Partners Fund II is currently offering Units for sale to a maximum of 499 investors at the per Unit price of $50,000 with the minimum investment per investor being one (1) Unit ($50,000). The Fund, in its sole discretion, will determine any maximum number of Units to which any investor may subscribe and any division or fractionalization of Units that may be made available to any investor thereby reducing the minimum investment for such investor accordingly.

The Units may not be freely assigned and are subject to restrictions on transfer by law, by regulation in the state where they are sold, and by the Operating Agreement. It is not anticipated that a public trading market in the Units will develop. See "Restrictions On Transferability of the Units" below.

**Restrictions on Transferability of the Units**

There are substantial restrictions on the transferability of the Units in the Operating Agreement and as imposed by state and federal securities laws. Before selling or transferring any Units, a Member must obtain the written consent of the Manager and comply with applicable requirements of the Operating Agreement and federal and state securities laws and regulations, including the financial suitability requirements of such laws or regulations. It is highly unexpected that any market for the Units will develop and prospective investors should view the Units solely as a long-term investment.

In addition, the Operating Agreement provides that an assignee of the Units may not become a substitute Member ("Substitute Member") without meeting certain conditions and without consent to such substitution by the Manager, which consent may be withhold in its sole discretion. If an assignee of a Member ("Assignee") is not admitted to Partners Fund II as a Substitute Member, such Assignee will have no right to vote on Partners Fund II matters, will have no right to information relating to Partners Fund II business, and will have no right to participate in the management and affairs of Partners Fund II. Such Assignee would only be entitled to receive the share of profits and distributions, and return of contributions, to which a Member would otherwise be entitled.

The Units offered hereby have not been registered under the Securities Act nor by the securities regulatory authority of any state. Units may not be resold unless they are registered under the Securities Act and registered or qualified under applicable state securities laws or unless exemptions from such registration and qualification are available.

Appropriate legends setting forth the restrictions on transfer of the Units will be set out on any certificates representing Units.

**The Operating Agreement**

Upon acceptance of their subscriptions, investors will enter into the Operating Agreement and become Members of Partners Fund II. The description of the Operating Agreement contained in this Memorandum is qualified in its entirety by reference to the form of Operating Agreement attached to this Memorandum as Exhibit "A".

**Term; Liquidation.** Unless earlier dissolved or terminated in accordance with the terms of the Operating Agreement, Partners Fund II will terminate 10 years following the Initial Closing (unless extended by a vote of the Members owning a majority of Units) at which time Partners Fund II must either (a) liquidate assets, distribute proceeds and be dissolved, (b) consummate an initial public offering of our Units, or (c) be acquired by or merged into another company such that the Units of the Members are exchanged for the securities of such other company on terms acceptable to the Members owning a majority of Units.

**Distributions.** Distributions made to the Members by Partners Fund II will be made net of the Fund's obligations, expenses and reserves on a pro rata basis in accordance with each Member's Units owned, beginning after the Fund has acquired sufficient investments to sustain such distributions, and as determined in the Manager's sole discretion. Distributions will be derived from sources including, but not limited to: (a) cash flow from rental income and loan repayments from real estate or real estate related investments owned by the Fund ("Operational" sources), and; (b) proceeds

28

Exhibit A
p. 29

from financings, refinancings, sales or liquidations of real estate or real estate related investments owned by the Fund ("Transactional" sources).

The Manager will, in its sole discretion, determine the designation of distributions, subject to applicable laws and rules, and distributions will be made in the following priority:

a) From Operational Cash Flow:

   i. First, 100% of cash flow distributions from operations of the Fund's real estate and real estate related investments each calendar year, will be distributed to the Members net of obligations, expenses and reserves until each Member has received 7% of their Capital Contribution, as adjusted each calendar year for any return of Capital Contributions made (each Member's "Capital Balance"), as a preferential return (the "Preferential Return" or "Preference"), and;

   ii. In addition to the 7% Preferential Return, thereafter, 70% of cash flow distributions will be distributed to the Members and 30% to the Manager.

b) From Transactional Proceeds:

   i. First, 100% of transactional proceed distributions from any financings, refinancings, sales or liquidations of the Fund's real estate and real estate related investments, will be distributed to the Members net of obligations, expenses and reserves until each Member has received a full return of their Capital Contribution, with each of such distributions reducing by its same amount the Capital Balance upon which the 7% Preference is calculated each calendar year, and with such Preference ceasing once all Members have received the full return of their original Capital Contribution, and;

   ii. In addition to a full return of the Members' Capital Contributions, thereafter, 70% of all distributions will be distributed to the Members and 30% to the Manager.

**Allocation of Net Income and Net Loss.** Allocations of income, gain, loss, deduction and credit of Partners Fund II will be allocated for Federal income tax purposes in accordance with applicable regulations under the Internal Revenue Code and generally in a manner consistent with the foregoing distribution provisions.

**Withdrawal and Transfer.** Members may not withdraw from Partners Fund II. In addition, a Member may not transfer or assign any portion of his, her or its interest in Partners Fund II without (i) the prior written consent of the Manager, which consent may be given or withheld in the Manager' sole discretion, and (ii) compliance with certain other limitations.

**Voting Rights and Amendments.** Except with respect to amendments, Members generally will have no right to vote on matters relating to Partners Fund II unless requested by the Manager. The Operating Agreement may be amended either (a) by the Manager together with the affirmative vote of the Members holding a majority of the Units or (b) by the affirmative vote of all Members.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit A
p. 30

## FEDERAL INCOME TAX CONSEQUENCES

**Tax Disclosure**

CIRCULAR 230 DISCLAIMER.  ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES SET FORTH IN THIS PRIVATE PLACEMENT MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND IT CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING ANY U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON SUCH PERSON.  SUCH DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION AND MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM. EACH INVESTOR SHOULD SEEK ADVICE BASED ON HIS, HER OR ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following discussion applies to persons purchasing Units directly from Partners Fund II. Prospective purchasers of Units should not view the following analysis as a substitute for careful tax planning, particularly since the income tax consequences of an investment in limited liability companies such as Partners Fund II are often uncertain and complex. Also, the tax consequences will not be the same for all taxpayers.  Prospective purchasers of Units should be aware that the following discussion necessarily condenses or eliminates many details that might adversely affect some prospective purchasers of Units significantly. Finally, investors might be faced with substantial legal and accounting costs in resisting a challenge by the Internal Revenue Service (the "IRS") to the tax treatment of an investment in Partners Fund II, even if the IRS's challenge proves unsuccessful.

The discussion of the tax aspects contained in this Memorandum is based on law presently in effect and certain proposed Treasury Regulations. Nonetheless, investors should be aware that new legislative, administrative or judicial action could significantly change the tax aspects of Partners Fund II.

Congress is currently analyzing and reviewing numerous proposals regarding changes to the Federal income tax laws. The extent and effect of any such changes, if any, is uncertain.

Counsel will not prepare or review Partners Fund II's income tax information return, which will be prepared by the Manager and independent accountants for Partners Fund II.  On behalf of Partners Fund II, the Manager will make a number of decisions on such tax matters, such as the expensing or capitalizing of particular items, the proper period over which capital costs may be depreciated or amortized, and the allocation of acquisition costs between real property improvements and personal property.   Such matters will be handled on the Fund's behalf by the Manager often with the advice of independent accountants retained by Partners Fund II, and will not usually be reviewed with counsel.

There is uncertainty concerning certain of the tax aspects discussed herein, and there can be no assurance that some of the deductions claimed or positions taken by Partners Fund II will not be challenged by the IRS.  An audit of Partners Fund II's information return may result in an increase in Partners Fund II's gross income, in the disallowance of certain deductions and in an audit of the income tax returns of the Members, which could result in adjustments to non-Partners Fund II items of income, deduction or credit.  Final disallowance of such deductions could adversely affect the Members.  In addition, state tax authorities may audit Partners Fund II's tax returns, which could result in unfavorable adjustments for Members.

Investors should not purchase Units solely for the purpose of obtaining tax shelter for income from sources other than Partners Fund II. It is unlikely that Partners Fund II will provide any such tax shelter. Even if a Member is entitled to deduct his, her or its share of Partners Fund II's losses on his, her or its personal tax return, any such deductions may be relatively small in relation to the amount invested in the purchase of Units.  A portion of the amount invested may be allocated to the purchase of intangible assets amortizable over a 15 year period, or to land, which, unlike buildings and other improvements, is not depreciable for income tax purposes, or other nondeductible expenses. Prospective purchasers of Units are urged to consult their own tax advisors as to the tax consequences to them of purchasing Units.

**Tax Consequences Regarding Partners Fund II**

**Status as a Partnership.** There have been recent changes relating to the determination as to whether a limited liability company will be taxed as a partnership or a corporation.  Treasury Regulations have recently been issued which provide that a limited liability company will be classified as a partnership for federal income tax purposes as long as an election is not made to treat the limited liability company as an association taxable as a corporation.  Partners Fund II has represented that no such election has been or will be made.

If Partners Fund II is treated as a partnership for federal income tax purposes, each Member will be required to include in income his, her or its distributive shares of income, gain, deductions and loss of Partners Fund II. Consequently, each Member will be subject to tax on his, her or its distributive share of Partners Fund II income, whether or not Partners Fund II actually distributes cash in an amount equal to the income.

If for any reason Partners Fund II is treated as a corporation for tax purposes, it will be deemed to have contributed all of its assets subject to all of its liabilities to a newly formed corporation in exchange for the corporation's stock. The stock of the corporation is treated as being distributed to the Members in a complete liquidation of Partners Fund II. The income and deductions of Partners Fund II will be reflected only on its income tax return instead of being passed through to the Members, and the Members will be treated as corporate shareholders for tax purposes. In such event, Partners Fund II would be required to pay income tax at the corporate tax rates on its taxable income, thereby reducing the amount of cash available for distribution to Members. In addition, any distribution by Partners Fund II to the Members would be taxable to them as dividends, to the extent of current and accumulated earnings and profits, or treated as gain from the sale of their Partners Fund II interests, to the extent such distributions exceeded both current and accumulated earnings and profits of Partners Fund II and the Member's tax basis for their Units.

**Publicly Traded Partnerships**. Certain publicly traded partnerships are taxed as corporations for federal income tax purposes. Publicly traded partnerships are defined as partnerships whose interests are (1) traded on an established securities market or (2) readily tradable on a secondary market or the substantial equivalent thereof. The determination as to whether Partners Fund II will be considered as "publicly traded" will depend on the number and type of subsequent transfers of Units. The Operating Agreement provides that any transfer of Units will not be effective unless and until the Manager determines that such transfer will not cause Partners Fund II to be considered a publicly traded partnership under the applicable IRS guidelines. It is unclear whether the Manager will be able to effectively limit possible transfers.

Partners Fund II and its Members will be subject to additional rules if Partners Fund II is publicly traded but Partners Fund II is not taxed as a corporation. The net income from publicly traded partnerships not taxed as corporations is not treated as passive income for purposes of the passive loss rules. Each partner in a publicly traded partnership treats the loss from the partnership as separate from the income or loss from any other publicly traded partnership and separate from any income or loss from passive activities. Net losses attributable to a partner's interest in a publicly traded partnership are not allowed against the partner's other income but instead are suspended and carried forward. Such losses can be applied against the net income from the partnership in the next tax year (or the next succeeding tax year in which the holder of the interests in the partnership has net income from the partnership). Upon a complete disposition (within the meaning of the passive loss rules) of the partner's entire interest in a publicly traded partnership, any remaining suspended losses are allowed.

**Limitations on Losses from Passive Activities**. Losses from passive trade or business activities generally may not be used to offset "portfolio income," i.e., interest, dividends and royalties, or salary or other active business income. Deductions from passive activities may generally be used to offset income from passive activities. Interest deductions attributable to passive activities are treated as passive activity deductions, and not as investment interest. Thus, such interest deductions are subject to limitation under the passive activity loss rule and not under the investment interest limitation. Credits from passive activities generally are limited to the tax attributable to the income from passive activities. Passive activities include (1) trade or business activities in which the taxpayer does not materially participate, which would include holding an interest as a Member, and (2) rental activities. Thus, a Member's share of Partners Fund II's Net Income and Net Loss will constitute income and loss from passive activities and will be subject to such limitation.

Losses (or credits that exceed the regular tax allocable to passive activities) from passive activities that exceed passive activity income are disallowed and can be carried forward and treated as deductions and credits from passive activities in subsequent taxable years. Disallowed losses from an activity, except for certain dispositions to related parties, are allowed in full when the taxpayer disposes of his entire interest in the activity in a taxable transaction.

In the case of rental real estate activities in which an individual actively participates, up to $25,000 of losses (and credits in a deduction-equivalent sense, which amount may be reduced depending on the Member's adjusted gross income) from all such activities are allowed each year against portfolio income and salary and active business income of the taxpayer. Members subject to the rules described below will not be actively participating in Partners Fund II's rental real estate activities and, therefore, will not be able to deduct any Partners Fund II Net Loss against their portfolio or active business income.

Certain taxpayers can deduct losses and credits from rental real estate activities against other income, such as salaries, interest, dividends, etc. A taxpayer qualifies for this exception to the passive loss rules described above if: (1) more

31

than half of the personal services performed by the taxpayer in trades or businesses during a year are performed in real property trades or businesses in which the taxpayer materially participates; and (2) the taxpayer performs more than 750 hours of services during the year in real property trades or businesses in which the taxpayer materially participates. In the case of a joint return, one spouse must satisfy both requirements. A real property trade or business is any real property development, redevelopment, construction, reconstruction, acquisition, conversion, rental, operation, management, leasing or brokerage trade or business. In determining whether a taxpayer performs more than half his, her or its personal services in real property trades or businesses, services performed as an employee are disregarded unless the employee is a more than 5% owner of the employer.

Allocations of Net Income and Net Loss. Net Income and Net Loss will be allocated as set forth in the Operating Agreement. Although such allocations are permitted under partnership law, the Code and Treasury Regulations require that such allocations satisfy certain requirements. Section 702 of the Code provides that, in determining income tax, a partner must take into income his, her or its "distributive share" of Partners Fund II's income, gain, loss, deduction or credit. The partners may specially allocate their distributive shares of such profits and losses, thus redistributing tax liability, by provision in the operating agreement. However, the IRS will disregard such an allocation, and will determine a partner's distributive share in accordance with the partner's interest in Partners Fund II if the allocation lacks "substantial economic effect."

Treasury Regulations on the allocation of items of partnership income, gain, loss, deduction and credit under Section 704(b) of the Code are concerned with whether an allocation of partnership tax items has "substantial economic effect." Under the Treasury Regulations, an allocation has economic effect only if, throughout the term of the partnership, the partners' Capital Accounts are maintained in accordance with the Treasury Regulations, liquidation proceeds are to be distributed in accordance with the partners' Capital Account balances, and any partner with a deficit Capital Account following the distribution of liquidation proceeds is required to restore the amount of that deficit to Partners Fund II for payment to creditors or distribution to partners in accordance with their positive Capital Account balances. If the partners' obligations to restore deficit Capital Account balances is limited, the operating agreement must contain a "qualified income offset" provision, as described in the Treasury Regulations.

The Treasury Regulations also require that the economic effect of the allocation be "substantial." In general, the economic effect of an allocation is "substantial" if there is a reasonable possibility that the allocation will affect substantially the dollar amounts to be received by the partners from the partnership, independent of tax consequences. The economic effect of an allocation is not substantial, however, if, at the time the allocation becomes part of the operating agreement, (1) the after-tax economic consequences of at least one partner may, in present value terms, be enhanced compared to such consequences if the allocation were not contained in the operating agreement, and (2) there is a strong likelihood that the after-tax economic consequences of no partner will, in present value terms, be substantially diminished compared to such consequences if the allocation were not contained in the operating agreement. In determining the after-tax economic benefit or detriment to a partner, tax consequences that result from the interaction of the allocation of such partner's tax attributes that are unrelated to the partnership will be taken into account.

The Treasury Regulations provide that allocations of loss or deduction attributable to non-recourse liabilities of a partnership ("non-recourse deductions") cannot have economic effect because, in the event there is an economic burden that corresponds to such an allocation, the creditor alone bears that burden. Thus, non-recourse deductions must be allocated in accordance with the partners' interests in the partnership. Allocations of non-recourse deductions are deemed to be made in accordance with the partners' interests in the partnership if, and only if, the following conditions are satisfied:

1. Throughout the full term of the partnership, the partners' Capital Accounts are maintained in accordance with the Treasury Regulations, and upon liquidation of the partnership, liquidating distributions are required to be made in accordance with the positive Capital Account balances of the partners.

2. Beginning in the first taxable year in which there are non-recourse deductions and thereafter throughout the full term of the partnership, the operating agreement provides for allocations of non-recourse deductions among the partners in a manner that is reasonably consistent with allocations, which have substantial economic effect, of some other significant partnership item attributable to the property securing non-recourse liabilities of the partnership.

3. Beginning in the first taxable year of the partnership in which the partnership has non-recourse deductions and thereafter throughout the full term of the partnership, the operating agreement contains a "minimum gain chargeback," as defined in the Treasury Regulations.

32

Exhibit A
p. 33

4.  All other material allocations and Capital Account adjustments under the operating agreement are recognized in accordance with the Treasury Regulations.

The Operating Agreement requires that the Members' Capital Account balances be maintained in accordance with the Treasury Regulations, and liquidation proceeds are to be distributed to the Members, in proportion to their positive Capital Account balances. The Operating Agreement contains a "minimum gain chargeback" provision, and the non-recourse deductions are to be allocated under the Operating Agreement in a manner that is reasonably consistent with allocations, i.e., in accordance with allocations of Net Income, Members are not required to restore a deficit capital account balance. The Operating Agreement, however, contains a "qualified income offset" provision.

**Transfers of Units.** For federal income tax purposes, items of income, gain, loss, deduction or credit of Partners Fund II may be allocated to a Member only if they are received, paid or incurred by Partners Fund II during that portion of the year in which the Member is treated as a member of Partners Fund II for tax purposes.

If any Member's interest in Partners Fund II changes at any time during Partners Fund II's taxable year, each Member's share of each item of Partners Fund II income, gain, loss, deduction and credit is to be determined by using any method prescribed by Treasury Regulations that takes into account the varying interests of the Members in Partners Fund II during the taxable year.

The legislative history concerning this provision indicates that a monthly convention will be provided for by regulation. Under this convention, partners entering on the sixteenth day of the month or later will be treated as entering on the first day of the following month, and partners entering during the first 15 days of the month will be treated as entering on the first day of the month. The regulations may also provide for other conventions and may deny the use of any convention when the occurrence of significant, discrete events (e.g., a large, unusual gain or loss) would mean that use of the convention could result in significant tax avoidance.

The Net Income or Net Loss allocable to any Units transferred during any year will be allocated among the persons who were the holders thereof during such year in proportion to the number of months that each such holder was recognized as the owner of such Units during the year (for the purposes of such allocation, ownership for each month is determined as of the fifteenth day of each month). A holder who purchases an investor Unit during the first 15 days of a month will receive allocations of Net Income and Net Loss relative to such month. A holder who purchases an investor Unit on or after the sixteenth day of the month will be treated for income tax allocation purposes as acquiring his, her or its investor Unit on the first day of the following month. The holder of an investor Unit will be required to report a share of Partners Fund II's Net Income or Net Loss during the period of such holder's ownership on his, her or its personal income tax return even though he, she or it receives no distributions with respect to such period of ownership and/or the amount distributed to such holder has no relationship to the amount that he, she or it is required to report.

**Calculation of Member's Adjusted Basis.** Each Member's adjusted basis in his, her or its Units will be equal to such Member's cash Capital Contributions increased by (i) the amount of his share of the Net Income of Partners Fund II, and (ii) his, her or its share of non-recourse indebtedness to which Partners Fund II property is subject, if any. A Member's share of non-recourse liabilities is the sum of (a) the Member's share of Partners Fund II minimum gain; (b) the amount of any taxable gain that would be allocated to the Member under Section 704(c); and (c) the Member's share of the excess non-recourse liabilities.

A Member's basis in his, her or its Units is reduced, but not below zero, by (i) the amount of his, her or its share of Partners Fund II Net Loss and expenditures which are neither properly deductible nor properly chargeable to capital account and (ii) the amount of cash distributions received by the Member from Partners Fund II. For purposes of calculating a Member's adjusted basis in his, her or its Units, any reduction in the amount of Partners Fund II non-recourse indebtedness will be treated as a cash distribution to such Member in accordance with his, her or its allocable share of such indebtedness and accordingly will reduce the basis in such Member's Units.

The Treasury Regulations employ an economic risk of loss analysis to determine whether a Partners Fund II liability is a recourse or non-recourse liability and to determine a Members' shares of any liability of Partners Fund II. Under the Treasury Regulations, a Partners Fund II liability is a recourse liability to the extent that any partner or related person bears economic risk of loss for that liability. A Member's share of any recourse liability of Partners Fund II equals the portion, if any, of the economic risk of loss for such liability that is borne by the Member.

Exhibit A
p. 34

33

A Member bears the economic risk of loss for a Partners Fund II liability to the extent that the Member (or a related person) would bear the economic burden of discharging the obligation represented by that liability if Partners Fund II were unable to do so (reduced by any right of reimbursement).  In the case of a limited liability company, such as Partners Fund II, a member generally will not bear the economic risk of loss for any Partners Fund II liability because the Member has no obligation to contribute additional capital to Partners Fund II.

If no Member bears the economic risk of loss for a Partners Fund II liability, the liability is a non-recourse liability of Partners Fund II.  An exception to this rule applies in the case of a partner (or related person) who makes a non-recourse loan to Partners Fund II.  In such a case, the lending or related partner is considered to bear the economic risk of loss for such liability.

To the extent that a Member's share of Partners Fund II Net Loss exceeds the adjusted basis of such Member's Units at the end of a Partners Fund II year in which such Net Loss occurs, such excess Net Loss cannot be utilized in that year by the Member for any purpose, but is allowed as a deduction at the end of the first succeeding Partners Fund II taxable year, and subsequent Partners Fund II taxable years, to the extent that the adjusted basis of such Member's Units at the end of any such year exceeds zero (before reduction by such excess Net Loss from a prior year).

**Treatment of Cash Distributions from Partners Fund II**.  The Operating Agreement provides for various forms of cash distributions resulting from operations of Partners Fund II.  Cash distributions (including for federal income tax purposes, a Member's share of any reduction in non-recourse indebtedness) made to a Member, other than those made in exchange for or in redemption of all or part of his, her or its Units, will generally not affect the calculation of a Member's distributive share of Net Income or Net Loss from Partners Fund II.  Such distributions are generally first applied against and reduce the Member's adjusted basis in his, her or its Units.  To the extent that such distributions are so applied against and reduce the adjusted basis of the Member's Units, they will not give rise to a realization of income, gain or loss by the Member.  Cash distributions in excess of a Member's adjusted basis in his, her or its Units will result in the recognition of gain to the extent of such excess.  Ordinarily, any such recognized gain will be treated as gain from the sale or exchange of an investor Unit.  See "Treatment of Gain or Loss on Disposition of Units" under this heading.

**Net Income in Excess of Cash Distributions**.  It is possible that a Member's share of Partners Fund II Net Income may exceed cash distributed to him, her or it with respect to his, her or its Units, and such Member's tax liability on that share may even exceed such distributions.

**Treatment of Liquidating Distributions**.  Generally, upon liquidation or termination of Partners Fund II, gain will be recognized by a Member only to the extent that cash is distributed (including his, her or its share of any reduction in Partners Fund II non-recourse liabilities) in excess of such Member's adjusted basis in his, her or its Units at the time of distribution.

**Treatment of Gain or Loss on Disposition of Units**.  It is not expected that any public market will develop for the Units.  Furthermore, Members may not be able to liquidate their Units promptly at reasonable prices since any transferee of Units will be required to comply with the minimum purchase requirements and the investor suitability standards imposed by the transferee's state of residence or by Partners Fund II, and since all assignees of Units may be admitted as Substitute Members only with the consent of the Manager.

Any gain or loss realized by a Member upon the sale or exchange of Units will generally be treated as capital gain or loss, provided that such Member is not deemed to be a "dealer" in such securities.  However, any portion of the gain that is attributable to unrealized receivables or inventory items of Partners Fund II that have substantially appreciated in value will generally be treated as ordinary income.  If the Member's holding period for the Units sold or exchanged is more than one year, the portion of any gain realized that is capital gain will be treated as long-term capital gain.  *The sale of Units by a Member will not qualify for tax-deferred like-kind exchange treatment under Section 1031 of the Internal Revenue Code.*

A transferor Member must notify Partners Fund II of any intended sale or exchange of his, her or its Partners Fund II interest involving unrealized receivables or appreciated inventory.  Once Partners Fund II is so notified, the transferor and the transferee on the sale or exchange must be reported to the IRS.  Penalties will apply for the failure by the transferor Member to report to Partners Fund II, and the failure by Partners Fund II to report to the IRS the transferor and the transferee.

In determining the amount realized upon the sale or exchange of Units, a Member must include, among other things, his, her or its share of Partners Fund II indebtedness.  Therefore, it is possible that the gain realized on a Member's sale of

34

Exhibit A
p. 35

Units may exceed the cash proceeds of the sale, and, in some cases, the income taxes payable with respect to the gain realized on the sale may exceed such cash proceeds.

**Treatment of Gifts of Units.** Generally, no gain or loss is recognized for federal income tax purposes as a result of a gift of property. However, in the event that a gift (including a charitable contribution) of an investor Unit is made at a time when a Member's share of Partners Fund II's non-recourse indebtedness exceeds the adjusted basis of his, her or its Units, such Member may recognize gain for income tax purposes upon the transfer. Such gain, if any, will generally be treated as capital gain except for the portion of any such gain attributable to any unrealized receivables (which includes, for these purposes, depreciation recapture attributable to Partners Fund II property) or inventory items of Partners Fund II that have substantially appreciated in value, which will generally be treated as ordinary income. Gifts of Units may also be subject to a gift tax imposed pursuant to the rules generally applicable to all gifts of property.

**Sale or Other Disposition of the Assets.** In general, if one or more of Partners Fund II's assets constitutes a capital asset in the hands of Partners Fund II, any profit or loss realized by Partners Fund II on its sale or exchange (except to the extent that such profit represents depreciation recapture taxable as ordinary income) will be treated as capital gain or loss under the Code. Capital gain will be taxed to individuals at varying rates based on the length of the holding period. If, however, it is determined that Partners Fund II is a "dealer" in real estate for federal income tax purposes or that the assets sold constitute "Section 1231 assets" (such assets are capital assets involuntarily converted and depreciable business property held for more than 12 months), the gain or loss generated from the sale of such assets will not be capital gain or loss.

In the event Partners Fund II is deemed a "dealer" and the assets sold constitutes real estate that is not considered to be capital assets or Section 1231 assets, any gain or loss on the sale or other disposition of such property would be treated as ordinary income or loss. As a general rule, the holding of parcels of real property for investment is not the type of activity that would cause a person or entity to be considered a "dealer" in real property. It is unlikely, therefore, that Partners Fund II will be viewed as a "dealer" in real property. However, the question of "dealer" status is a question of fact to be determined at the time of the sale of the property. Consequently, counsel has expressed no opinion on this issue.

In the event that assets sold or involuntarily converted constitute Section 1231 assets, a Member would combine their distributive share of Partners Fund II gains or losses attributable to such assets with any other Section 1231 gains or losses realized by such Member in that year, and the resultant net Section 1231 gains or losses would be taxed as capital gains or constitute ordinary losses, as the case may be. This treatment may be altered depending on each Member's disposition of Section 1231 property over several years. In general, net Section 1231 gains are recaptured as ordinary income to the extent of net Section 1231 losses in the five preceding taxable years.

In determining the amount realized upon the sale, exchange or other disposition of real property assets, Partners Fund II must include, among other things, the amount of any liability to which the property is subject. Furthermore, Partners Fund II may take back purchase money obligations as part of the consideration for the sale of the property. Partners Fund II may attempt to structure any such sale so as to qualify as an "installment sale" for federal income tax purposes, but there can be no assurance that any such sale could or would so qualify. Unless such sale qualifies as an "installment sale," Partners Fund II would generally be deemed to have received as proceeds of such sale the fair market value of such purchase money obligations.

Thus, Partners Fund II's gain on the disposition of any such property may exceed the cash proceeds, if any, of such disposition, and in some cases the income taxes payable by the Members with respect to such gain may exceed the cash proceeds, if any. In the event one or more of the properties is sold, any profit or loss realized by Partners Fund II on such sale(s) or exchange(s) will be treated as ordinary income or loss under the Code.

**Foreclosure.** In the event of a foreclosure of a mortgage or deed of trust on any real property assets, Partners Fund II would realize gain, if any, in an amount equal to the excess of the outstanding mortgage over the adjusted tax basis of the property, even though Partners Fund II might realize an economic loss upon such a foreclosure. In addition, the Members could be required to pay income taxes with respect to such gain even though they receive no cash distributions as a result of such foreclosure.

**Compensation for Management Services/Rental Income.** Any compensation paid to Partners Fund II for managerial services, whether in the form of cash, a percentage of profits or an interest in the properties being managed by Partners Fund II, generally will constitute ordinary income, allocated to the Members as part of the net income of Partners Fund II (as discussed above). Net rental income will likewise constitute ordinary income, allocated to the members as part of the net income of Partners Fund II.

Exhibit A
p. 36

**Partners Fund II's Termination for Tax Accounting Purposes**. Partners Fund II will terminate for tax purposes if, within a 12 month period, 50% or more of the capital and profits interests in Partners Fund II are sold or exchanged. Termination of Partners Fund II for tax purposes would not cause a Member to recognize gain unless such Member's share of Partners Fund II's cash (or cash deemed distributed as a result of relief of indebtedness) exceeded the adjusted basis of his, her or its Units. Nor would it cause a Member to recognize loss unless Partners Fund II's assets at the time of termination consisted solely of cash or certain unrealized receivables or substantially appreciated inventory and the Member's share thereof was exceeded by his, her or its adjusted basis.

**Dissolution**. Dissolution of Partners Fund II pursuant to state law prior to expiration of its term should not by itself create tax consequences for the Members unless the dissolution is followed by a liquidation of Partners Fund II. Such dissolution and liquidation might create adverse tax and economic consequences for Partners Fund II. For example, if, as a result of dissolution, Partners Fund II were required to liquidate its interest in one or more of the assets during a limited period of time, Partners Fund II might sustain substantial economic losses based on the original cost of each of such assets. Nevertheless, Partners Fund II might realize substantial taxable gain on such dispositions as a result of the use of borrowing, if any, in connection with acquisitions of the assets.

**Tax Elections**. Partners Fund II may make certain elections for federal income tax reporting purposes that could result in various items of Partners Fund II income, gain, loss, deduction and credit being treated differently for tax and Partners Fund II purposes than for accounting purposes.

The Code provides for optional adjustments to the basis of Partners Fund II property for purposes of measuring both depreciation and gain upon distributions of Partners Fund II property (Section 734) and transfers of Units (Section 743) provided that a Partners Fund II election has been made pursuant to Section 754. The general effect of such an election is that transferees of Units are treated, for purposes of computing depreciation and gain, as though they had acquired a direct interest in Partners Fund II assets, and Partners Fund II is treated for such purposes, upon certain distributions to partners, as though it had newly acquired an interest in Partners Fund II assets and therefore acquired a new cost basis for such assets. Any such election, once made, is irrevocable without the consent of the IRS.

As a result of the complexities and added expense of the tax accounting required to implement such an election, Partners Fund II does not presently intend to make such an election. Therefore, any benefits which might be available to the Members by reason of such an adjustment to basis will be foreclosed. In addition, a Member may have greater difficulty in selling Units since the purchaser will obtain no current tax benefits from the investment to the extent that such investment exceeds his allocable share of Partners Fund II's basis in its assets and may be required to recognize taxable income to the extent of such excess, even though the purchaser does not realize any economic profit.

**Deductibility of Interest**. Interest will accrue and be payable on any loan used to acquire, and secured by, any of the assets. The deduction of such interest is limited by the rules limiting the deductibility of passive losses, discussed above. See "Limitations on Losses and Credits from Passive Activities" under this heading.

**Start-up Expenses**. Section 195 of the Code provides taxpayers with an election to amortize start-up expenditures ratably over a period of at least 60 months commencing with the month in which the new business begins. A start-up expenditure eligible for such amortization must be paid or incurred in connection with investigating the creation or acquisition of an active trade or business or paid or incurred in connection with creating an active trade or business. Such amounts must also be of a type which, if paid or incurred in connection with the expansion to an existing trade or business in the same field, would be allowable as a current deduction in the year paid or incurred. In the case of Partners Fund II, the eligibility for the new election to amortize is made at the Partners Fund II level.

**Organization and Syndication Expenses**. Expenses paid or incurred in connection with the organization and syndication of a partnership must be capitalized. Expenses of organizing a partnership may be amortized over a period of not less than 60 months. However, syndication expenses may not be deducted currently nor amortized. The determination as to whether expenses are organization or syndication expenses is a factual determination which will initially be made by Partners Fund II. The IRS could challenge Partners Fund II's allocations between organization and syndication expenses. Consequently, expenses that are treated as subject to amortization could be re-characterized as non-deductible syndication expenses.

**Depreciation and Cost Recovery**. Current federal income tax law permits Partners Fund II, as an owner of improved real property, to take depreciation deductions based on the entire cost of the depreciable improvements, even if such improvements are financed in part with borrowed funds. If, however, the purchase price of the real property and the

36

Exhibit A
p. 37

liabilities to which the property is subject are in excess of the fair market value of the property, Partners Fund II non-recourse will not be entitled to take depreciation deductions to the extent that deductions are derived from such excess. Any real property assets will be depreciated on a straight line method over 39 years, using the mid-month convention. Under the mid-month convention, property is treated as placed in service during the mid-point of the month.

Depreciation deductions can only be claimed for that portion of real property which is depreciable. Since land is not depreciable, an allocation must be made between the value of improvements on real estate and the underlying land. The allocation of the purchase price between depreciable and non-depreciable items is a question of fact, and if the amount allocated by Partners Fund II to depreciable items is decreased and the amount allocated to non-depreciable items such as land is increased, Partners Fund II losses for federal income tax purposes will be decreased. The allocation of the purchase price between buildings and land is a question of fact.

With respect to individual Members, a 20% penalty is imposed on all underpayment of tax attributable to a substantial valuation overstatement. A valuation overstatement is substantial when the value or adjusted basis claimed with respect to a property is determined to be at least 200% of its correct valuation or adjusted basis. The penalty will not be applicable unless the underpayment of tax is at least $5,000. The Manager of Partners Fund II does not anticipate that the value or adjusted basis assigned to any single real property that may be purchased by Partners Fund II will equal or exceed 200% of its correct valuation or adjusted basis.

**Partners Fund II Tax Returns.** The federal income tax returns of Partners Fund II may be audited by the IRS, and such an audit may result in adjustments to the various items reported by Partners Fund II. For example, various deductions claimed by Partners Fund II on its returns of income could be disallowed in whole or in part on audit, thereby resulting in an increase in the Net Income or a reduction in the Net Loss of Partners Fund II. The disallowance of such deductions in whole or in part could increase a Member's taxable income without the receipt of any additional cash distributions from Partners Fund II.

The IRS has shifted the focus of its audits from the member level to the partnership level, in this case meaning the Partners Fund II level. Members in Partners Fund II may be bound by actions taken by the Manager at the Partners Fund II level during the course of an audit.

**Payments to the Sponsors and the Manager.** The Sponsors will receive the Formation Fee and the Manager will receive the various Fees-for-Services and Distribution-Sharing Income described elsewhere in this Memorandum. The tax treatment of these payments is set forth below.

Partners Fund II will treat the expenses of the Offering as non-amortizable formational and organizational, and syndication costs, and these costs will be capitalized. These costs consist of work related to hiring of attorneys and accountants, guidance and assistance in drafting this Memorandum, and development of the Fund's business plan, as well as the legal and accounting fees payable to the attorneys and accountants hired by the Sponsors, and printing, marketing, advertising, due diligence expenses, and other costs and expenses directly related to preparing and syndicating the Offering.

The allocation of such costs between deductible expenses and nondeductible expenses will depend upon a determination to be made when such costs are actually incurred in the future, and counsel has expressed no opinion on the deductibility of such costs.

Real estate brokerage commissions incurred with the purchase of any real property assets will be treated as capitalized expenditures and added to the basis of the property purchased. The amount of such brokerage commissions cannot be estimated at this time.

In addition, there are additional limits on the deductibility of payments between related parties. No deduction is allowed for a payment by an accrual basis taxpayer to a related cash basis recipient until such time as the recipient includes the payment in income. The definition of related party for purposes of this provision includes a partnership and any partner in the partnership. Partners Fund II will be on the cash method of accounting.

## General Considerations

**At Risk Rules.** A Member that is an individual or closely held corporation will be unable to deduct his, her or its distributive share of Partners Fund II Net Loss, if any, to the extent such Net Loss exceeds the amount such Member has "at risk." A Member's initial amount at risk will equal the sum of (i) the amount of money invested by the Member in Partners

Exhibit A
p. 38

Fund II, (ii) the basis of any property contributed by such Member to Partners Fund II, and (iii) the amount of borrowed funds used in Partners Fund II activities to the extent that the Member is personally liable with respect to such indebtedness. A Member can include in the amount at risk such Member's share of any qualified non-recourse financing obtained by Partners Fund II to buy real property.

A Member's amount at risk will be reduced by the amount of any cash distributed to such Member and the amount of Net Loss allocated to such Member, and will be increased by the amount of Net Income allocated to such Member. Net Loss not allowed under the 'at risk' provisions may be carried forward to subsequent taxable years and used when the amount at risk increases.

**Alternative Minimum Tax.**  Taxpayers may be subject to the alternative minimum tax in addition to the regular income tax.  The alternative minimum tax applies to designated items of tax preference.  Specifically, subject to certain different rates applicable to net capital gains, and based on 2005 rates, the tax is determined by subjecting alternative minimum taxable income in excess of $40,000 in the case of a subchapter C corporation, and $58,000 in the case of married couples filing a joint return or a surviving spouse ($40,250 for a single taxpayer, $29,000 for a married taxpayer filing separately, or $22,500 for estates or trusts) to a flat rate of 26.00% (20.00% in the case of corporations) for alternative minimum taxable income in excess of the exemption up to $175,000 and 28.00% on any excess. The exemption amounts are reduced, but not below zero, by 25 cents for each $1 that alternative minimum taxable income exceeds $150,000 for a C corporation, married couples filing a joint return or a surviving spouse, $112,500 for a single taxpayer, and $75,000 for a married taxpayer filing separately and for estates and trusts and alternative minimum taxable income for a married taxpayer filing separately is increased by the lesser of (i) 25.00% of the excess alternative minimum taxable income over $165,000 or (ii) $22,500.  The limitations on the deduction of passive losses also apply for purposes of computing alternative minimum taxable income.

For further information concerning tax preferences and the alternative minimum tax, prospective Members should consult their individual tax advisors.

**Activities Not Engaged in for Profit.** Under Section 183 of the Code, certain losses from activities not engaged in for profit are not allowed as deductions from other income.  The determination of whether an activity is engaged in for profit is based on all the facts and circumstances, and no one factor is determinative, although the Treasury Regulations indicate that an expectation of profit from the disposition of property will qualify as a profit motive.  Section 183 contains a presumption that an activity is engaged in for profit if income exceeds deductions in at least three out of five consecutive years.  Although it is reasonable for a prospective Member to conclude that he, she or it can realize a profit from an investment in Partners Fund II as a result of cash flow, appreciation in any real property purchased by Partners Fund II, rents, and any compensation for management services, there can be no assurance that Partners Fund II will be found to be engaged in an activity for profit due to the fact that the applicable test is based on the facts and circumstances existing from time to time.

The IRS is paying increased attention to the application of Section 183 to partnerships. Moreover, the Tax Court has accepted the argument by the IRS that Section 183 applies to the activities of a Partners Fund (rather than the partner) and that the provisions of Section 183 are applied at the Partners Fund II level.  Partners Fund II intends to conduct all operations in a businesslike manner in order to generate a profit from management of the properties and the operation, rental, and sale of any real property purchased by Partners Fund II.  In the event Section 183 is applied with respect to the Units of a Member, a substantial portion of the tax benefits associated with this Offering would be eliminated.

Based on the objectives of Partners Fund II, representations regarding the Fund's business motives and counsel's review of the proposed activities of Partners Fund II, although the issue is basically factual, in counsel's opinion, it is more likely than not that, if litigated, Partners Fund II will be held to be engaged in a business for profit and not be subject to Section 183 of the Code.

**General Limitations on the Deductibility of Interest.**  In addition to the limitations on the deductibility of interest incurred in connection with passive activities, the following are additional restrictions on the deduction of interest:

**Prepaid Interest.** Partners Fund II does not anticipate prepaying any interest on any loans it may obtain, but Partners Fund II may pay certain amounts commonly referred to as "points," which may be considered prepayments of interest for federal income tax purposes. Interest prepayments (including "points") must be capitalized and amortized over the life of the loan with respect to which they are paid.

Exhibit A
p. 39

**Capitalized Interest.** Interest on debt incurred to finance construction of real property is not currently deductible but will be capitalized as part of the cost of the real property. Interest incurred on other debts of Partners Fund II will be subject to the rules concerning the deductibility of passive losses, discussed above. See "Limitations on Losses and Credits from Passive Activities" under this heading.

**Interest Incurred to Carry Tax-Exempt Securities.** Section 265(a)(2) of the Code disallows any deductions for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS announced in Revenue Procedure 72-18, 1972-1 C.B. 660, that the prescribed purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment." This Revenue Procedure means that while Partners Fund II's purpose in incurring indebtedness will be attributable to its Manager, the limited liability company interest held by each Member will be considered as a "portfolio investment." Therefore, in the case of a Member owning tax-exempt obligations, the IRS might take the position that their allocable portion of the interest incurred by Partners Fund II on its borrowings or of any interest incurred by the Member to purchase their investor Units in Partners Fund II, should be viewed as incurred to enable them to continue to carry tax-exempt obligations, and that such Member should not be allowed to deduct his, her or its full allocable share of such interest.

The application of Section 265(a)(2) turns upon each individual Member's purpose for acquiring an interest in Partners Fund II. Thus, Section 265(a)(2) might be applied to a Member whose purpose for investing in Partners Fund II rather than in a non-leveraged investment is to enable such Member to continue to carry tax-exempt obligations or such shares of stock. It should be noted that Section 7701(f) of the Code directs the IRS to prescribe regulations as may be necessary or appropriate to prevent the avoidance of provisions of the Code which deal with the linking of borrowings to investments through the use of related persons, pass-through entities or other intermediaries. Therefore, the provisions of Section 265(a)(2) may be applied to a Member if the Member does not himself, herself or itself own tax-exempt obligations or stock of a regulated investment which distributes exempt interest dividends but rather such obligations or stock is owned by a person, entity or other intermediary related to the Member.

**Penalties.** Under Section 6662 of the Code, a 20% penalty is imposed on any "substantial understatement of income tax." In general, a "substantial understatement of income tax" will exist if the actual income tax liability of the taxpayer exceeds the income tax liability shown on his, her or its return by the greater of 10% of the actual income tax liability or $5,000. The amount of an understatement may be reduced by any portion of such understatement which is attributable to (1) the income tax treatment of any item shown on the return if there is "substantial authority" for the taxpayer's treatment of such item on his, her or its return, or (2) any item with respect to which the taxpayer (a) adequately discloses on his, her or its return the relevant facts affecting the item's income tax treatment, and (b) there is a reasonable basis for the item's tax treatment by the taxpayer, unless the understatement is attributable to a "tax shelter." A "tax shelter" is defined for this purpose to include a partnership (or other entity) that has as "a significant purpose" the avoidance or evasion of federal income tax. In the case of a tax shelter, as so defined, the amount of the understatement cannot be reduced under the foregoing rules. Regardless of whether the understatement is attributable to a tax shelter, the penalty will be abated with respect to any portion of an understatement if the taxpayer had reasonable cause and acted in good faith.

Based on Partners Fund II's investment objectives, it is believed that there are substantial grounds for a determination that Partners Fund II does not constitute a tax shelter for these purposes; however, it is possible that Partners Fund II may be considered a tax shelter and that certain partnership tax items could be considered tax shelter items within the meaning of Section 6662 of the Code. Because the issue is dependent upon facts relating to Partners Fund II's future operations and other factual determinations which are not known at this time, and because there is a current lack of administrative and judicial guidance as to what constitutes a "significant purpose," the interpretation of which term is uncertain, it is not possible to guarantee that the IRS will not consider the investment a tax shelter for purposes of Section 6662 of the Code.

In addition, Section 6662A of the Code imposes a separate penalty on an understatement resulting from (1) any listed transaction or (2) any reportable transaction other than a listed transaction with a significant tax avoidance purpose. A listed transaction is a reportable transaction that is the same as, or substantially similar to, a transaction specifically identified by the IRS as a tax avoidance transaction for purposes of Section 6011 of the Code. A reportable transaction is any transaction with respect to which information is required to be included with a return or statement because, as determined under Regulations prescribed under Section 6011 of the Code, the IRS has determined that such transaction has a potential for tax avoidance or evasion. The amount of the penalty is generally 20% of the understatement, increasing to 30% if the transaction was not properly disclosed.

One type of reportable transaction is a loss transaction. This type of transaction, subject to certain exceptions, is any

investment resulting in a partnership or any non-corporate partner claiming a loss under Section 165 of the Code of at least two million dollars in any single taxable year or four million dollars in aggregate Section 165 losses in the taxable year that the investment is entered into and the five succeeding taxable years combined. For this purpose, a Section 165 loss includes an amount deductible under a provision of the Code that treats a transaction as a sale or other disposition or otherwise results in a deduction under Section 165. Although the IRS has issued guidance that would exclude certain loss transactions from the definition of reportable transactions, it is nonetheless possible that Partners Fund II could engage in a reportable transaction by realizing a Section 165 loss, or aggregate Section 165 losses, which would meet the dollar amount thresholds described above. However, merely engaging in a reportable transaction does not mean that the tax treatment of the activities is improper. No penalty applies to a reportable transaction understatement if the taxpayer shows (1) that there was a reasonable cause for the understatement and that the taxpayer acted in good faith, (2) the relevant facts of the transaction were disclosed as provided in applicable Regulations, (3) there is, or was, substantial authority for the claimed tax treatment, and (4) the taxpayer reasonably believed that the tax treatment was more likely than not proper.

In addition to the substantial understatement penalty described above, the Code also imposes (1) a 20% penalty on any portion of an underpayment of tax attributable to (a) any substantial valuation misstatement, defined generally as a situation where the value or adjusted basis of a property claimed on a return is 200% or more of the correct value or adjusted basis, or (b) negligence, defined as any failure to make a reasonable attempt to comply with the Code, or a careless, reckless or intentional disregard of federal income tax rules or regulations and (2) a 40% penalty on any portion of an underpayment of tax attributable to any gross valuation misstatement, defined generally as a situation where the value or adjusted basis of a property claimed on a return is 400% or more of the correct value or adjusted basis.

**State and Local Taxes.** In addition to the federal income tax consequences described above, prospective investors should consider the state tax consequences of an investment in Partners Fund II. A Member's distributive share of the taxable income or loss of Partners Fund II generally will be required to be included in determining his reportable income for state and local tax purposes. As Partners Fund II will earn income and most likely own property in more than one state, it is possible that Members will be required to file local tax returns in each state in which Partners Fund II owns property. Furthermore, it is possible that a state will require that Partners Fund II withhold taxes from any payments which are made to the Members.

**Miscellaneous Considerations.** It should be noted that a number of issues discussed in this Memorandum, including issues on which counsel has commented on, have not been definitively resolved by statutes, regulations, rulings or judicial opinions. Accordingly, no assurances can be given that the conclusions expressed herein will be accepted by the IRS, or, if contested, would be sustained by a court, or that legislative changes or administrative pronouncements or court decisions may not be forthcoming that would significantly alter or modify the conclusions expressed herein.

**Tax Shelter Registration and Investor Lists.** The organizer of a "tax shelter" must register the tax shelter with the IRS. For this purpose, an investment will generally constitute a tax shelter if the ratio of anticipated tax deductions and 350% of the anticipated tax credits to Capital Contributions as of the end of any of the first five years (calculated as provided in the Treasury Regulations) exceeds 2 to 1. The Managers have represented that based on the intended operations of the Company, the Company will not satisfy the definitional requirements for a "tax shelter" and will not be registered with the IRS. Consequently, the Managers may be subject to penalty in the event the IRS determines that the Company was required to register as a tax shelter.

**United States Income Tax Considerations For Foreign Investors.** The federal income tax treatment applicable to a nonresident alien or foreign corporation investing in the Company is highly complex and will vary depending on the particular circumstances of such investor and the effect of any applicable income tax treaties. Each foreign investor should consult his own tax advisor as to the advisability of investing in the Company. Furthermore, some of the provisions appear likely to change in the near future. The federal income tax treatment will generally depend on whether the Company is deemed to be engaged in a United States trade or business. This determination must be made annually. The Code does not define what constitutes a United States trade or business, rather, this determination is based upon an examination of the facts and circumstances attending Company's operations and activities.

**United States Withholding Tax on United States Source Income Not Derived in a United States Trade or Business.** If the Company is not engaged in any trade or business during a tax year, a foreign investor would be subject to a 30.00% withholding tax (subject to reduction or elimination by applicable income tax treaties) with respect to its distributive share of certain items of Company gross income, such as United States source interest, dividends, rents and other portfolio or investment income. Various statutory exemptions from the 30.00% withholding tax (or a lower treaty rate) apply to interest income from bank deposits and certain portfolio indebtedness and 30.00% withholding tax may be reduced by income tax treaties. A foreign Member who is entitled to income tax treaty benefits may claim such benefits by executing and filing with

the Company certain IRS-required forms in a timely manner. In this case, the investor should contact the Company for the specific forms and procedures.

If a foreign Member claims a reduction in the 30.00% withholding tax in reliance on an income tax treaty, the Member may be required to disclose the claimed reduction in its United States income tax return or, if no return is filed, in the form the Treasury Department has prescribed in Treasury Regulations under Section 6114 of the Code. If the foreign investor's share of Company capital gain is not effectively connected with the foreign investor's conduct of a United States trade or business and the foreign investor, in the case of an individual, is not physically present in the United States for 183 days or more during a taxable year, the capital gain will not be subject to United States tax.

**Tax Consequences to Foreign Investors if the Company is Engaged in a United States Trade or Business.** If in any year the Company is deemed to be engaged in a United States trade or business, a foreign Member will also be considered to be engaged in a United States trade or business. Thus, the Member would be required to file a United States federal income tax return and would be subject to tax at graduated rates on its distributive share of net income from the Company which was "effectively connected" with such trade or business. In determining the investor's United States taxable income, the investor would be permitted the same deductions allowed a United States resident individual or corporation to the extent the deductions are effectively connected with a United States trade or business. However, a prerequisite to receiving the benefit of deductions is the filing of a true and accurate United States income tax return. Any Company losses that are not effectively connected with a United States trade or business would not be deductible from the Member's United States source income. Additionally, foreign investors may be subject to Federal and state estate, inheritance or gift taxes, state and local income taxes and to the alternative minimum tax.

If a foreign investor is subject to United States income tax on its distributive share of Company income at regular United States rates and is required to file United States income tax returns, such foreign investor's share of Company taxable income is not subject to the 30.00% withholding tax discussed above, provided the foreign investor completes and files with the Company the IRS required form for exemption from withholding of tax on income effectively connected with the conduct of a trade or business in the United States. This form must be filed with the Company prior to the acceptance by the Managers of the subscription of such foreign investor and annually thereafter for each year in which the foreign investor is a Member.

If the Company has "effectively connected" income which is allocable to a foreign Member, then the Company must pay a Federal withholding tax, presently equal to 38.00%, and, a California withholding tax equal to 8.84% in the case of a Member that is a corporation (35.00% and 9.30% for a Member who is an individual, partnership, estate or trust) of the adjusted "effectively connected" taxable income that is allocable to that foreign Member.

If a foreign Member has filed the IRS form to claim exemption from the 30.00% withholding, that Member is deemed to have "effectively connected" income subject to withholding. The Company must make installment payments of withholding tax based on the amount of effectively connected income allocable to its foreign Members, without regard to whether distributions are made during the Company's taxable year and the foreign Members' distributive share of the Company's tax credits. The foreign Member's share of any withholding tax paid by the Company will be treated as distributed to that Member on the earlier of the day on which the tax is paid by the Company or the last day of the Company's tax year for which the tax is paid and will reduce the foreign Member's adjusted basis in his Units. Amounts paid by the Company will be treated as loan by the Company to the foreign Member and will be subject to an interest charge equal to the Prime Rate. The amount of the loan and interest charge will be offset against the foreign Member's share of Distributions. Withholding is not required on any amount subject to the 30.00% withholding discussed earlier. The amount withheld attributable to a foreign Member is creditable against the United States income tax liability of that foreign Member subject to certain limitations. Withholding is not required with respect to a particular Member if that Member provides a Certificate of Non-foreign Status in accordance with Revenue Procedure 89n31, 1989n1 C.B. 895. For tax treaty purposes, a foreign Member may be deemed to have a "permanent establishment" in the United States for any year in which the Company is engaged in a United States trade or business.

**Miscellaneous Considerations.** Foreign corporate investors should also be aware that if the Company is deemed to be engaged in a United States trade or business, the United States Branch Profit Tax may apply to income from the Company to the extent the Company has income effectively connected with a United States trade or business.

In determining the advisability of an investment in the Company, foreign investors should consult their own tax advisors concerning (i) whether they will be treated as being engaged in a United States trade or business or having permanent establishment in the United States, (ii) whether gain from the sale of Units is effectively connected with their

Exhibit A
p. 42

conduct of a United States trade or business or a permanent establishment in the United States, (iii) the income tax consequences relating to the ownership of Units in their own particular circumstances and (iv) the tax consequences of owning Units under the internal tax laws of the foreign investor's home country.

It should be noted that a number of issues discussed in this PPM, including issues on which counsel has commented on, have not been definitively resolved by statutes, regulations, rulings or judicial opinions. Accordingly, no assurances can be given that the conclusions expressed herein will be accepted by the IRS, or, if contested, would be sustained by a court, or that legislative changes or administrative pronouncements or court decisions may not be forthcoming that would significantly alter or modify the conclusions expressed herein.

**Withholding on Dispositions of United States Real Property Interests.** Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), nonresident aliens and foreign corporations are subject to withholding on dispositions of United States real property interests. For this purpose, United States real property owned by the Company will be treated as held proportionately by its Members. Therefore, a foreign Member may be subject to withholding when he sells or exchanges his Investor Units to a United States person. The Company is required to deduct and withhold from any cash Distribution an amount presently equal to 35.00% for United States tax purposes to the extent the Distribution is attributable to gain from the sale of a United States real property that is allocable to a foreign Member that is a corporation. If the gain is effectively connected with a United States trade or business and the Company makes installment payments of withholding tax, the Company is not required to withhold tax on cash Distributions. See "Tax Consequences to Foreign Investors if the Company is Engaged in a United States Trade or Business" under this heading. If the Company distributes a United States real property interest to a Foreign Member, it is required to withhold 10.00% of the fair market value of the interest for Federal income tax purposes.

## REPORTS AND ACCOUNTING MATTERS

The Manager will keep proper and complete records of account for Partners Fund II, using the cash method of accounting. These records will be kept at Partners Fund II's principal place of business and each Member (or a duly authorized representative) will at all times, during reasonable business hours, have the right to inspect and examine them. The fiscal year of Partners Fund II will be a calendar year. The Manager will prepare and transmit to the Members the following periodic reports:

1. Within 75 days after the end of each fiscal year of Partners Fund II, an annual report.
2. Within 75 days after the end of each fiscal year of Partners Fund II, a Form K-1 for use by the Members in preparation of their federal income tax returns for such fiscal year.
3. Within 60 days after the acquisition of any real estate or real estate related investment, a detailed report, issued monthly or not less frequently than quarterly, containing the investment's year-to-date income and expenses.

## ADDITIONAL INFORMATION

Seán Dennison, one of the Fund's two Principal Officers, and/or the Fund's Officers, will answer all inquiries from qualified subscribers concerning Partners Fund II and matters relating to the Offering and sale of the Fund's Units. All subscribers will be afforded the opportunity to obtain any additional information to the extent the Fund possesses such information or can acquire such information without unreasonable effort or expense that is necessary to verify the information in this Memorandum. Subscribers may review copies of other material contracts relating to Partners Fund II described in this Memorandum. The mailing address for Landwin Partners Fund II, LLC, is 1340 E. Route 66, Suite 205, Glendora, California 91740. The Fund's telephone number is 626.335.8606, its facsimile number is 626.335.8605, and its email address is invest@landwin.com.

42

## INDEX TO EXHIBITS TO THE MEMORANDUM

EXHIBIT "A"-OPERATING AGREEMENT.................................................................................44

    EXHIBIT A TO THE OPERATING AGREEMENT-MEMBER LIST.................................................64

    EXHIBIT B TO THE OPERATING AGREEMENT-MANAGEMENT AGREEMENT..............................65

EXHIBIT "B"-FORMATION FEE AGREEMENT..........................................................................70

    EXHIBIT A TO THE FORMATION FEE AGREEMENT-PRMISSORY NOTE...........................................72

EXHIBIT "C"-INSTRUCTIONS FOR SUBSCRIBING.....................................................................76

EXHIBIT "D"-SUBSCRIPTION AGREEMENT...........................................................................77

EXHIBIT "E"-CONSENT OF SPOUSE....................................................................................83

EXHIBIT "F"-W-9 FORM.................................................................................................84

Exhibit A
p. 44

EXHIBIT "A"

THE OPERATING AGREEMENT

## LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
## LANDWIN PARTNERS FUND II, LLC

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF LANDWIN PARTNERS FUND II, LLC, a Delaware limited liability company ("Partners Fund II" or the "Fund") dated as of May 25, 2007 (the "Agreement"), is made by and among Sylvia, Inc., a California Corporation ("Sylvia"), and SmithDennison Capital, LLC, a California Limited Liability Company ("SDC" and together with Sylvia, the "Sponsors"), as the Fund's Sponsors; Landwin Management, LLC, a Delaware limited liability company (the "Manager"), as the Fund's Manager, and its managers, Sylvia and SDC and their respective principal officers (collectively, the "Manager's Managers"), and; Partners Fund II and its limited liability company members (collectively, the "Members"), as the Fund's Members, and as listed on Exhibit A hereto.

### RECITALS

WHEREAS, the Certificate of Formation of Partners Fund II was filed with the Office of the Secretary of State of Delaware by the Sponsors on May 25, 2007, and;

WHEREAS, Partners Fund II, its Sponsors, its Manager, and its Members mutually desire to enter into this Limited Liability Company Operating Agreement on the terms and conditions herein set forth;

NOW THEREFORE, in consideration of the promises and covenants contained herein, the parties hereto agree as follows:

### AGREEMENT

1. FORMATION OF LIMITED LIABILITY COMPANY.

Pursuant to Sections 18-201 et. seq. of Title 6 of the Delaware Code Statutes (the "Delaware Limited Liability Company Act" or "Act"), Sylvia and SDC, as organizers and Sponsors, have formed a Delaware limited liability company under the laws of the State of Delaware by filing, on May 25, 2007, the Articles for LANDWIN PARTNERS FUND II, LLC, a Delaware limited liability company ("Partners Fund II" or the "Fund"). The business of Partners Fund II shall be conducted under the provisions of such Articles of Organization until such time as the Members shall file amendments to the Articles of Organization in accordance with applicable law and the terms for amendment under said Articles of Organization.

2. OFFICES.

The principal office of Partners Fund II is located at 1340 E. Route 66, Suite 205, Glendora, California 91740, and the principal telephone number is 626.335.8606. Partners Fund II may have such other offices and telephone numbers as the Manager may designate or as the business of Partners Fund II may require.

3. PURPOSE.

Partners Fund II is organized to acquire, hold, and realize upon an unidentified pool of real estate and real estate related investments, including, but not limited to, equity and debt investments, or such other purposes as may be authorized in the Articles of Organization or otherwise permitted under the laws of the State of Delaware or any other jurisdiction in which Partners Fund II may be authorized to conduct business.

4. DURATION OF PARTNERS FUND II.

44

Exhibit A
p. 45

Unless earlier dissolved and terminated in accordance with the provisions of this Agreement, Partners Fund II will terminate ten (10) years from the date of the initial closing (the "Initial Closing") of its offering (the "Offering") of limited liability company units of membership interest (the "Units"), which shall occur upon the acceptance of the first five million dollars ($5,000,00) of Units sold in the Offering contained in the Private Placement Memorandum dated July 1, 2007 (the "Offering"), at which time Partners Fund II must either: (i) liquidate assets, distribute proceeds and be dissolved; (ii) consummate an initial public offering ("IPO") of its Units of membership interest, or; (iii) be acquired by or merged into another company such that the Units of the Members are exchanged for the securities of such other company on terms acceptable to the Members whose percentage interest in the Partners Fund (the, "Percentage Interest") at such time collectively exceeds fifty percent (50%) of all Members' Percentage Interests at such time (the "Majority-in-Interest of the Members"), unless the duration of Partners Fund II is extended by a vote of the Majority-in-Interest of the Members.

## 5. CAPITAL CONTRIBUTIONS.

5.1     The Members agree for themselves and their successors, assigns and heirs, that their participation in Partners Fund II is considered a long-term investment, and that any return of capital invested in Partners Fund II prior to the termination and winding up of Partners Fund II is made in the sole discretion of the Manager. The Members agree to share in all post-formation profits and surpluses of Partners Fund II as provided herein according to their respective Percentage Interest. Each of the Members, upon being admitted to Partners Fund II, shall have made a capital contribution (each, a "Capital Contribution" and collectively, the "Capital Contributions") in the cash amounts designated on their respective signature pages hereto.

5.2     No Member shall be entitled to interest on or with respect to any Capital Contribution.

5.3     Except as provided in this Agreement, no Member shall be entitled to withdraw any part of such Member's Capital Contribution or to receive distributions from Partners Fund II except as provided in this Agreement.

## 6. ADDITIONAL CAPITAL CONTRIBUTIONS.

The Members may, but are not required to, make any additional Capital Contributions as deemed in the sole discretion of the Manager as necessary for the operation of Partners Fund II (collectively, the "Additional Capital Contributions"), provided however, that in any event where any Member does not contribute their proportionate share of any such Additional Capital Contribution so requested by the Manager, then all other Members shall have pro-rata rights of first refusal to make such Additional Capital Contributions not made by such Member, and such other Members shall therefore receive an increase in their proportionate share of ownership interest in the entire Partners Fund II entity as represented in additional Units, or portions thereof, in direct proportion to the Additional Capital Contribution so made as compared to all Capital Contributions. In any event where there is any shortfall in Additional Capital Contributions made by the Members, the Manager shall have the sole discretion to authorize additional offers of additional Units to new prospective investors.

## 7. LIMITATIONS ON CAPITAL CONTRIBUTIONS.

No Member shall be entitled to interest on or with respect to any Capital Contribution, and, except as provided herein, no Member shall be entitled to withdraw any part of their respective Capital Contribution or to receive distributions from Partners Fund II, except as provided herein. No Member shall be entitled to demand or receive any asset or property of Partners Fund II, except as provided herein or required by law.

## 8. CAPITAL ACCOUNTS

An individual capital account shall be maintained for each Member (each, a "Capital Account"). Maintenance of Capital Accounts shall be in accordance with standard tax accounting principles, and any questions arising with respect thereto shall be interpreted in accordance with the Internal Revenue Service's Regulations, Section 1.704-1(b), as amended from time to time. Except as otherwise provided herein, no additional share of profits or losses (or voting rights) shall inure to any Member as a result of any changes or fluctuations in their Capital Account.

8.1 Calculation of Capital Account. The Capital Account of each Member shall consist of such Member's Capital Contribution as set forth in Section 5, adjusted as follows:

A. Each Member's respective Capital Account shall be increased by any Additional Capital Contribution made by such Member, and any allocation to such Member of Partners Fund II's income and gains (or

Exhibit A
p. 46

items thereof), including income and gains exempt from tax, and income and gains described in Treasury Regulations, but excluding income and gains described in Treasury Regulations;

B. Each Member's Capital Account shall be decreased by any amount of cash distributions made by Partners Fund II to such Member, and any allocation to such Member of Partners Fund II's losses and deductions (or items thereof), including losses and deductions described in Treasury Regulations, and;

C. Any special adjustments of such Member's Capital Account, including, but not limited to, those relating to transfers of Partners Fund II's Membership Units and any pre-liquidation adjustments, shall be made in the sole discretion of the Manager and in accordance with the Internal Revenue Service's Regulations.

8.2 <u>Negative Capital Account</u>. The Members agree that any negative balance in the Members' Capital Accounts shall be treated as loans made by Partners Fund II to any such Members and that any negative balance in such Capital Accounts shall be repaid to Partners Fund II by such any Members upon or prior to: (i) the liquidation and dissolution of Partners Fund II, as provided herein, or; (ii) payment by Partners Fund II to such Member of any cash distributions, as provided herein. (For example, if a Member's Capital Account balance was a negative $5,000, and such Member was entitled to a distribution of $8,000, then the balance of $5,000 would be applied against such Member's negative account balance to return it to a zero balance and such Member would receive a net distribution of $3,000. Nothing in this paragraph shall be construed to be interpreted that any Member must pay a negative balance out-of-pocket at anytime.

9. <u>PARTNERS FUND II COSTS AND EXPENSES.</u>

All costs and expenses of Partners Fund II shall be paid from Partners Fund II's funds, including, but not limited to:

A. Costs of due diligence, acquisitions, operations, maintenance, and dispositions of any real estate and real estate related investments or any other property of the Fund;

B. The Manager's fees for services ("Fees-for-Services") and distribution-sharing income ("Distribution-Sharing Income"); any expense reimbursement payments to the Sponsors or Manager; the Sponsors' formation fee ("Formation Fee"), and; any other third party fees approved by the Manager in its sole discretion;

C. Legal and accounting fees and expenses including, but not limited to, those in connection with the formation, organization or offering of the Units of Partners Fund II;

D. Taxes (except income taxes payable by the Members), insurance, interest, travel expenses, telephone, internet and any other electronic communications expenses, any repair and maintenance expenses, any administrative expenses, and;

E. Any other cost and expense incurred in the operation of Partners Fund II's business.

10. <u>ALLOCATION AND DISTRIBUTIONS OF PROFITS AND LOSSES.</u>

10.1 <u>Determination of Profits and Losses.</u> The Members agree to treat Partners Fund II as a partnership, and the Members, as partners for Federal income tax purposes, shall file all tax returns accordingly. Partners Fund II's net profits and net losses shall be determined by the accountant, selected in the sole discretion of the Manager, preparing Partners Fund II's tax returns, as soon as practicable following the close of each fiscal year of Partners Fund II, which shall be the calendar year.

10.2 <u>Allocation of Profits and Losses.</u> Partners Fund II's profits and losses shall be determined as prescribed by applicable Treasury Regulations, credited and charged to each Member pro-rata in proportion to their Percentage Interest. The membership interest of each Member is the percentage representing the ratio of each such Member's Units over the total number of Units then outstanding (as represented in Exhibit A hereto, and as may be amended from time to time, as provided herein.)

10.3 <u>Negative Capital Account Balances.</u> Unless the Manager consents otherwise, Members with negative

46

Exhibit A
p. 47

Capital Account balances shall first have deducted from their respective share of any distributions any amounts outstanding pursuant to such Capital Account balances (with accrued interest and penalties being paid prior to reduction of the principal owed on any such loans).

10.4    <u>Priority of Distributions After Payment of Obligations and Expenses.</u>  Distributions of cash to Members shall be made only in the sole discretion of the Manager and the Manager shall have the absolute discretion to refrain from making any such distributions whenever the Manager deems that such funds are required for the current or future needs of Partners Fund II.  Members shall not have any right to demand any distribution of funds from Partners Fund II.  All distributions, other than tax distributions, as described below, shall be made by Partners Fund II as follows:

A.   Distributions shall be made net of all Partners Fund II's obligations, expenses and reserves;

B.   Distributions shall be made on a pro rata basis in accordance with each Member's Units owned;

C.   Distributions shall be derived from sources including, but not limited to;

    i.   Operational cash flow from rental income and loan repayments collected from real estate or real estate related investments owned by the Fund, and;

    ii.   Transactional proceeds from financings, refinancings, sales or liquidations of real estate or real estate related investments owned by the Fund;

D.   The Manager, in its sole discretion, will determine the designation of distributions, subject to applicable laws and rules;

E.   Distributions shall be made in the following priority:

    i.   From Operational Cash Flow:

        a)   First, 100% of cash flow distributions derived from operations of the Fund's real estate and real estate related investments each calendar year, net of obligations, expenses and reserves, will be distributed to the Members until each Member has received each year 7% of their then current Capital Contribution balance as a preferential return (the Members' "Preferential Return" or "Preference"), and;

        b)   Thereafter, 70% of all remaining operational cash flow from operations each calendar year will be distributed to the Members, and 30% of such operational cash flow will be distributed to the Manager;

    ii.   From Transactional Proceeds:

        a)   First, 100% of transactional proceed distributions derived from any financings, refinancings, sales or liquidations of the Fund's real estate and real estate related investments will be distributed to the Members until each Member has received from all sources a full return of their original Capital Contribution (Each distribution made will reduce by its same amount the remaining balance of each Member's original Capital Contribution to be returned, and, accordingly, the amount upon which the 7% Preference will be calculated each year.  In addition, the Preference will cease once all Members have received a full return of their original Capital Contribution), and;

        b)   Thereafter, 70% of all distributions from any source and of any designation will be distributed to the Members, and 30% of such distributions will be distributed to the Manager.

10.5    <u>Tax Distributions.</u>  The Manager may, in its sole discretion, distribute to the Members, within 90 days after the end of each fiscal year, amounts calculated to approximate their respective tax liabilities for such fiscal year with respect to income allocated to the Members, less all amounts distributed to the Members in such

Exhibit A
p. 48

fiscal year (other than distributions with respect to tax liabilities for the fiscal year preceding such fiscal year). Any such tax distributions shall be made pro-rata in accordance with each Member's Percentage Interest on an estimated basis during the year, subject to adjustments at the end of such fiscal year, and shall be deemed advances, and therefore shall reduce the amounts otherwise distributable to the Members.

10.6   Withholding. Partners Fund II shall comply with withholding requirements under Federal, state and local law and shall remit amounts withheld to and file required forms with the applicable jurisdictions. To the extent Partners Fund II is required to withhold and pay over any amounts to any authority with respect to distributions or allocations to any Member, the amount withheld shall be deemed to be, at the option of the Tax Matters Partner, either a distribution to or a demand loan by Partners Fund II to such Member in the amount of the withholding. In the event of any claimed over-withholding, Members shall be limited to an action against the applicable jurisdiction. If the amount was deemed to be a demand loan, Partners Fund II may, at its option: (a) at any time require the Member to repay such loan in cash, or; (b) at any time reduce any subsequent distributions by the amount of such loan. Each Member agrees to furnish Partners Fund II with any representations and forms as shall reasonably be requested by Partners Fund II and/or the Manager to assist it in determining the extent of, and in fulfilling its withholding obligations.

10.7   Tax Matters Partner. For purposes of Code Section 6231(a)(7), the "Tax Matters Partner" shall be the Manager. If Landwin Management, LLC, ceases to be the Manager, then the Tax Matters Partner shall be an Officer appointed by a Majority-in-Interest of the Members. The Tax Matters Partner is specifically directed and authorized to take whatever steps may be necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the Regulations.

10.8   Reserves. Partners Fund II may, in the sole discretion of the Manager, establish reserves in such amounts and for such time periods as the Manager determines reasonably necessary for estimated accrued Partners Fund II expenses and any contingent or unforeseen Partners Fund II liabilities. When such reserves are no longer necessary, the balance may be distributed to the Members as provided herein.

10.9   Transfer of Membership Units. In the event there has been a transfer of a Membership Unit, or Membership Units, during a particular fiscal year of Partners Fund II, the net profits or net losses or distributions for such year shall be allocated between the transferor and the transferee as described in this Section 10. If any Membership Unit, or any interest in any such Unit, is disposed of pursuant to this Section 10, any Member disposing of such Unit shall nevertheless be entitled to a fraction of the profits and be charged with a fraction of the losses in respect to such interest for the fiscal year of Partners Fund II in which such disposition occurs. The numerator of such fraction shall be the number of days of such year that such Member was a Member with respect to such Unit, and the denominator of such fraction shall be the number of days of each year. Any predecessor or successor of such Member with respect to such Unit (or interest therein) shall share in such profits and be charged with such losses on the same basis.

10.10   Special Tax Allocations. Notwithstanding the foregoing, any capital gain recognized by Partners Fund II as a result of any sale of real property shall be specially allocated for tax purposes to those Members of Partners Fund II receiving a distribution of the proceeds from such sale of such real property generating such capital gains, but only to the extent of the amount of the cash distribution to such Member. In this regard, distributions of cash received upon the sale of such real property may be made to those Members who do not wish to participate in a Code Section 1031 like-kind exchange, in either complete or partial liquidation of such Members' Membership Units in Partners Fund II.

10.11   Special Allocations. Except as otherwise provided in this Agreement, the following special allocations will be made in the following order and priority:

10.11.1   Partnership Minimum Gain Chargeback. Notwithstanding any other provision of this Section 10, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Member will be specially allocated items of income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Partnership Minimum Gain during such year determined in accordance with Treasury Regulations Section 1.704 2(g)(2). The items to be allocated will be determined in accordance

48

Exhibit A
p. 49

with Treasury Regulations Section 1.704 2(g). This Section 10.11.1 is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations, will be interpreted consistently with the Treasury Regulations and will be subject to all exceptions provided therein.

10.11.2  Partner Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Section 10 (other than Section 10.11.1 which shall be applied first), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Member with a share of such Partner Nonrecourse Debt Minimum Gain (determined under Treasury Regulations Section 1.704-2(i)(5)) as of the beginning of the year will be specially allocated items of income and gain for that period (and, if necessary, subsequent periods) in an amount equal to such Member's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during such year determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be so allocated will be determined in accordance with Treasury Regulations Section 1.704-2(g). This Section 10.11.2 is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, will be interpreted consistently with the Treasury Regulations and will be subject to all exceptions provided therein.

10.11.3  Nonrecourse Deductions. Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated among the Partners in proportion to their respective Percentage Interests in the Partnership.

10.11.4  Partner Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

10.11.5  Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Partners Fund II asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Treasury Regulations Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

10.11.6  Interest in Partners Fund II. Notwithstanding any other provision of this Agreement, no allocation of Profit or Loss or item of Profit or Loss will be made to a Member if the allocation would not have "economic effect" under Treasury Regulations Section 1.704-1(b)(2)(ii) or otherwise would not be in accordance with the partner's interest in the partnership within the meaning of Treasury Regulations Section 1.704-1(b)(3) or 1.704-1(b)(4)(iv). The Manager will have the sole authority to reallocate any item in accordance with this Section 10.11.6. Notwithstanding the authority granted to make such allocations as may be appropriate to accomplish the purposes of this Section 10.11.6, no allocation under this Section 10.11.6 will affect or otherwise alter the amount of any distribution to which a Member would otherwise be entitled pursuant to any provision of this Agreement.

10.11.7  Return Allocation. After giving effect to all preceding special allocations in this Section 10.11, all or a portion of the remaining items of income or gain for the fiscal year, if any, will be specially allocated to the Members in proportion to the cumulative distributions each Member has received with respect to any preferential return from the formation of Partners Fund II to a date 75 days after the end of such fiscal year until the aggregate amounts of income or gain allocated to each such Member pursuant to this Section 10.11.7 for the fiscal year in question and all prior years is equal to the cumulative amount of such distributions received by such Member.

10.12  Curative Allocations. The allocations set forth in Section 10.11 (except for those in Section 10.11.7) (the

Exhibit A
p. 50